*Exhibit 2*



## BASELINE DOCUMENTATION



# Weehaw
## PLANTATION

Georgetown County ◆ South Carolina

*Exhibit 2*



P.O. Box 467 ● 100 Hickory Hill Road
Chadds Ford ● PA ● 19317
Tel: 610.388.3670 ● Fax: 610.388.3673

w w w . n a l t . o r g

## NORTH AMERICAN LAND TRUST
### Conservation Easement
### Baseline Documentation

# *Weehaw Plantation*

### Georgetown County,
### South Carolina

## ~ T A B L E   O F   C O N T E N T S ~

**A. Owner Acknowledgement**

**B. Baseline Documentation Overview**
  I.     Introduction
  II.    Contact Information
  III.   Conservation Purposes
  IV.    Conservation Management
  V.     Monitoring Policy
  VI.    Mission Statement

**C. North American Land Trust IRS Information**

**D. North American Land Trust Board Resolution & Minutes**

**E. Recorded Copy of Conservation Easement**

**F. Habitat Description: Nick Roark, Ecological Associates**

**G. Site Visit Report: Chris Wilson, NALT**

**H. Photographic Documentation: Chris Wilson, NALT**

**I. Supportive Mapping**
  1.   Proximity Map
  2.   Base Map
  3.   Aerial Photo



A. Owner Acknowledgment

*Exhibit 2*



**North American Land Trust**

P.O. Box 467 • 100 Hickory Hill Road
Chadds Ford • PA • 19317
Tel: 610.388.3670 • Fax: 610.388.3673

www.nalt.org

## Baseline Documentation
## Acknowledgment

*Property:*     Weehaw Plantation

*Location:*     Georgetown County,
South Carolina

By signing below, the Owner and Trust certify that they have received and fully reviewed the attached Baseline Documentation in its entirety and that it is an accurate representation of the physical condition of the conservation area to the best of their knowledge.

- Kyle Young, owner of the above named property, agrees that the description prepared herein is an accurate representation of the physical condition of the conservation area to the best of their knowledge.

*Signature:*

*Title:*      Owner

*Date:*      9-2-03

- By signing below, on behalf of North American Land Trust, Steven W. Carter certifies that the Trust has received and fully reviewed the attached Baseline Documentation in its entirety, and that it is an accurate representation of the physical condition of the conservation area to the best of their knowledge.

*Signature:*
Steven W. Carter
Stewardship Coordinator

*Date:*      7/22/03

*Exhibit 2*



B. Baseline Documentation Overview

*Exhibit 2*

NORTH AMERICAN LAND TRUST
**Conservation Easement**
**Baseline Documentation**

# *Weehaw Plantation*

**Georgetown County,**
**South Carolina**

## ~Baseline Documentation Overview~

**I.     Contact Information**

Mr. Kyle Young
P.O. Box 2038
Myrtle Beach. SC
29578-2038

**II.     Introduction**

The following baseline documentation describes the conservation values and physical condition of **Weehaw Plantation** located in Georgetown County, South Carolina.  A conservation easement was donated on the property by Larry and Judy Young to North American Land Trust on December 29, 1995.  The conservation easement area is comprised of approximately 788 acres.

This expansive conservation easement is one of NALT's most significant protection efforts in coastal South Carolina.  Located at the confluence of the Great Pee Dee River and the scenic Black River, Weehaw Plantation contains nearly 800 acres of pristine wetlands and pine dominated uplands that provide valuable habitat for a variety of South Carolina indigenous flora and fauna.

A more detailed description of the conservation values at Weehaw Plantation can be found within this baseline documentation in the Habitat Description Report drafted by Nick Roark of *Ecological Associates,* and the Site Visit Report  by Chris Wilson, NALT's Conservation Biologist.

*Exhibit 2*

### III.    Conservation Purposes

The IRS Tax Code Section 170 (h) has established specific "Conservation Purposes" that, if perpetually protected through the donation conservation easement, could render the donor eligible for tax relief.  In particular, this easement addresses two conservation purposes:

**1.)    *The protection of a relatively natural habitat of fish, wildlife, or plants or similar ecosystem;***

- The conservation easement precludes the development of open space and ecologically significant land which could have otherwise been accomplished.

- The property is located on the banks of the Black River and Pee Dee River. The easement will further benefit and enhance this watershed by protecting riparian and forested/vegetated areas from disturbance, providing vital protection of stream ecosystems from non-point source pollution, sedimentation, stream bank erosion, and excessive temperatures.  Vegetated and undisturbed stream corridors provide vital food and habitat sources for aquatic organisms and insects, which form the basis of a healthy stream ecosystem supporting numerous species of fish, reptiles, amphibians, birds, and mammals.

**2.)    *The preservation of open space (including farmland and forest land) where such preservation is-***

**(a)    *For scenic enjoyment of the general public, or***

- A significant portion of the conservation area is visible to the general public who can enjoy the rich scenic character of its natural resources from the Black River, Pee Dee River, Highway 701 and Wedgefield Road.

**(b)    *Pursuant to clearly delineated Federal, State, or local governmental conservation policy, and will yield significant public benefit;***

- **South Carolina Scenic Rivers Act**
  On Tuesday, June 5, 2001, a 75-mile segment of the Black River was designated as a State Scenic River.  The Black River is the seventh and the longest river to receive this designation in South Carolina.

*Exhibit 2*

- **<u>Nationwide Rivers Inventory</u>**
  In order to be listed on the NRI, a river must be free flowing and possess one or more Outstandingly Remarkable Values (ORVs).  The Black River possesses 6 ORVs:
  1. Scenic
  2. Recreation
  3. Geology
  4. Fish
  5. Wildlife
  6. History

- **<u>South Carolina Conservation Bank Bill: S-297; H-3462</u>**
  "This bill establishes a statewide program to preserve natural areas and historic sites. A public-private partnership is created to purchase land and conservation easements from willing sellers. Funding for competitive grants would come from $.25 of the deed recording fee that would be redirected from the General Fund to the Conservation Bank."

- **<u>South Carolina Farm and Forests Protection Act; Agriculture, Forestry, Natural Resources: S-156; H-3111</u>**
  "Whereas, it is the policy of the State that agricultural and forest lands are valued natural and ecological resources which provide needed open space for wildlife habitat, clean air, clean water, groundwater recharge, and protection of cultural resources…"

- **<u>South Carolina Code, Title 27, Chapter 8: Conservation Easement Act</u>**
  "A recent South Carolina law, the Conservation Easement Act of 1991, provides a sound legal basis for the donation of conservation easements to preserve the natural, historic, architectural, or archaeological aspects of properties. The law also makes the donation of easements more attractive by requiring the local tax assessor to consider the easement when assessing the value of the property."

- **<u>South Carolina Riparian Buffer Zone Management Act of 2001: S-0417</u>**
  "that riparian buffers adjacent to stream systems and coastal areas provide numerous environmental protection and resource management benefits that, depending on location and existing conditions, may include the following:

*Exhibit 2*

(a) restoring and maintaining the chemical, physical, and biological integrity of the State's water resources;
(b) removing pollutants delivered from urban stormwater;
(c) reducing erosion and sediment entering waters;
(d) stabilizing stream banks;
(e) providing infiltration of stormwater runoff;
(f) maintaining base flow of streams;
(g) contributing the organic matter that is a source of food and energy for the aquatic ecosystem;
(h) providing tree canopy to shade streams and protect aquatic organisms;
(i) providing riparian wildlife habitat; and
(k) furnishing scenic value and recreational opportunity."

- **USDA Farm Service Agency: Conservation Reserve Program (CRP)**
  "The Conservation Reserve Program (CRP), administered by the USDA-Farm Service agency, is the Federal Governments single largest environmental improvement program on privately owned farms. Most of the acreage is devoted to trees. Although CRP originally was designed to prevent soil erosion, it has been expanded throughout the years to address water quality and wildlife concerns. South Carolina is the top state in the Southeast for installing riparian buffers adjacent to waterbodies through CRP for water quality protection."

- **Natural Resource Conservation Service (NRCS): South Carolina Wetlands Reserve Program**
  "South Carolina's WRP focuses on restoring wetlands back to their original condition in addition to improving waterfowl and wildlife habitat over and above existing natural conditions."

- **United States Department of Agriculture Natural Resources Conservation Service: 2000 Forestry Incentives Program**
  "Outlook: As South Carolina's population and industry continue to grow, so will the demand for timber. As forests are harvested, it is critical that the supply be replenished, not only to meet timber demands, but also for continued wildlife habitat. This, combined with other conservation methods, will ensure a healthy environment in South Carolina for years to come."

- **South Carolina Department of Natural Resources: Heritage Trust Program: SC Code Ann., § 51-17**
  "The goal of the Heritage Trust Program is to protect endangered species and prevent habitat loss, mainly through land acquisition and the establishment of heritage preserves."

- **South Carolina Conservation Incentives Act: SC Code § 12-6- 3515**

*Exhibit 2*

"The Act offers tax incentives to taxpayers for the donation of land or conservation easements to conservation organizations."

## IV.    Conservation Management

### *Forest Management*

Cutting of live trees within the Conservation Area (CA) is prohibited. However, some types of forest management activities are permitted and may be deemed necessary on a periodic basis.  Permitted activities may include the removal of dead or damaged trees, harvesting personal firewood, and removing exotic (non-native) species, so long as easement restrictions are not violated.  For instance, altering topography while constructing new roads to access a stand of damaged trees is not permitted.

NALT's desired outcome of protecting forests within the CA is to <u>provide habitat for species of viability concern and natural forest conditions that are not otherwise well represented across the landscape</u>. Although such conditions can vary across the landscape, in most cases the desired condition is best described as "old-growth".  Such naturally maturing forests are characterized as containing well developed soils and an <u>abundance</u> of woody debris, both standing and fallen, in a variety of types, sizes, and decay classes.  Although the removal of dead or damaged trees is permitted, we encourage landowners and forest managers to recognize the extreme ecological importance of woody debris and undisturbed soils.

NALT recognizes the ecological importance of active forest management activities, such as prescribed burns in appropriate forest types, and encourages such activities when, and where, appropriate by certified individuals.  All permitted "stand" level forest management or restoration activities must be pre-approved by NALT and usually require a management plan written by a qualified forester. When forest management is necessary, efforts must be made to avoid damage to soils and aquatic features by heavy machinery and erosion.

Forest conditions will be assessed on each annual monitoring visit by a NALT staff person or representative. If necessary, management suggestions will be outlined in the monitoring report.

### *Aquatic Features Management*

NALT's desired outcome of protecting aquatic features within the CA is to maintain or enhance water quality, natural hydrology, and aquatic habitats for species of viability concern.

*Exhibit 2*

Alteration of natural hydrology, stream channels, wetlands, or other watercourses is prohibited in the Conservation Area.  Introduction of non-native plant or animal species to natural aquatic features is also prohibited.  The introduction of fish, particularly predatory fish (such as bass, sunfish, and trout) to otherwise free-free ponds, is discouraged.

Landowners should recognize that streams benefit from forest cover and shading, and that woody debris in streams and wetlands is an important ecological component. Removal of woody debris from aquatic features should be avoided

Some aquatic features, such as bogs, may require active management, such as shrub removal, to maintain habitats for rare species.

All efforts to control stream bank erosion, or any other manipulation of aquatic features requires consultation with, and pre-approval from, NALT and may also require government permits.

Aquatic feature conditions will be assessed on each annual monitoring visit by a NALT staff person or representative. If necessary, management suggestions will be outlined in the monitoring report.

## V.        Monitoring Policy

Part of the responsibility NALT assumes when it accepts the donation of a conservation easement is the perpetual monitoring of the subject property to ensure that the integrity of the conservation purposes remain intact.  This baseline document will provide the basis for the monitoring program.  By chronicling the property through photographs, professional reports and maps, an accurate depiction of the property is presented at the time of the donation.  This will prove essential to a future NALT representative who can quickly compare data and photographs to determine how the property has changed. Regularly scheduled monitoring visits will also help establish a sound relationship between the landowner and land trust.  This is an important ingredient for effective stewardship.

*The Monitoring Process:*

1.  Notify the landowner prior to the monitoring visit and provide them, or their representative, an opportunity to meet and/or accompany you.

*Exhibit 2*

2. Review the baseline documentation for the property and become familiar with the restrictions and reserved rights clauses in the conservation easement.

3. Survey the property and record any apparent changes since the previous monitoring visit, or discrepancies from the baseline documentation.  Attempt to take photographs in the same position and location as previous photographs.

4. Communicate with the landowner about the visit and ask if they have questions.  Find out if they intend to initiate any Reserved Rights in the immediate future.

5. Draft a report describing the visit and provide to landowner for review.  If the landowner agrees the report is accurate, they will then forward a signed copy for NALT's files.

6. This process will be repeated annually and perpetually.

It is crucial that the landowner communicate with NALT about any future activities within the conservation easement area.  This includes exercising any of the Reserved Rights in Article 3.  This will ensure NALT's files remain updated and will avoid any potential misunderstandings during regularly scheduled monitoring visits.

NALT is confident these steps will result in a harmonious relationship between landowner and land trust while protecting the conservation areas.  Thank you for your cooperation.

## VI.     Mission Statement

The North American Land Trust is committed to the preservation of natural ecosystems and the conservation of agriculturally productive lands. NALT believes that preservation and conservation efforts often require different techniques and management strategies. Our goal is to be a professional organization committed to one single, but extremely important, purpose: long term stewardship of our natural heritage.



C. NALT IRS Information

*Exhibit 2*



P.O. Box 467 ▪ 100 Hickory Hill Road
Chadds Ford ▪ PA ▪ 19317
Tel: 610.388.3670 ▪ Fax: 610.388.3673

w w w . n a l t . o r g

### *Important Tax Information Regarding North American Land Trust*

The following information is attached regarding NALT's current status:

#### Internal Revenue Service – Charitable Status

The IRS notified NALT that it had granted it permanent status on June 25, 1997 as a publicly supported 501 (c) (3) organization as described in section 509 (a)(1) and 170 (b) (1) (A) (vi). The notification is attached to this memorandum. Tax returns (IRS form 990) have been filed annually and are available upon request.

#### Internal Revenue Service – Employer Identification Number

NALT was assigned an Employer Identification Number on September 28, 1992  (Notification # CP 575 E).

The EIN that was assigned is: **23-2698266**

A copy of the notification is attached to this memorandum.

#### Commonwealth of Pennsylvania – Bureau of Charitable Organizations

NALT is registered with the Bureau of Charitable Organizations and has submitted annual reports by the required deadlines.

The registration number is: **0014473**

#### Auditor's Report

NALT has an annual audit that is performed by the following firm:

Maillie, Falconiero & Company
22 North Church Street
P.O. Box 3068
West Chester, PA 19381

*Exhibit 2*

INTERNAL REVENUE SERVICE
DISTRICT DIRECTOR
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

JUN 2 5 1997

Date:

Employer Identification Number:
    23-2698266
DLN:
    17053088920007
Contact Person:
    D. A. DOWNING
Contact Telephone Number:
    (513) 241-5199
Our Letter Dated:
    November 1992
Addendum Applies:
    No

NORTH AMERICAN LAND TRUST
C/O ANDREW JOHNSON
PO BOX 134
CHADDS FORD, PA  19317-0134

Dear Applicant:

This modifies our letter of the above date in which we stated that you
would be treated as an organization that is not a private foundation until the
expiration of your advance ruling period.

Your exempt status under section 501(a) of the Internal Revenue Code as an
organization described in section 501(c)(3) is still in effect. Based on the
information you submitted, we have determined that you are not a private
foundation within the meaning of section 509(a) of the Code because you are an
organization of the type described in section 509(a)(1) and 170(b)(1)(A)(vi).

Grantors and contributors may rely on this determination unless the
Internal Revenue Service publishes notice to the contrary. However, if you
lose your section 509(a)(1) status, a grantor or contributor may not rely on
this determination if he or she was in part responsible for, or was aware of,
the act or failure to act, or the substantial or material change on the part of
the organization that resulted in your loss of such status, or if he or she
acquired knowledge that the Internal Revenue Service had given notice that you
would no longer be classified as a section 509(a)(1) organization.

As of January 1, 1984, you are liable for taxes under the Federal
Insurance Contributions Act (social security taxes) on remuneration of $100
or more you pay to each of your employees during a calendar year. You are
not liable for the tax imposed under the Federal Unemployment Tax Act (FUTA).

You are required to file Form 990 only if your gross receipts each year
are normally more than $25,000. For guidance in determining whether your gross
receipts are "normally" more than $25,000, see the instructions for Form 990.
If a return is required, it must be filed by the 15th day of the fifth month
after the end of your annual accounting period. A penalty of $10 a day is
charged when a return is filed late, unless there is reasonable cause for the
delay. However, the maximum penalty charged cannot exceed $5,000 or 5 percent
of your gross receipts for the year, whichever is less. This penalty may also
be charged if a return is not complete, so please be sure your return is
complete before you file it.

If we have indicated in the heading of this letter that an addendum
applies, the addendum enclosed is an integral part of this letter.

Letter 1050 (DO/CG)

*Exhibit 2*

-2-

NORTH AMERICAN LAND TRUST

Because this letter could help resolve any questions about your private foundation status, please keep it in your permanent records.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

District Director

*Exhibit 2*

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
PHILADELPHIA  PA   19255

DATE OF THIS NOTICE: 09-28-97
NUMBER OF THIS NOTICE:  CP 575 E
EMPLOYER IDENTIFICATION NUMBER:  23-2698266
FORM:  SS-4          TAX PERIOD:  N/A
2820722445  O

FOR ASSISTANCE PLEASE
WRITE TO US AT:

INTERNAL REVENUE SERVICE
PHILADELPHIA  PA   19255

NORTH AMERICAN LAND TRUST
% GAIL CUMMINGS LEVAN
3800 CENTRE SQUARE WEST
PHILADELPHIA  PA   191022186

BE SURE TO ATTACH THE
BOTTOM PART OF NOTICE

OR YOU MAY CALL US AT:

574-9900 LOCAL PHIL.
1-800-829-1040 OTHER PA

## NOTICE OF NEW EMPLOYER IDENTIFICATION NUMBER ASSIGNED

Thank you for your Form SS-4, Application for Employer Identification Number (EIN).  The number assigned to you is shown above.  It will be used to identify your business account, tax returns and documents, even if you don't have employees.

1. Keep a copy of the number in your permanent records.
2. Use your name and the number exactly as shown above on all Federal tax forms.
3. Use the number on all tax payments and tax-related correspondence or documents.

Using a variation of your name or number may result in delays or errors in posting payments to your account.  It also could result in the assignment of more than one Employer Identification Number.

We have established the filing requirements and tax period shown above for your account based upon the information provided.  If you need help to determine your required tax year, get publication 538, Accounting Periods and Methods, which is available at most IRS offices.

Assigning an Employer Identification Number does not grant tax-exempt status to nonprofit organizations.  Any organization, other than a private foundation, having annual gross receipts normally of $5,000 or less is exempt by statute if it meets Internal Revenue Code requirements.  Such organizations are not required to file Form 1023, Application for Recognition of Exemption, or Form 990, Return of Organization Exempt from Income Tax.

However, if your organization wants to establish its exemption and receive a ruling or determination letter recognizing its exempt status, file Form 1023 with the Key District Director.  For details on how to apply for the exemption, see Publication 557, Tax-Exempt Status for Your Organization.

Thank you for your cooperation.

Keep this part for your records.          CP 575 E (Rev. 8-90)

*Exhibit 2*

# *Commonwealth of Pennsylvania*



## *Department of State*
## *Bureau of Charitable Organizations*

### *Certificate of Registration*

*No. 14473*

*This is to certify that **NORTH AMERICAN LAND TRUST** is registered as a charitable organization with the Department of State's Bureau of Charitable Organizations under the Solicitation of Funds for Charitable Purposes Act, 10 P.S. Section 161.2 et seq., and is authorized to solicit charitable contributions under the conditions and limitations set forth under the Act.*

*This certificate is not to be used as identification, nor does it constitute an endorsement.*

*ACTING SECRETARY OF THE COMMONWEALTH*

*MARK SCHWEIKER, GOVERNOR*

*THIS CERTIFICATE EXPIRES: 05/15/2003*

*Exhibit 2*



D. NALT Board Resolution and Minutes

*Exhibit 2*



P.O. Box 467 • 100 Hickory Hill Road
Chadds Ford • PA • 19317
Tel: 610.388.3670 • Fax: 610.388.3673

w w w . n a l t . o r g

## North American Land Trust
## Board Resolution & Minutes
December 19, 1996

**Excerpt from Minutes of Meeting:**

A meeting of the Board of Directors of North American Land Trust was commenced by telephone conference call at 10:30 A.M. on December 19, 1996.

- The Board **approved** the acceptance of a conservation easement on the *Weehaw Plantation* consisting of approximately 788 acres.

The above is a true and correct excerpt of the minutes of the Board Meeting on December 19, 1996.

Andrew L. Johnson
President

*Exhibit 2*



E. Recorded Conservation Easement

*Exhibit 2*

4-1995
WEEHAW PLANTATION
DATE STAMPED COPY OF C.E. DOCUMENT
RECORDING DATE: 12-29-1995

## DECLARATION OF RESTRICTIVE COVENANTS

THIS CONSERVATION EASEMENT AND DECLARATION OF RESTRICTIVE
COVENANTS (hereinafter called the "Declaration") made December 29 , 1995 ,
BETWEEN LARRY YOUNG and JUDY YOUNG, husband and wife ("Grantor"), whose
address is DeBordieu Colony, Georgetown, SC 29440 , and **NORTH AMERICAN LAND
TRUST**, a Pennsylvania non-profit corporation having an address of P.O. Box 134, Chadds
Ford, PA 19317 ("Grantee"),

### WITNESSETH THAT:

**WHEREAS,** the Grantor is the owner in fee simple of certain real property
(hereinafter referred to as the "Property") locally known as "Weehaw Plantation" and more
particularly described by metes and bounds in Exhibit A attached hereto and depicted on the
plan attached hereto as Exhibit B; and

**WHEREAS**, Grantee is a non-profit corporation having tax-exempt status under
Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (hereinafter called the
"Code"), has been established as a public charity for the purpose of preserving and
conserving natural habitats, environmentally sensitive areas and open space and for other
charitable, scientific and educational purposes, and meets the requirements of a "qualified
organization" under Section 170(h)(3) of the Code; and

**WHEREAS**, the ecological significance of the Property has been established in the
reports, plans, accompanying photographs, documentation and exhibits, including the plans
prepared by Design Works dated December 27 , 1995 (collectively called the
"Baseline Documentation") which concludes that, among other things:

(a)     The Property has been recognized as containing important rice fields;
and

(b)     The Property provides an important, ecologically stable habitat for
flora and fauna, including particularly waterfowl, that are native to the "lowcountry" of South
Carolina; and

(c)     The Property also contains the remnants of an 18th century formal
garden including ancient camellias and specimen live oak trees; and

(d)     The Property consists of a unique, environmentally sensitive land area
because it is a portion of the estuaries of the Black River and Pee Dee River; and

(e)     The Property consists of valuable scenic vistas that can be seen from

515478.4 12.26.95

4-1995

*Exhibit 2*

the Intra Coastal Waterway, the Black River and the Pee Dee River and Highways 701 and S-22-325; and

WHEREAS, the Baseline Documentation establishes the Property to be a relatively natural habitat of fish, wildlife, plants, and similar ecosystems; and

WHEREAS, the Baseline Documentation further establishes that the Property is open space which, pursuant to clearly delineated Federal and state, governmental conservation policies, merits conservation in the manner intended by Grantor and Grantee and expressed in this document and such conservation and will yield a significant public benefit; and

WHEREAS, the Baseline Documentation also establishes that conservation of the Property in the manner intended Grantor and Grantee and expressed in this document will provide scenic enjoyment for the general public and such conservation will yield a significant public benefit; and

WHEREAS, Grantor and Grantee desire to perpetually conserve the natural, scientific, educational, open space, and scenic resources of the Property; and

WHEREAS, Grantor and Grantee intend to create with this document a "conservation easement" as defined in the Conservation Easement Act of 1991, as amended through the date hereof (the "Act"), Sections 27-8-10 *et seq.* of the South Carolina Code of Laws.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and with the intention of making an absolute and unconditional gift, by these presents Grantor freely grants and conveys unto the Grantee, its successors and assigns forever, a perpetual easement in gross over the Property according to the terms set forth in this Declaration, and agrees to subject the Property perpetually to covenants and restrictions as herein set forth.

## ARTICLE A.    GRANT OF ACCESS EASEMENT

Grantor hereby grants and conveys unto Grantee, it successors and assigns, the easement and right of Grantee to enter upon and inspect the Property at any time and from time to time, provided that Grantor is first given notice of any such visit at least seven (7) days in advance.

## ARTICLE B.    GRANTOR'S DECLARATION OF COVENANTS AND RESTRICTIONS

The Grantor, for itself, its successors and assigns, covenants and declares that the Property shall be, and hereby is, bound by and made subject to the following covenants and restrictions in perpetuity, subject to the Reserved Rights (hereinafter defined).

1.    The Property shall not be used for any industrial or commercial purpose

or purposes, including but not limited to: (1) manufacture or assembly of any products, goods, equipment, chemicals, materials or substances of any kind or nature whatsoever; (2) sale of any products, goods or services of any kind or nature whatsoever, except for the sale of agricultural products (including animals and animal products) grown or raised on the Property; (3) storage of any products or goods of any kind or nature, except for the storage of agricultural products (including animals and animal products) grown or raised on the Property; and (4) offices for persons involved in the sale, manufacture or assembly of goods or services or for the performance of services, other than for the sale of agricultural products (including animals and animal products) grown on the Property. There shall not be constructed, cut, created or placed on the Property any road, driveway, cartway, path or other means or right of passage across or upon the Property if the same is to be used, nor may any road, driveway, cartway, path or other means or right of passage located on the Property be used, in conjunction with any uses which are prohibited by the terms of this Declaration. Nothing herein is intended, nor shall be construed, to prohibit the cultivation, breeding or raising of agricultural products or livestock or standard equestrian uses.

2.    No structures of any kind shall be built, erected, installed, placed, affixed or assembled within or upon the Property or upon any trees or other natural features upon the Property, except to the extent necessary for:

(a)    Drainage and erosion control measures.

(b)    Conservation, nature education or security measures.

"Structure" shall mean any assembly of material forming a construction for occupancy or use for any purpose and erected upon or attached to the ground including, for example but not for limitation of the foregoing definition, the following: buildings, fences, platforms, sheds, bins, shelters, ponds, dikes, dams, groins, docks, bridges, piers, towers, antennae, tanks, and bulkheads.

3.    No cutting of timber or removal or destruction of trees shall be permitted within the Property except when conducted for the following purposes:

(a)    To clear and restore vegetative cover that has been damaged or disturbed by forces of nature or otherwise; and

(b)    To prune and selectively thin trees, but only if done in accordance with good forest management practices according to a plan approved by Grantee in advance.

(c)    To plant and harvest perennial grasses and plantation pine (if done in accordance with good forest management practices according to a plan approved by Grantee in advance).

4.    Without limitation of any other restrictions or covenants herein, no signs, billboards or outdoor advertising structures shall be placed, erected or maintained within the Property except a reasonable number of regulatory or directional signs including, for example but not for limitation of the foregoing definition, "no trespassing" signs, "no gunning" signs and "no hunting" signs, and one sign not exceeding four (4) square feet in area on each if two sides for any of the following purposes:

(a)    To state the name of the Property and/or the names and addresses of the occupants;

(b)    To advertise an activity permitted under the provisions of this Declaration;

(c)    To educate the public as to the ecology of the area; and

(d)    To identify the interest of Grantee in the Conservation Easement Area.

5.    There shall be no filling, excavating, dredging, surface mining, or drilling, nor removal of topsoil, sand, gravel, rock, peat, minerals, or other materials, nor any dumping of ashes, trash, garbage, or any other unsightly or offensive materials. There shall be no material change in the topography of the land in any manner. The foregoing shall not be construed to prohibit plowing or tilling of soil or agricultural Structures (to the extent included in the Reserved Rights) on the Property for agricultural purposes, so long as the requirements for such agricultural practices set forth in this Declaration are followed.

6.    There shall be no introduction of exotic plant or animal species except those traditionally and prevalently used as of, or prior to, the date hereof for wildlife food planting or for agricultural planting traditional to the area.

7.    There shall be no dredging, construction of ponds, groins, or dikes, nor any manipulation of natural water courses within any salt or brackish marsh. The foregoing shall not be construed to prohibit ponds as agricultural Structures on the Property provided that Grantor complies with the provisions pertaining to agricultural Structures in the Reserved Rights.

8.    All agricultural activity on the Property shall be conducted in accordance with the following requirements:

(a)    Good conservation practices shall be followed, in compliance with the then prevailing practices established by the United States Department of Agriculture Soil Conservation Service (the "Recommended Agricultural Practices").

(b)    Grantor shall not apply chemicals, insecticides or biocides and shall situate no manure or compost piles within 100 feet of any streams, creeks, rivers, ponds

*Exhibit 2*

or other bodies of water.

       (c)    Livestock and agricultural activities shall be confined to fields and pastures maintained for such purposes under Recommended Agricultural Practices and, without limitation of the foregoing requirement, livestock shall not be permitted to roam freely in woodlands, ponds, other water impoundments or wetlands.

       (d)    Contour farming shall be practiced on all areas of the Property which are plowed or tilled. Plowing and tillage shall not be conducted on slopes exceeding 15% in grade or within 100 feet of streams or wetlands.

      9.    The parties recognize that this Declaration cannot address every circumstance that may arise in the future, and the parties agree that the purpose of this Declaration is to preserve the Property predominantly in its present condition, and to protect or enhance the Property's environmental systems. Any use or activity not reserved in Article C, below, which is inconsistent with the purpose to this Declaration or which materially threatens the purpose of this Declaration is prohibited.

## ARTICLE C.       RESERVED RIGHTS

      Notwithstanding any provision to the contrary contained in this Declaration, the Grantor reserves for itself, its successors and assigns, the rights set forth in this Article (the "Reserved Rights"):

      1.    The right to erect, maintain, repair, and replace six single family dwellings (individually a "Dwelling" and collectively the "Dwellings"), along with private driveways serving the Dwellings. The Dwellings may each be used solely as a single family dwelling. Grantee shall also have the right to erect, maintain, repair, and replace structures accessory to and smaller than the Dwellings and that are typically considered accessory to a principal single family dwelling; provided that only one accessory structure for each of the Dwellings shall be constructed or used for human habitation (in addition to the Dwelling) and such accessory structure shall not exceed 50% of the square footage of the Dwelling to which it is associated. Such accessory structures may include, for example and not for limitation of the definition, a boat house, gazebo, or garage. The Grantee may also keep, maintain, repair, and replace the "Lodge" (as depicted in Exhibit B) as a building for occupancy and use as a single family dwelling (with all the attendant rights of a Dwelling hereunder) or as a common building for guest residence or community gatherings by the owners of the Dwellings and their guests. The Dwellings and all structures accessory to the Dwellings must each be located within one of the areas depicted as a "Restricted Building Envelope" on Exhibit B to this Declaration and the Lodge must be located within the Lodge Site as depicted on Exhibit B to this Declaration.

      2.    The right to erect, maintain, repair and replace a common recreational area not exceeding three acres in area (the "Recreation Area") within the Restricted Building

*Exhibit 2*

Envelope.

  3. The right to erect, maintain, repair, and replace buildings necessary to the performance of the agricultural and livestock uses allowed on the Property up to an aggregate of 5,000 square feet of floor area for all agricultural buildings on the entire Property.

  4. The right to erect, maintain, repair, and replace Structures (as defined above), other than buildings, necessary for the performance of the agricultural and livestock uses allowed on the Property, including but not limited to irrigation and structures necessary for the maintenance of the controlled and uncontrolled rice fields on the Property.

  5. The right to provide, to the extent typical of a country property, (1) utilities to the Dwellings, Recreation Area, Lodge, and other allowed Structures, and (2) roads and paths for ingress and egress to the Dwellings, the Lodge, the Recreation Area and other Structures and uses not prohibited hereunder. The right to provide normal, sanitary sewer and/or septic tank facilities, water or wells serving the Dwellings and the Lodge as would be typical of a country property. The right to provide, in any lawful manner and subject to all governmental regulations, any erosion control devices so as to protect the Property and its perimeters.

  6. Grantor may thin and remove invasive plants not native to the Property using good vegetation management practices in accordance with a plan approved in advance by Grantee.

  7. Without limiting the restrictions and covenants set forth above, Grantee agrees that the exercise of all Reserved Rights shall be in full accordance with all applicable local, state, and federal laws and regulations and the conservation purposes of this Declaration.

  8. Grantor shall notify Grantee in writing before exercising any Reserved Rights or taking any action which may affect any of the conservation purposes of this Declaration and shall, upon request of Grantee, provide Grantee with plans depicting in such detail as Grantee reasonably requests the construction or other activity, and location thereof, which Grantor intends to undertake.

## ARTICLE D. GRANTEE'S COVENANTS

  1. Grantee shall use its best efforts to enforce both the rights granted to it and the restrictions imposed upon the Property under this Declaration.

  2. If at any time Grantee or any successor or assignee is unable to enforce this Declaration in full or fails to do so, or if Grantee or any successor or assignee ceases to exist or ceases to be a "qualified organization" (as defined in the Code) a "holder" (as

*Exhibit 2*

defined in the Act) and if, within a reasonable period of time after the occurrence of any of these events, Grantee or any successor or assignee fails to assign all of its rights and responsibilities under this Declaration to a "qualified organization" and "holder", then the rights and responsibilities under this Declaration shall become vested in and fall upon another qualified organization in accordance with a cy pres proceeding in any court of competent jurisdiction.

3.    Notwithstanding the foregoing or anything else in this Declaration to the contrary, Grantee, its successors and assigns shall have the right to assign, either wholly or partially, its right, title and interest hereunder provided that the assignee is a "qualified organization" under the Code and a "Holder" under the Act and provided that the assignee shall hold the Conservation Easement exclusively for purposes herein set forth.  The term "Grantee" as used in this Declaration shall mean the above-named Grantee and any of its successors and assigns.

## ARTICLE    E.    REMEDIES AND ENFORCEMENT

1.    Grantee shall have the right to enforce by proceedings at law or in equity each and every one of the covenants and restrictions set forth in this Declaration.  The foregoing shall not limit any of the rights or remedies available to the Grantee at law or in equity.

2.    Without limitation of any other rights of the Grantee herein, Grantee's right of enforcement of this Declaration shall include the right to seek specific performance by Grantor of the restoration of the Property to its original condition as established in the Baseline Documentation and as otherwise may be required in this Agreement.

3.    If Grantor fails to pay taxes or other governmental assessments which may become a lien upon the Property Grantee may, but shall have no obligation to, pay such taxes or assessments or any part thereof upon ten (10) days prior written notice to Grantor, according to any bill, statement or estimate procured from the appropriate public office. Payment made by Grantee shall become a lien on the Property in favor of Grantee after thirty (30) days' notice and demand for payment sent by Grantee to Grantor and shall bear interest until paid by Grantor at the rate of eighteen percent (18%) per annum.

4.    This Declaration may only be enforced by the parties hereto, and their respective successors and assigns, and no third party beneficiary rights, including but not limited to third party rights of enforcement, are created hereby.

5.    In the event that Grantee acts, after 30 days' notice to the Grantor, to enforce this Declaration or any obligation hereunder, all reasonable expenses incurred by Grantee shall be charged to and paid by the Grantor, including reasonable attorney's fees regardless of whether an action or proceeding is commenced.  All such expenses, together with costs of collection (including reasonable attorneys fees) if the Grantor is determined by a

*Exhibit 2*

court to have violated this Declaration), shall be recoverable by the Grantee and be liens upon the Property, and collection thereof may be enforced by foreclosure and sale of the Property, notwithstanding anything to the contrary, this Declaration shall not merge with any interest in the Property upon such sale and title shall be transferred subject hereto in accordance with the laws of the state in which the Property is located.

## ARTICLE   F.   GENERAL PROVISIONS

1.    This Declaration gives rise to a property right and interest immediately vested in the Grantee.  For purposes of this Declaration, the fair market value of Grantee's right and interest shall be equal to the difference, as of the date hereof, between the fair market value of the Property when subject to this Declaration and the fair market value of the Property if unencumbered by this Declaration.

2.    The parties recognize the environmental, scenic and natural values of the Property and have the common purpose of preserving these values.  Any general rule of construction to the contrary notwithstanding, this Declaration shall be liberally construed in favor of the grant to effect the purpose of this Declaration and the policy and purposes of the Grantee.  If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purpose of this Declaration that would render the provision valid should be favored over any interpretation that would render it invalid.  The parties intend that this Declaration, which is by nature and character primarily prohibitive ( in that the Grantor has restricted and limited the rights inherent in ownership of the Property, shall be construed at all times and by all parties to effectuate its purposes.

3.    Grantor covenants and agrees to indemnify, defend and hold harmless the Grantee from and against any loss, cost (including reasonable attorneys fees), liability, claim, penalty, fine, and damage, of any kind or nature whatsoever, which Grantee may suffer or incur or which is commenced or threatened against Grantee or any of its directors, officers or employees arising from violation of any law involving the Property, any breach of the covenants and restrictions herein by Grantor, taxes and assessments upon the Property, any death or injury to any person occurring on or about the Property or any loss or damage to any property occurring on or about the Property; provided, however, that Grantor shall have no obligation to indemnify Grantee against loss, cost, liability, claim, penalty, fine or damage which results from Grantee's own negligent acts.  Without limitation of the foregoing, Grantor shall retain all responsibilities and shall bear all costs and liabilities of any kind related to the ownership, operations, upkeep, and maintenance of the Property, including the general liability insurance coverage.

4.    Grantor shall defend, indemnify and hold harmless Grantee, its successors, assigns, employees, and agents from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature known or unknown, contingent or otherwise because of non-compliance with this Declaration or any law, regulation, ordinance or court order.

*Exhibit 2*

5. Grantor shall continue to pay all taxes, levies and assessments and other governmental or municipal charges which may become a lien on the Property, including any taxes or levies imposed to make those payments.

6. When a change in conditions gives rise to the extinguishment of this Declaration or a material term or provision hereof by judicial proceeding, the Grantee, on any subsequent sale, exchange or involuntary conversion of the Property, shall be entitled to a portion of the proceeds of sale equal to the greater of: (a) the fair market value of the Easement or about the date of this Declaration; (b) Grantor's Proportionate Share of the proceeds of such sale, exchange or involuntary conversion, (c) the full proceeds from the sale, exchange or involuntary conversion, without regard to contrary terms of this Declaration, if state law provides that the donor is entitled to the full proceeds.  "Fair market value of the Easement" shall mean the difference between the fair market value of the Property unencumbered by this Declaration and the fair market value of the Conservation Easement encumbered by this Declaration. "Grantor's Proportionate Share" shall mean the fraction derived from the fair market value of the Easement on or about the date hereof divided by the fair market value of the Property, if unencumbered by this Declaration, on or about the date hereof.  "Proceeds of sale" shall mean the cash value of all money and property paid, transferred or contributed in consideration for, or as otherwise required as a condition, to the  sale, exchange or involuntary conversion of the Property, minus the actual bona fide expenses of such transaction and an amount attributable to the residential improvements constructed upon the Property pursuant to the Reserved Rights hereunder, if any. All such proceeds received by Grantee shall be used in a manner consistent with the conservation purposes of this grant.

7. Whenever all or part of the Property is taken by exercise of eminent domain by public, corporate or other authority so as to abrogate the restrictions imposed by this Declaration, the Grantor and Grantee shall join in appropriate actions at the time of such taking to recover the full value of the taking and all incidental or direct damages resulting from the taking. All expenses incurred by the Grantor and the Grantee, including reasonable attorney's fees, in any such action shall be paid out of the recovered proceeds.  Grantee shall be entitled to Grantors Proportionate Share of the recovered proceeds and shall use such proceeds in a manner consistent with the conservation purposes of this grant.  The respective rights of the Grantor and Grantee set forth in paragraph 8, above,  and this paragraph 9 shall be in addition to and not in limitation of, any rights they may have in common law with respect to a modification or termination of this Declaration by reason of changed conditions or the exercise of powers of eminent domain as aforesaid.

8. The failure of Grantee to exercise any of its rights under this Declaration on any occasion shall not be deemed a waiver of said rights and Grantee retains the right in perpetuity to require full compliance by Grantor of the covenants and restrictions in this Declaration.

9. Grantor and Grantee recognize that circumstances could arise which

*Exhibit 2*

this end, Grantee and Grantor shall mutually have the right, in their sole discretion, to agree to amendments to this Declaration which are not inconsistent with the basic purpose of the Declaration as stated in this document, provided, however, that Grantee shall have no right or power to agree to any amendments hereto that would result in this Declaration and Declaration failing to qualify as a valid conservation easement under the Act, as the same may be hereafter amended, or Section 170(h) of the Code as hereafter amended.

10.    This Declaration and all of the covenants, easements and restrictions herein set forth shall run with the land and be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, successors and assigns. The term "Grantor" used herein shall mean and include the above-named Grantor and any of its successors or assigns that are the legal owners of the Property or any part thereof. The term "Grantee" used herein shall mean and include the above-named Grantor and any of its successors or assigns, it being understood and agreed that any assignee of the rights of Grantee hereunder must be a "qualified organization" as defined in Section 170(h) of the Code, as amended, and shall carry out the obligations of the Grantee and the intent of this Declaration.

11.    Grantor shall be and remain liable for any breach or violation of this Declaration only if such breach or violation occurs during such time as Grantor is the legal owner of the Property or part thereof.

12.    Grantor agrees that all mortgages upon any or all of the Property entered into after the date of this Declaration will be subject to and subordinate to this Declaration.

13.    Grantor shall notify Grantee in writing of any sale, transfer, lease or other disposition of the Property or any part thereof, whether by operation of law or otherwise, at least 30 days after such disposition, such notice shall include a copy of the deed, lease, or other Declaration of transfer, the date of transfer, and the name or names and addresses for notices of the transferee.

14.    All notices required of Grantor under the terms of this Declaration, and all requests for the consent or approval of Grantee, shall be in writing and served personally or sent by certified mail, return receipt requested, addressed to Grantee at the address set

*Exhibit 2*

forth below or such other address provided by Grantee for the purpose.

**GRANTEE:**                              **GRANTOR:**

North American Land Trust          Lafayette Drive
P.O. Box 134                              DeBordieu Colony
Chadds Ford, PA  19317            Georgetown, SC 29440

**With Copy To:**                         **With Copy To:**

George Asimos, Jr.                      W. Bradley Blair, II
Saul, Ewing, Remick & Saul        Legends Group
1055 Westlakes Drive, Suite 150   P.O. Box 2038
Berwyn, PA  19312                     Myrtle Beach, SC  29578

15.    By signing this Declaration, Grantor certifies  that:

(a)    Grantor has received and fully reviewed the Baseline Documentation in its entirety.

(b)    The Baseline Documentation includes, among other things:

    i)    The appropriate survey maps from the United States Geological Survey, showing the property line and other contiguous or nearby protected areas.

    ii)    A map of the area drawn to scale showing all existing man-made improvements or incursions (such as roads, buildings, fences, or gravel pits), vegetation and identification of flora and fauna (including, for example, rare species locations, animal breeding and roosting areas, and migration routes), land use history (including present uses and recent past disturbances), and distinct natural features (such as large trees and aquatic areas).

    iii)    An aerial photograph of the property at an appropriate scale taken as close as possible to the date the donation is made.

    iv)    On-site photographs taken at appropriate locations on the property.  The condition of particular natural resources to be protected by this Declaration  at or near the time of the gift is established therein.

(c)    The Baseline Documentation, being an inventory of the resources of the Property, including the maps and photographs therein, is an accurate

*Exhibit 2*

representation of condition of the Conservation at the date hereof.

(d)    Grantor has been represented by counsel of Grantor's selection, and fully understands that Grantor is permanently relinquishing property rights which would otherwise permit the Grantor to have the full use and enjoyment of the Property.

(e)    Grantor hereby certifies that the Property is not encumbered by any mortgage, lien or other encumbrance, or that all such mortgages, liens or encumbrances, if any, have been subordinated to this Declaration by a duly executed instrument recorded in the Office of the County Clerk in which the Property is located.

(f)    That the undersigned individual signing on behalf of the Grantor have all legal authority to enter into this Declaration and perform all of the obligations of the Grantor hereunder, as the binding act of the Grantor.

16.    Grantor hereby warrants and represents that the Grantor is seized of the Property in fee simple, and has good right to grant and convey this Declaration, that the Property if free and clear of any and all encumbrances, except matters of record, and that the Grantee and its successors and assigns shall have the use of and enjoy all of the benefits derived from and arising out of this Declaration, and that any mortgage rights are subordinate hereto.

17.    **TO HAVE AND TO HOLD** the easements and rights set forth in this Declaration unto Grantee, its successors and assigns, for its own use and benefit forever.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, Grantor and Grantee have executed this Declaration as of the day and year first above written.

**GRANTOR:**

Witness _Michele D. Vick_    _____ [SEAL]
_Angela Marshall_              LARRY YOUNG

Witness _Michele D. Vick_    _____ [SEAL]
_Angela Marshall_              JUDY YOUNG

*Exhibit 2*

**GRANTEE**:

NORTH AMERICAN LAND TRUST

WITNESS: _Pamela S. Theine_

By: _John v.H. Halsey_ [SEAL]
Name: John v.H. Halsey
Title: President

STATE OF NEW YORK    :
                     :
COUNTY OF SUFFOLK    :

On this, the __27__ day of __DECEMBER__, 19__95__, before me, the undersigned officer, personally appeared JOHN VAN HEUSEN HALSEY who acknowledged himself to be the PRESIDENT of NORTH AMERICAN LAND TRUST, a corporation, and that he as such PRESIDENT , being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as PRESIDENT.

In witness whereof, I hereunto set my hand and official seal.

_Melanie A. Tebbens_

Title of Officer

**MELANIE A. TEBBENS**
Notary Public, State of New York
No. 01TE5035908, Suffolk County
Commission Expires November 14, 1996

515478.3 12/26/95                        -13-

*Exhibit 2*

STATE OF SOUTH CAROLINA )
          )   PROBATE
COUNTY OF _Horry_    )

   PERSONALLY APPEARED before me the undersigned witness who, after being duly sworn, deposes and says that (s)he saw the within-named Larry Young and Judy Young, sign, seal and as their act and deed, deliver the within-written instrument and that (s)he with the other witness above witnessed the execution thereof.

        _Michele D. Vick_

SWORN to before me this
_29th_ day December, 1995.
_Laura S. Tyler_   (L.S.)
Notary Public for South Carolina

My Commission Expires: _11-9-2003_

36558.1-FM (SSJ) 900000-486

*Exhibit 2*

STATE OF _NEW YORK_ )
                   )             PROBATE
COUNTY OF _SUFFOLK_ )

       PERSONALLY APPEARED before me the undersigned witness who, after being duly sworn, deposes and says that she saw the within-named North American Land Trust, a Pennsylvania corporation, by John v.H. Halsey, its President, sign, seal, and, as the act and deed of the corporation, deliver the within-written instrument and that she with the other witness above witnessed the execution thereof.

                                  (Either witness signs here)

Sworn to before me this
_27_ day of December, 1995

Notary Public for _____

My Commission Expires: _____

       **MELANIE A. TEBBENS**
       **Notary Public, State of New York**
       **No. 01TE5035908, Suffolk County**
       **Commission Expires November 14, 1996**

As used in this document, all references to "Bank" "NationsBank" or "NationsBank of North Carolina, N.A." "NationsBank of South Carolina, N.A." or "NationsBank, N.A. (Carolinas)" shall mean NationsBank, N.A.

## JOINDER AND CONSENT OF MORTGAGEE

_____NATIONSBANK, N.A._____ ("Mortgagee"), the holder of the mortgage encumbering the Property in the amount of $19,400,000.00 recorded at Book _652_, Page _1_ in the _R.M.C._ of _Georgetown_ County, _South Carolina_ (the "Mortgage") hereby consents to the terms of this Declaration and agrees that the lien of the Mortgage shall be fully subordinate to the rights, title and interest of Grantee under this Declaration and the rights of the Grantee to enforce this Declaration. Without limitation of the foregoing, Mortgagee agrees that, in the event of foreclosure of the Mortgage or a judgment obtained under the Mortgage or any promissory note secured thereby, the Property described in this Declaration shall remain under and subject to the covenants and restrictions set forth in this Declaration, as fully as if the Mortgage was executed, delivered and recorded after the dates of execution, delivery and recording of this Declaration. This Joinder and Consent of Mortgagee shall be binding upon Mortgagee's successors and assignees as holders of the Mortgage and any amendment thereof.

Mortgagee:

Witness

Witness

NATIONSBANK, N.A.

By: _____

Name: Dale C. Zeglin

Title: Senior Vice President

State of South Carolina ) 
                        ) 
County of HORRY         ) 

Personally appeared before me the undersigned witness, who, being duly sworn states that s/he saw the within named _____NATIONSBANK, N.A._____

by _Dale C. Zeglin_ , its _Senior Vice President_ , sign, seal and as its act and deed deliver the within written Joinder and Consent of Mortgagee, and that s/he with the other witness witnessed the execution thereof.

Sworn to before me this
_28th_ day of December, 1995.

_____ (SEAL)
Notary Public for South Carolina
My Commission Expires: _1-5.98_

*Exhibit 2*

EXHIBIT A
LEGAL DESCRIPTION

TRACT I

All that piece, parcel or tract of land situate, lying and being in the County of Georgetown, State of South Carolina, shown and designated as Tract B on that certain plat entitled "Map of WeeHaw Plantation Containing 1231.3 Acres in Tax District No. 2, and 266.7 Acres in Tax District No. 3, Total Area 1498 Acres dated November 21, 1978 prepared by Samuel M. Harper, RLS, reference to said plat being hereby made.

Saving and excepting therefrom Tract B 144.1 acre (Old Rice Fields) and Tract B 64.9 acres (Old Rice Fields) as shown on above referenced plat.

Saving and excepting therefrom Tracts 1, 2 and 3 as shown on a "Map of 166.34 Acres of Land in Tax District No. 2, Georgetown County, South Carolina Being a Part of WeeHaw Plantation surveyed for Margaret Barnwell Harvin", prepared by Samuel M. Harper, RLS, dated April 29, 1988. Said plat being recorded in Book 9, Page 467 in the Office of the Clerk of Court for Georgetown County on May 3, 1988.

Also saving and excepting therefrom a certain 5 acre tract as shown on a sketch prepared by Wendell Powers, RLS, dated April 24, 1995 and recorded at Slide 169, Page 5A; said sketch also attached to deed recorded in Deed Book 627, at Page 83 in the Office of the Clerk of Court for Georgetown County.

The said easement area being granted herein butting and bounding, measuring and containing as follows: Beginning at the point of the intersection of U.S. Highway 701 and South Carolina Highway 22-325, Being the Point of Beginning, thence turning and running along a line North 69°57' East for a distance of 3,108 feet to a point; thence turning and running along a line North 14°12' West for a distance of 1,401 feet to a point; thence turning and running along a line North 57°41' West for a distance of 2,122.2 feet to a point; thence turning and running along a line North 11°35' West for a distance of 257.8 feet to a point; thence turning and running along a line South 35°25' East for a distance of 411 feet to a point; thence turning and running along a line South 35°06' West for a distance of 200 feet to a point; thence turning and running along a line South 35°22' West for a distance of 56.06 feet to a point; thence turning and running along a line South 84°01' West for a distance of 116.5 feet; thence turning and running along a line North 36°34' West for a distance of 187 feet to a point; thence turning and running along a line North 24°30' West for a distance of 1,630.5 feet to a point; thence turning and running along a line North 73°18' West for a distance of 444.2 feet to a point; thence turning and running along a line North 76°18' West for a distance of 200 feet to a point; thence turning and running along a line North 29°18' West for a distance of 64.4 feet; thence turning and running along a line North 75°55' West for a distance of 296 feet; thence turning and running along a line South 73°41' West for a distance of 117.4 feet to a point; thence turning and running along a line South 62°19' West for a distance of 90 feet to a point; thence turning and running along a line South 87°03' West for a distance of 167.4 feet; thence turning and running along a line North 64°19' West for a distance of 183 feet to a point; thence turning and running along a line North 21°19' West for a distance of 89.5 feet; thence turning and running

along a line North 61°11' West for a distance of 166.5 feet; thence turning and running along a line South 56°58' West for a distance of 41 feet; thence turning and running along a line North 69°00' West for a distance of 748 feet; thence turning and running along a line North 77°28' West for a distance of 103 feet; thence turning and running along a line North 67°43' West for a distance of 563 feet to a point at the centerline of the Black River; thence meandering along the centerline of the river bed of the Black River in a Southerly direction to the intersection of the centerline of the Pee Dee River; thence meandering along the centerline of the Pee Dee River in a Westerly direction; thence turning and running along a line which is projected into the Pee Dee River South 40°00' East for a distance of 2,650± feet to a point; thence turning and running along a line North 44°00' East for a distance of 900± feet to a point; thence turning and running along a line South 70°00' East for a distance of 1,850± feet; thence turning and running along a line South 35°00' East for a distance of 200± feet; thence turning and running along a line South 70°10' East for a distance of 359 feet to a point; thence turning and running along a line South 46°47' East for a distance of 335.5 feet to a point; thence turning and running along a line North 40°48' East for a distance of 560.4 feet; thence turning and running along a line South 49°12' East for a distance of 25 feet; thence turning and running along a line North 40°48' East for a distance of 375 feet; thence turning and running along a line South 56°42' East for a distance of 162 feet; thence turning and running along a line South 56°48' East for a distance of 4,732.05 feet to a point; thence turning and running along a line South 19°58'35" West for a distance of 300 feet; thence turning and running along a line South 56°54'40" East for a distance of 745.45 feet to a point; thence turning and running along a line South 80°00' East for a distance of 32 feet; thence turning and running along a line North 20°00' East for a distance of 897.7 feet to a point; thence turning and running North 44°59' East for a distance of 15.7 feet to the point of beginning.

36548.1-EX (SSJ) 900000-486

*Exhibit 2*

ALSO
TRACT II

Parcel 3-489-11

All those certain pieces, parcels or tracts of land constituting rice fields situate on the Eastern side of Black River, now or formerly known as Taylor's Island, designated as property of Grantors, Alston, and Cain Patch and creek and Point Field, in deed from Frank G. Tarbox to D.V. Richardson dated June 15, 1925, and recorded in the Office of the clerk of Court for Georgetown County in Deed Book Z-1 at Page 586. Said fields taken together measure and contain eighty-eight (88) acres, more or less, and But and bound as follows: Northeast on lands of Vanderbilt and Pyatt; Southeast on lands of Baruch and Vanderbilt; Southwest on lands of Vanderbilt; and Northwest on Black River.

AND

Parcel 3-489-2

All that certain piece, parcel or tract of land situate, lying and being in Township No. 7, Georgetown County, South Carolina, being more particularly shown on a plat made by White & Gourdin, Surveyors, recorded in the Office of the Clerk of Court for Georgetown County in Plat Book B at Page 74, as Fields Numbered Sixteen (16) and Seventeen (17), said fields butting and bounding, according to said plat, as follows: West by highwater mark of Black River; North and East by lands, now or formerly, of Dr. F.S. Parker and lands of Alderly Plantation; and South by Tract Numbers 18 and 19, as shown on said plat. The said lands contain in the aggregate fifty-five and seven-tenths (55.7) acres, more or less, and were among the lands conveyed by Martha A. Pyatt, et. al, to Isaac E. Emerson by deed dated January 30, 1909, recorded in the Office of the Clerk of Court for Georgetown County in Deed Book M at Page 374.

*Exhibit 2*

EXHIBIT B





North American
LAND TRUST

F. Existing Conditions Report

*Exhibit 2*



# ECOLOGICAL ASSOCIATES, INC.

Ecological • Environmental • Natural Resources Consulting
4676 Bears Bluff Road • Wadmalaw Island, SC 29487
(843) 559-4127 • Fax (843) 559-1564 • e-mail ecologgnr@aol.com

# ~Weehaw Plantation~

## *Habitat Description Report*

*Exhibit 2*

# HABITATS – WEEHAW PLANTATION EASEMENT

Wetland and Open Water Habitats

- Palustrine Emergent Persistent Regularly Flooded
  (Uncontrolled Rice Fields)                                266 Acres
- Palustrine Emergent Persistent Artificially Flooded
  (Controlled Rice Fields)                                  179 Acres
- Palustrine Forested Deciduous Irregularly Flooded         73 Acres
- Palustrine Forested Deciduous Seasonally Flooded          15 Acres
- Riverine Tidal Open Water                                 20 acres

Upland Habitats

- Mixed Pine (Excessively Thinned)                          35 Acres
- Mixed Pine                                                160 Acres
- Young Pine                                                69 Acres
- Oak-Pine Hammock                                          15 Acres
- Open/Maintained/Wildlife Food Plots                       20 Acres

Total                                                       854 Acres [1]

---

[1] All acreages are approximate, based on best available information

*Exhibit 2*

## WEEHAW PLANTATION EASEMENT HABITAT DESCRIPTIONS

### WETLAND HABITATS

The wetland habitats within the Weehaw Plantation easement are primarily in the palustrine system, which includes among others, wetlands dominated by trees, shrubs, persistent emergent, and emergent mosses and lichens in tidal and non-tidal areas. The palustrine system contains non-tidal wetlands typically known as marsh, swamp, bog, fen, prairie, and bay, found throughout the United States. This grouping also includes small, shallow, permanent or intermittent ponds, and tidal freshwater wetlands (Cowardin et al. 1979). Weehaw Plantation also contains a small amount of riverine habitat along the Pee Dee and Black Rivers.

The palustrine system does not contain subsystems, therefore, the next hierarchial level is class. Two classes of palustrine wetlands, described by the dominant life form of the vegetation, occur within the Weehaw Plantation easement, including emergent and forested. Subclass designations and water regime modifiers can be used to further define these classes by the type of vegetation and water regime, respectively. The wetland habitats within the Weehaw easement, as classified by Cowardin et al. (1979), are described separately in the following sections.

### Palustrine Emergent Persistent Regularly Flooded

The palustrine, emergent, persistent, regularly flooded wetlands (PEM1N), commonly known as uncontrolled rice fields, abandoned rice fields or tidal freshwater wetlands, are abundant within the Weehaw Plantation easement. This wetland type is characterized by dense stands of rooted, persistent, emergent aquatic plants, sometimes interspersed with areas of shallow open

1

water. These areas typically receive regular tidal flooding. The palustrine emergent wetlands generally do not support tree or shrub species, however, occasional bald cypress (*Taxodium distichum*), red maple (*Acer rubrum*) or water tupelo (*Nyssa aquatica*) seedling or sapling may be present. The palustrine emergent wetlands are dominated by southern wild rice (*Zizaniopsis miliacea*), and wild rice (*Zizania aquatica*), with lesser amounts of cattail (*Typha latifolia*), arrow-arum (*Peltandra virginica*), arrowheads (*Sagittaria spp.*), and pickerel weed (*Pontederia cordata*). Percent coverage of vegetation in the uncontrolled rice fields is usually 100 percent.

**Palustrine, Emergent, Persistent, Artificially Flooded**

The palustrine, emergent, persistent, artificially flooded wetlands (PEM1K), commonly known as controlled rice fields or impoundments, comprise a smaller portion of the Weehaw Plantation easement. This wetland type is essentially a PEM1N wetland that has been effectively impounded. The water level is manipulated to provide access and achieve a more desirable wetland species composition (typically a species composition that provides preferred waterfowl forage). This wetland type is also characterized by dense stands of rooted, persistent, emergent aquatic plants, however, there are larger areas of shallow open water. These areas are typically drawn down during the growing season and flooded during the fall and winter. The controlled rice fields are dominated by wild rice, arrow-arum, arrowheads, pickerel weed, smartweeds (*Polygonium* spp.), and a variety of sedges (*Carex* spp.). Percent coverage of vegetation in the controlled rice fields is usually 70 to 90 percent.

**Palustrine, Forested, Deciduous, Irregularly Flooded**

The palustrine, forested, deciduous irregularly flooded (PFO6M) wetland type includes the cypress, tupelo, mixed hardwood wetlands that are subject to irregular tidal inundation. The canopy in PFO6M wetlands includes bald cypress, water tupelo, swamp tupelo (*Nyssa sylvatica* var. *biflora*), with lesser amounts of laurel oak (*Querucs laurifolia*), and red maple. Canopy closure is generally 60 to 80 percent, with an average DBH of 16 to 30 inches. A well developed subcanopy is present consisting of red bay (*Persea borbonia*), titi (*Cyrilla racemosa*), magnolia bay (*Magnolia virginiana*), and saplings of the canopy species. Closure of the subcanopy is often 40 to 60 percent.

The shrub layer generally varies in density from 30 to 40 percent coverage and includes wax myrtle (*Myrica cerifera*), fetterbush (*Lyonia lucida*), spice-bush (*Clethra alnifolia*), and blueberry (*Vaccinium* spp.). Ground cover is present in areas of low shrub density and includes southern wild rice, blue flag iris (*Iris virginica*), pickerel weed, netted chain-fern (*Woodwardia aerolata*), lizard's tail (*Saururus cernuus*), Virginia chain-fern *(Woodwardia virginica)*, sedges, and panic grasses *(Panicum spp.)*. Percent coverage of the understory varies widely between 30 and 70 percent.

**Palustrine, Forested, Deciduous, Seasonally Flooded**

The palustrine, forested, deciduous, seasonally flooded (PFO6C) wetland type includes the cypress, tupelo, mixed hardwood wetlands that do not receive tidal inundation. The seasonally flooded hydrologic regime is characterized by the presence of surface water for extended periods especially early in the growing season, but generally lacking surface water by the end of the

3

growing season in most years. When surface water is absent, the water table is often near the land surface.

The canopy in PF06C wetlands includes bald cypress, swamp tupelo, water tupelo, laurel oak, and red maple. Canopy closure is generally 80 to 100 percent, with DBHs ranging from 16 to 30 inches. A well developed subcanopy is present consisting of red bay, titi, magnolia bay, wax myrtle, and saplings of the canopy species. Closure of the subcanopy is often 30 to 50 percent.

The shrub layer generally varies in density from 30 to 60 percent coverage, and includes tall gallberry (*Ilex coriacea*), inkberry (*Ilex glabra*), fetterbush, spice-bush, and blueberry. Ground cover is relatively sparse and includes netted chain-fern, lizard's tail, Virginia chain-fern, blue flag iris, sedges, and panic grasses. Percent coverage of the understory is less than 30 percent.

**Riverine, Tidal, Open Water**

The riverine, tidal, open water habitats (R1OW) within the easement include the edges of the river channels along the Pee Dee and Black Rivers. These habitats are waterward of the controlled and uncontrolled rice fields. Although tidal, these areas are permanently inundated, with water depths ranging from two feet near the marsh edge to 20+ feet in the river channel. The bottom is unconsolidated mud

## UPLAND HABITATS

The majority of the upland habitats within the Weehaw Plantation easement are pine forests in

4

various stages of management. The balance of the uplands on the site consists of oak-pine hammock and open/maintained/wildlife food plots. The upland areas of the site are intensively managed for pine timber production and wildlife. Five specific upland habitat types were identified within the easement. These individual habitat types are discussed in the following sections.

## Mixed Pine

The majority of the uplands within the Weehaw Plantation easement are mixed pine habitats. The natural mixed pine habitats within the Weehaw easement are composed primarily of loblolly pine, with minor amounts of longleaf (*Pinus palustris*) and pond pine (*Pinus serotina*). Canopy closure is estimated at 60 to 70 percent, with an average DBH of 14 to 24 inches. There is very little subcanopy (less than 20 percent), and a modest shrub stratum. The shrub layer is dominated by wax myrtle, blueberries, red bay, and sapling sweetgum (*Liquidambar styraciflua*) and red maple. The percent coverage of the shrub stratum is approximately 40 to 60 percent. Understory species in the mixed pine habitat includes blackberries (*Rubus* spp.), greenbriar (*Smilax* spp.), broom-straw (*Andropogon* sp.), inkberry, large gallberry, and seedlings of the canopy and subcanopy species. Percent coverage of the understory is 80 to 90 percent.

## Mixed Pine Heavily Thinned

The heavily thinned natural mixed pine habitats within the Weehaw easement are similar to the mixed pine habitats, however, the basal area of pine trees is maintained at a relatively low level and the understory is managed by intensive burning and/or mowing. These habitats are also

5

composed primarily of loblolly pine, with minor amounts of longleaf and pond pine. Canopy closure in the thinned mixed pine stand is estimated at 20 to 30 percent, with an average DBH of 14 to 24 inches. There is very little subcanopy and/or shrub stratum. The understory is diverse and exhibits more herbaceous species, benefiting from an open canopy and the absence of competition from shrubs. Understory species in the thinned mixed pine habitat includes goldenrod (*Solidago* spp.), asters (*Aster* spp.), panic grasses (*Panicum* spp.) blackberries, broom-straw, wax myrtle, and inkberry. Percent coverage of the understory is 90 to 100 percent.

**Young Pine**

A large portion of the uplands within the Weehaw Plantation easement is composed of young pines. The young pines are eight to 12 years old with DBHs typically less than six inches. The dominant trees are loblolly. There is no significant subcanopy or shrub stratum. Understory is also limited due the closed canopy at approximately 20 feet. The understory around the edges of these habitats is similar the understory found in the adjacent open/maintained areas.

**Oak-Pine Hammock**

A small portion of the Weehaw Plantation easement is composed of an oak-pine hammock situated around the old plantation home site and along the entrance drive. These areas contain old-growth oaks and pine, and are highly maintained and/or landscaped. The canopy in the oak-pine habitat includes live oak (*Quercus virginiana*), laurel oak (*Quercus hemispherica*), loblolly pine, and magnolia (*Magnolia grandiflora*). Canopy closure is generally 60 to 90 percent, with DBHs ranging from 24 to 36+ inches. Periodic bush-hogging and landscaping have altered the

6

vegetation species composition and structure of the subcanopy and understory compared to typical undisturbed hammock communities. The subcanopy consists of widely scattered individuals of American holly (*Ilex opaca*), magnolia, and ornamental shrubs and trees. The understory and ground cover is composed of grassed and landscaped areas.

**Open-Maintained**

A portion of the Weehaw Plantation easement is open upland that is maintained in a grassland community with scattered wildlife food plots by selective management of species composition, and in some cases periodic mowing and/or prescribed burning. The open-maintained areas are vegetated with an assortment of perennial grasses and forbs, including goldenrod, broom-straw, asters, Joe-pye weed (*Eupatorium* sp.), St. Johns wort (*Hypericum* sp.), and assorted wildflowers, grasses, and forbs. The food plots are planted in an assortment of small grains.

7

*Exhibit 2*



G. Photographic Documentation

*Exhibit 2*



P.O. Box 467 • 100 Hickory Hill Road
Chadds Ford • PA • 19317
Tel: 610.388.3670 • Fax: 610.388.3673

w w w . n a l t . o r g

# ~Weehaw Plantation~

## *Photographic Baseline Documentation*

### *Photos Taken by Chris Wilson, Conservation Biologist,*
### *March 26, 2003*

*Exhibit 2*

WEEHAW CONSERVATION EASEMENT
PHOTOGRAPHIC DOCUMENTATIION
Photographs taken by Christopher R. Wilson, NALT Conservation Biologist
March 26, 2003

## PHOTO INDEX

| | | |
|---|---|---|
| I | 84 | Front Gate. Mature Loblolly/ Longleaf Pine forest in background. |
| 2 | 310 | Mature Loblolly/ Longleaf Pine forest. Suitable habitat for Red-cockaded reintroduction. |
| 3 | 40 | Mature Loblolly/ Longleaf Pine forest. Suitable habitat for Red-cockaded reintroduction. |
| 4 | 330 | Cypress / Tupelo Seasonally flooded swamp |
| 5 | 300 | Cypress / Tupelo Seasonally flooded swamp |
| 6 | 0 | Un-named tributary of the Black River. |
| 7 | 270 | Field in foreground. Swamp in background. |
| 8 | I80 | Gravel Road. |
| 9 | 90 | Maintained open field. Apparently planted with food crops for wildlife. A Snipe or Woodcock was flushed in this area. |
| I0 | 34 | Gravel Road. |
| II | 347 | Cypress swamp with past tree harvesting |
| I2 | | Red-banded Hairstreak (*Calycopis secrops*) |
| I3 | | Old growth Cypress swamp |
| I4 | | Old growth Cypress swamp |
| I5 | | Old growth Cypress swamp |
| I6 | 260 | Maintained open field. |
| I7 | I70 | Maintained open field. |
| I8 | 45 | Road. Scattered pines. |
| I9 | I70 | Existing structures within out parcels of easement. Black River in background. |
| 20 | I00 | Existing structures within out parcels of easement. Flooded rice fields / duck pond. |
| 2I | 45 | Existing structures within out parcels of easement. Flooded rice fields / duck pond. |
| 22 | I00 | Flooded rice fields / duck pond. |
| 23 | I80 | Flooded rice fields / duck pond. |
| 24 | 0 | Floodplain. Forest in background. |
| 25 | 315 | Oak hammock forest. |
| 26 | I35 | Oak hammock forest. |
| 27 | 90 | Pine regeneration |

*Exhibit 2*



**TRACT 1**

**TRACT 2**

**LEGEND**

Property Boundary

FEMA 100 yr Floodplain

Photo Location & Direction

**NOTES**

1. Soils information source: United States Department of Agriculture

2. Flood plain information source: Federal Emergency Management Agency (FEMA)

3. Photograph locations are approximate

4. Photographs taken by Chris Wilson, Conservation Biologist on March 26, 2003

0   500   1000   2000 FEET

Scale: 1"=500'

*Weehaw Plantation*

Georgetown County
South Carolina

PHOTO INDEX MAP

Revisions:

North American Land Trust

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

## PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 1



Photo 2

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 3



Photo 4

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 5



Photo 6

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 7



Photo 8

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 9



Photo 10

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 11



Photo 12

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 13



Photo 14

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 15



Photo 16

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 17



Photo 18

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 19



Photo 20

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT
PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 21



Photo 22

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 23



Photo 24

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 25



Photo 26

*Exhibit 2*

# WEEHAW PLANTATION CONSERVATION EASEMENT

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist

March 26, 2003



Photo 27

*Exhibit 2*



H. Supportive Mapping

*Exhibit 2*



LEGEND

Property Boundary

NOTES

1. The location map is strictly for illustrative uses only. The boundaries indicated are not to be deemed accurate. For an accurate description of the Boundaries refer to Exhibits A & B in the baseline documentation.

TRACT 1

TRACT 2

Georgetown

*Weehaw Plantation*

Georgetown County
South Carolina

PROXIMITY  MAP

Revisions:

*Exhibit 2*



**TRACT 1**

**TRACT 2**

**LEGEND**

▬ ▬ Property Boundary

▧ FEMA 100 yr Floodplain

**NOTES**

1. Soils information source: United States Department of Agriculture

2. Flood plain information source: Federal Emergency Management Agency (FEMA)

Scale: 1"=500'

0  500  1000  2000 FEET

NORTH

*Weehaw Plantation*

Georgetown County
South Carolina

**BASE MAP**

Revisions:

*Exhibit 2*



TRACT 1

TRACT 2

**LEGEND**

- Property Boundary
- Description xxxx
- Description xxxx
- Description xxxx

**NOTES**

1. Soils information source: United States Department of Agriculture

2. Flood plain information source: Federal Emergency Management Agency (FEMA)

Scale: 1"=500'

| | |
|---|---|
| *Weehaw Plantation* | Revisions: |
| Georgetown County South Carolina | |

**AERIAL PHOTO**