# EXHIBIT B

December 4, 2024

EVALUATION OF **2008** HOSPITAL PARCEL REMOVAL FROM NORTH AMERICAN LAND TRUST'S **1995** CONSERVATION EASEMENT ON WEEHAW PLANTATION, GEORGETOWN COUNTY, SOUTH CAROLINA

*as it pertains to MST, LLC v. NALT et al., United States District Court, District of South Carolina, Civil Action No.: 22-cv-00874-DCN*

written by
Travis Hayes Folk, Ph.D.

*Folk Land Management, Inc*
*Green Pond, SC*

### Introduction and organization of report

This report was requested by legal counsel (Trenholm Walker) representing MST, LLC, owner of Weehaw Plantation. Mr. Walker requested I review the 1995 North American Land Trust (NALT) conservation easement, 2008 NALT amendment to the easement, an August 2024 expert report by Alton Brown of Resource and Land Consultants, Savannah, GA and any other pertinent materials. I was to evaluate the veracity of justification for the 2008 amendment to the 1995 conservation easement in response to the report of Mr. Alton Brown.

I have organized my report in the following fashion:

1. Site description of the Hospital Parcel and Weehaw Plantation
2. Summary of 1995 conservation easement and 2008 amendment
3. Professional qualifications as it pertains to this critique and compensation statement
4. Evaluation of Hospital Parcel and changes in ecological and viewshed values
5. Evaluation of 5 relinquished house parcels within Weehaw and changes in ecological and viewshed values
6. Comparison of ecological values and viewshed benefits before and after the 2008 amendment
7. Critique of expert opinions offered by A. Brown
8. Summary of materials used in this evaluation
9. Literature cited

I will also provide the caveat that I (and by extension, Folk Land Management) have worked on at least two dozen properties in South Carolina with North American Land Trust held conservation easements. Many of these were properties in Horry, Jasper, and Beaufort County and owned Ecovest, a Georgia based land holder. For these properties, we were engaged to assist in land management activities ranging from silviculturally prescribed timber sales and harvests, prescribed fire, road construction, herbicide application, etc. At present, we are actively working on one property in Jasper County with a NALT conservation easement.

December 4, 2024

1. **Site Description of Hospital Parcel and Weehaw Plantation**

Weehaw Plantation is located southeast of the intersection of US Highway 701 and Wedgefield Road (S-22-325) in Georgetown County, SC (See Map 1). The property is bounded to the east by the Black River and the Pee Dee River. Approximately the eastern third of the property (between uplands and the rivers) is broken dike rice fields (i.e., they were constructed in the late 18th or early 19th century for commodity level rice production but the dikes have been abandoned and are not functional). One 35-acre rice field is still functional in this area and managed for waterfowl and wading birds. Currently, the property is 1,000 acres and is composed of a 658-acre parcel on the southern side and a northern 342-acre parcel. The larger of the two (the southern one) is subject to the 1995 NALT conservation easement (see Map 2). At the western end of Weehaw Plantation is a 65-acre parcel owned by the Georgetown Memorial Hospital and referred to in this report and elsewhere as the Hospital Parcel (See Map 2).

The property is composed of the following habitat types: fire-maintained pine savanna (with loblolly and longleaf), open pasture, old growth live oaks (some of which are mowed beneath and other areas have been allowed to succeed into a shrub and small tree community beneath the oaks), tidal rice fields (most are broken dike fields and one is still functional and managed for waterbirds), mixed pine hardwoods, hardwood sloughs and a cypress reserve impoundment. The upland portion of the property is relatively flat minus the large cypress reserve that arcs across the northern and into the southern parcel and a hardwood slough that extends into the southern parcel near the Lodge residence. Soils in the upland areas are predominantly loamy sands, fine sands and some clayey sands (See Map 3).

The Hospital Parcel has similar habitats. The majority of this parcel are composed of loblolly and longleaf pine. Field observations indicate this area had once been managed with prescribed fire but active habitat management has ceased, likely since the Hospital Parcel was sold out of Weehaw Plantation. (See below for a more in-depth discussion of this habitat currently and in the past.) There also exists a forested wetland on the western side of the Hospital Parcel. A man-made ditch extends through the center of this semi-linear forested wetland and is composed of water oak, laurel oak, red maple, dwarf palmetto, wax myrtle, etc.

For clarity, the remainder of this report refers to the 65-acre Hospital Parcel and the southern 658-acre portion of Weehaw that is subject to the 1995 NALT conservation easement.

The majority of the upland habitat on the Hospital Parcel was also fire maintained pine savanna habitat in the past. The reference site for this is directly across the property line on Weehaw Plantation proper. There are several lines of evidence for this and I detail those below.

A sequence of aerial photos from 1995 to 2024 demonstrate similarity in habitat conditions until the sale of the Hospital Parcel and then a divergence of habitat conditions. Below is a year-by-year description of aerial photographs. (Maps 4, 5, and 6 are similar years and show the Hospital Parcel and more of Weehaw.)

This 1995 aerial photograph shows a similar canopy coverage between (what would become) the Hospital Parcel and Weehaw property to the east. Based on the remaining larger diameter trees in 2024, the forest coverage was pine in this aerial photograph.



This aerial photograph is from 2005 and shows a more open canopy than that in 1995. This condition exists on both the Hospital Parcel and Weehaw Plantation to the east.



The signature of this 2005 aerial photograph suggests an open canopy pine forest that is maintained with prescribed fire. Luckily, ground based photographs from 2003 exist in a NALT report of the current conditions can provide an accurate description of the conditions. Note, these photographs were taken by Chris Wilson of NALT on March 26, 2003 and included in the 2003 Baseline Documentation. The

December 4, 2024

following 3 photographs are taken from that report and indicate a fire-maintained pine savanna on the Hospital Parcel in 2003, several years before the 2008 amendment.  A photo index map was provided in the 2003 photo documentation and indicated photographs 1, 2, and 3 are taken from the Hospital Parcel.

*Exhibit 2*

**WEEHAW PLANTATION CONSERVATION EASEMENT**
PHOTOGRAPHIC DOCUMENTATIION
Photographs taken by Christopher R. Wilson, NALT Conservation Biologist
March 26, 2003



Photo 1



Photo 2

4

*Exhibit 2*

**WEEHAW PLANTATION CONSERVATION EASEMENT**

PHOTOGRAPHIC DOCUMENTATIION

Photographs taken by Christopher R. Wilson, NALT Conservation Biologist
March 26, 2003



Photo 3

This 2007 aerial photograph shows forest canopy similar to that in 2005, indicating that fire maintained pine savanna existed to 2007.



December 4, 2024

Current aerial photography from March 2024, indicate a change in habitat type. Note the greater interspersion of browns amongst green canopies on Weehaw Plantation itself. This is a signature of a pine savanna with an herbaceous and shrubby understory.



I further substantiated this current habitat difference during an October 15, 2024 site visit. The sequence of photos below is taken from the property line between the Hospital Parcel and Weehaw Plantation.



*First set of companion photos. Left photo of Hospital Parcel and right photo of Weehaw Plantation, both taken from same location on October 15, 2024.*

6



*Second set of companion photos.  Left photo of Hospital Parcel and right photo of Weehaw Plantation, both taken from same location on October 15, 2024.*

These two sets of companion photos indicate the same recent management history.  Specifically, this area of Weehaw Plantation closest to the Hospital Parcel has continued to be managed with prescribed fire while the Hospital Parcel has not.  The emerging woody understory on the Hospital Parcel indicate this.  The overstory is sparse and open which is what was suggested in 2005 and 2007 aerial photographs and the 2003 ground-based photographs by Chris Wilson in the NALT Baseline documentation.  When prescribed fire ceased on the Hospital Parcel after the 2008 amendment, woody species like loblolly pine, sweetgum, wax myrtle and others were allowed to develop and slowly grow towards the midstory.

### 2.  Summary of 1995 NALT conservation easement and 2008 amendment

On December 27, 1995, Larry and Judy Young (owners of Weehaw Plantation) placed a conservation easement on 788 acres of the property.  The easement was donated to the North American Land Trust and continues to be overseen by that entity.  It should be noted that at this time 8.25 acres of Weehaw were left out of this easement.  These acres are at the western end of the property near the confluence of US Highway and Wedgefield Road (S-22-325).  These 8.25 acres are centered where the front gate is placed currently (see Map 2).

I have read the conservation easement and it appears to have language common in purpose to many conservation easements across the Lowcountry and held by groups like NALT plus Ducks Unlimited, The Nature Conservancy, Lowcountry Land Trust and others.  The document identifies various conservation values of the property and they are as follows (in no particular order): rice fields, waterfowl habitat, 18th century formal garden, watershed of the Black and Pee Dee Rivers, scenic vistas into the property from the rivers and US Highway 701 and Wedgefield Road (S-22-325), and natural habitats.  To sum these values, Page 2 (third preamble statement) of the 1995 NALT conservation easement says "the Baseline Documentation also establishes that conservation of the Property in the manner intended (by) Grantor and Grantee and expressed in this document will provide scenic enjoyment for the general public and such conservation will yield a significant public benefit.."

7

In 2008, the then owners of Weehaw, Jacqueline and Kyle Young and NALT entered into an amendment of the 1995 conservation easement whereby they were allowed to remove 56.75 acres from coverage of the conservation easement.  In exchange, the Young's gave up development rights on 5 building envelopes and one "Recreation Area."  See Map 2 for identification of the 8.25 acre and 56.75-acre parcels.  These two parcels (i.e., 56.75 + 8.25 acres) then were combined into the 65-acre Hospital Parcel.  Map 2 identifies the 6 relinquished building envelopes and the resulting 65-acre Hospital Parcel.

The 2008 amendment to the conservation easement cited several reasons to justify modification of the 1995 conservation easement and they are as follows:

- The Georgetown Hospital needed to relocate its campus because of geographic restraints
- The Hospital Parcel was deemed to fulfill the need and no other suitable parcel existed in the area
- Moving the Georgetown Hospital would contribute positively to the population of the area
- The ecological benefit of removing 5 building envelopes (plus the Recreation Area) was greater than loss of habitat on the Hospital Parcel
- It was also said of the relinquished building envelopes that they had "superior location of the five dwellings in terms of scenic view from the Pee Dee River, Black River and Intracoastal Waterway and proximity to significant environmental features... (2008 Amendment, Page 2, 8[th] preamble statement)
- Also, "the loss of scenic view from Highway 701 and S-22-325 (Wedgefield Road) as a result of the development of the Hospital Parcel is insignificant in comparison to the substantial ecological and scenic benefits of the extinguishment of the five dwelling rights, in addition to the public and social benefits related to meeting the needs of the Hospital"

In summary, the 2008 amendment codified these relationships:  the adverse effect on the conservation values from the loss of 56.75 acres of habitat on the Hospital Parcel and the loss of scenic views into the Hospital Parcel was deemed of less value than the positive effect on the conservation values from removal of 6 building envelopes, the maintenance of viewshed from the Black River, Pee Dee River and Intracoastal Waterway to those 6 building envelopes and the conservation of ecological, wetland and archeological conditions on those 6 building envelopes.

3.  **Professional qualifications and compensation statement**

I believe I am qualified to provide the analysis and opinions within this report based on my education and professional experience.  I earned a Bachelor of Science (1998) in Forest Resources from the Warnell School of Forest Resources at the University of Georgia.  My coursework covered both wildlife and forest management topics.  I received a Master of Science (2001) and Doctor of Philosophy (2006) from the School of Forestry and Wildlife Science at Auburn University.  My MS research addressed incubation behavior and habitat use of wood ducks, and my PhD research addressed population ecology of northern bobwhites in fire maintained longleaf pine forests.  A common theme of both research endeavors was the consideration of how changes in habitats influenced behavior and demography of wildlife species.

This is germane to this case because it covers the value of habitats to a variety of species and how changes in habitat features can affect populations of flora and fauna.

After completing graduate work, I became employed by Folk Land Management in Green Pond, SC, a forestry and wildlife consulting firm founded in the early 1980s by my father. I now co-own this business with my brother Clay and continue to remain fully employed by the business. We have 10 professional staff including foresters, GIS associates, biologists and 2 Ph.D. wildlife biologists. Folk Land Management has several areas of expertise that I list below. I provide salient details that pertain to the topic at hand.

a) *Conservation easements*. We are involved on properties with conservation easements in two ways. First, we have represented and advised numerous property owners interested in placing a conservation easement on their property. We have assisted in selection of a qualified and appropriate land trust to hold the easement and the development of the easement language with the land owner and land trust. In assisting with development of easement language, I have had to consider current and long-term land management needs. This covers current ownership and future owners' potential management goals as well as ecological land management in light of changing climates and wetland conditions across the Lowcountry. Second, we assist numerous landowners in land management activities on properties with conservation easements. We consult these easement documents with great frequency to ensure our land management activities are compliant and in the spirit of the conservation easement. We also interact with land trust staff (primarily Ducks Unlimited, The Nature Conservancy and Lowcountry Land Trust) when ambiguity in easement language exists. I also served on the Board of Trustees of The Nature Conservancy of South Carolina for approximately 7 years.

Experience with conservation easements allows me in this case to both understand language within the NALT documents and also evaluate their impact to active land management and long-term ecological value of the property.

b) *Management of fire-maintained pine savannas*. Many of our clients engage our services to enhance and maintain habitat in fire-maintained pine savannas for wildlife species. This frequently involves silviculturally prescribed timber harvests, herbicide application, prescribed fire, and reforestation efforts. Our work in these habitats is initially (with a new client) to enhance an area such that it has qualities of fire-maintained pine savannas as well as continued management (for long-term clients) to ensure these habitat qualities are maintained over time.

Experience in fire-maintained pine savannas allows me in this report to provide expert opinion about the ecological value of the remaining habitat of this type on Weehaw Plantation proper but to also consider the lost ecological value on the Hospital Parcel.

c) *Identification of and management for multi-species values in Lowcountry habitats*. Many of our clients wish to manage for game species (e.g., quail, turkey, ducks) but these clients are also increasingly placing interest in managing habitats for a variety of values beyond habitat for game species. Examples of this include the following: identification of pitcher plant bogs and tailored management for those areas, management for a diversity of insect species, management for a range of migrating shorebird species, etc.

Experience with management of multiple species (game and nongame) allows me in this case to consider a wide range of ecological values within the Hospital Parcel and the area of the 6 relinquished building sites within Weehaw Plantation.

d) *Application of prescribed fire for ecological enhancement and wildfire purposes*.  We conduct prescribed fires year-round primarily to maintain and enhance wildlife habitat although we also conduct prescribed fires to reduce fuel loads in an effort to reduce wildfire risks.  Ecologically motivated fires are conducted to maintain appropriate plant structure and composition for species like red-cockaded woodpeckers, wildflowers for pollinator species and songbird habitat.  We have conducted prescribed fire on rural acreage as well as more urban landscapes like Sea Pines on Hilton Head (we use prescribe fire to manage a 400-acre forest preserve within the boundaries of Sea Pines, Hilton Head, SC).

Experience in deciding when to burn certain habitats and the application of that fire allows me to render an expert opinion on the ecological value of fire and the logistical difficulty of doing so.

e) *Red-cockaded woodpecker Safe Harbor Agreements*.  We have assisted landowners in becoming enrolled in South Carolina Department of Natural Resource's Red-cockaded Woodpecker Safe Harbor program.  This involves evaluation of suitable red-cockaded woodpecker habitat on a property and coordination with the SCDNR Safe Harbor biologist, currently Matt Lerow.  We also manage timber on properties with Safe Harbor agreements and must ensure that timber harvesting operations are conducted in compliance with Safe Harbor provisions.

Experience with Safe Harbor agreements provides me with an understanding of specific management guidance for this federally recognized threatened species.  This also has provided the need to remain current with scientific literature addressing RCW biology and management.

f) *Personal experience with Weehaw Plantation.*  I first visited Weehaw Plantation in 2015 where I was asked to develop a Clean Water Act wetland permit application for the restoration of a 135-acre freshwater cypress reserve.  We received federal and state wetland permits for this project and I oversaw installation of a rice field trunk in this reserve.  Through this project, I developed a better understanding of the property and the needs for the ecologically based land management.  Subsequently we have assisted in timber harvests, herbicide application for the control of invasive plant species and conducting prescribed fire across the property.  Folk Land Management has conducted prescribed fire on Weehaw for the last 6 years.

This experience provides me with site specific knowledge of Weehaw Plantation.

g) *Other areas of land management experience and expertise*

   a. Clean Water Act wetland permitting for ecologically beneficial projects to include historic rice fields, greentree reservoirs, coastal impoundments, etc.  We design wetland projects to enhance the ecological value of wetland habitats.  We develop and submit Clean

Water Act permits to the U.S. Army Corps of Engineers and South Carolinas' Department of Ecological Services. We also oversee construction of these projects.

b. Geographic information systems. We have utilized GIS as a tool in land management for over 20 years and we stay abreast of new remote sensing technologies available. As an example, we collaborated with Nemours Wildlife Foundation and Clemson University to systematically map all historic rice fields from North Carolina to Florida.

c. Reforestation. We plan and implement reforestation efforts for pine (loblolly and longleaf) and hardwood systems. We also are involved with continued management of these forested systems. Reforestation decisions are made to both enhance the ecological quality of a site as well as provide periodic timber revenue for landowners.

d. Control of invasive, exotic species. Invasive, exotic species are increasingly ubiquitous across the South Carolina and the United States in general (e.g., Brewer 2008, VerCauteren et al. 2020). We identify and implement control strategies for plant (e.g., Chinese tallow, Phragmites spp., etc.) and animal (e.g., feral pigs) species that have negative ecological impacts. Within fire-maintained pine systems, we control several plant species that can have negative impacts to native plant and animal species (i.e., exotic plant species outcompete native plant species and the resulting habitat structure and quality are not suitable to native fauna and therefore lead to local, native species' declines).

I am being compensated $250.00 per hour for work involved with this report. This includes trips to Weehaw, research time, and time spent drafting this report. I have had one Folk Land Management staff member prepare maps pertaining to this report as well as a staff member obtain pdf documents of pertinent peer-reviewed articles.

I have not testified in a case in the previous 4 years.

I have published several peer-reviewed and popular press articles in the last 10 years. These are listed below (and not included in the literature cited section at the end of this report).

Fields-Black, E. L., R. D. Hanks, T. H. Folk, R. Baldwin, E. P. Wiggers, A. Agha, D. D. Richter, and R. H. Coen. 2022. Resilience of coupled socio-ecological systems: historic rice fields of the U. S. South. *In* Perspectives on public policy in societal-environmental crises. (Izdebski, A., J. Haldon and P. Filipkowski, editors). Springer.

Folk, T. H., E. P. Wiggers, D. Harrigal, and M. Purcell (Editors). 2016. Rice fields for wildlife: history, management recommendations and regulatory guidelines for South Carolina's managed tidal impoundments. Nemours Wildlife Foundation, Yemassee, South Carolina.

Folk, T. H., E. Wiggers, and P. Hinchcliff. 2018. A case study in Lowcountry conservation: the development and implementation of wetlands regulation to benefit historic rice fields. Charleston Mercury Magazine Winter 2018. Charleston, South Carolina.

Folk, T. H., B. Bauer, E. Wiggers, D. Harrigal, A. Bridges, and J. Ayers (Editors). 2024. Historic Rice Fields & Coastal Impoundments for Wildlife: history, management recommendations and regulatory

guidelines for South Carolina's managed tidal impoundments. Second Edition. Nemours Wildlife Foundation, Yemassee, South Carolina.

Hanks, D. L., R. F. Baldwin, T. H. Folk, E. P. Wiggers, R. C. Coen, M. L. Gouin, A. Agha, D. D. Richter, E. L. Fields-Black. 2021. Mapping antebellum rice fields as a basis for understanding human and ecological consequences of the Era of slavery. Land: https://doi.org/10.3390/land10080831.

Heitmann, J. B., T. H. Folk, L. J. Lord, and D. J. McGlinn. 2024. Geographically isolated wetlands have higher alpha diversity than surrounding uplands in pine savanna ecosystems. Wetland Ecology and Management: *in print*.

Masto, N. M., A. C. Hsiung, R. M. Kaminski, B. E. Ross, M. R. Kneece, G. L. Wilkerson, R. F. Baldwin, R. D. Hanks, E. P. Wiggers, T. H. Folk, R. D. Perry, R. H. Coen, R. C. Leland, and J. T. Anderson. 2023. Waterbird-habitat relationships in South Carolina: implications for protection, restoration, and management of coastal and inland wetlands. Restoration Ecology e13956.

### 4.  Evaluation of ecological and viewshed values of the Hospital Parcel

A significant portion of the 2008 amendment was the removal of 56.75 acres from coverage by the conservation easement.  These acres (plus the unencumbered 8.25 acres) became the 65-acre Hospital Parcel.  The following discussion will, however, only apply to the 56.75 acres of the Hospital Parcel.  I review ecological and view shed values of these acres.

The forested portion of the Hospital Parcel is composed of a hardwood bottom and a former fire-maintained pine stand.  The hardwood bottom takes runoff from US Highway 701 and the wetland system eventually winds into the upper end the 135-acre cypress reserve on the northern parcel of Weehaw.  (As a reminder, this northern parcel is not encumbered by a conservation easement but has water connectivity to the Hospital Parcel.)  I developed and oversaw the wetland permit application to re-install a rice field trunk at the lower end of this reserve.  One (of several) rationale I presented for this permit was water quality.  To have water control in this reserve would enable water retention of runoff from the surrounding roads and developments.  The upper portion of the Hospital Parcel is the upper reach of this effort.

The most significant ecological aspect of the upland pine portion was the habitat itself.  Above I described the past habitat condition of these acres.  It had been fire-maintained pine savanna.  The present forest structure (i.e., minimal pine overstory with a dense tree and shrub midstory) indicate to me this area had been managed with prescribed fire.  Aerial photos in the early 2000s and 2003 ground-based photos confirm this.  Fire retards the growth of woody shrubs and trees and promotes an understory with grasses and forbs.  This early successional habitat is valuable for a variety of plant and animal species.

This type of habitat (i.e., herbaceous dominated understory) is generally referred to as early successional plant habitat.  A host of grass and forb species require this condition to grow.  Wiregrass is an excellent example in that fire must keep surrounding woody coemption at low levels such that it can grow.  It also requires fire during the growing season to successfully reproduce (Outcalt 1994).  Carnivorous pitcher

plants (*Sarracenia* spp.) are another species that does well in fire-maintained pine savannas of the Southeastern Coastal Plain (Peet and Allard 1993) and are present on a nearby property with similar habitat structure, management and soils (Folk, personal observation). Southern hog-nosed snakes also were known to inhabit this type of habitat across the Lowcountry but are nearly extirpated from the state (Gibbons and Dorcas 2015). A more complete summary of flora and fauna that depend on fire-maintained pine savannas can be found in the 18th Proceedings of the Tall Timbers Fire Ecology Conference (of which Peet and Allard 1993 are a chapter).

Red cockaded woodpeckers are one bird species quickly considered when discussing fire-maintained pine savannas across the Coastal Plain of the Southeast (Conner et al. 2001). They are the only North American woodpecker to nest in live trees and they rely on fire-maintained savannas to provide valuable foraging habitat. They excavate larger diameter southern yellow pine trees, typically longleaf or loblolly (Conner et al. 2001). Their preferred foraging habitat is on the stems of medium to larger pine trees and pine and hardwood midstory diminishes foraging habitat value (Walter et al. 2002).

A Safe Harbor Agreement was signed in 2013 between the owners of Weehaw (i.e., Heather and Jim Murren) and the South Carolina Department of Natural Resources. At the time of signing, one active cluster existed. Since that time several additional cavity trees have been detected. The habitat within Weehaw proper provide valuable cavity and foraging habitat and is mentioned as such in the SCDNR annual reports. The emerging woody midstory on the Hospital Parcel, though, does not represent valuable cavity or foraging habitat. Were the Hospital Parcel to have continued to have been managed similarly to the Weehaw proper, this cluster would have more available habitat.

A negative consequence of development of the Hospital Parcel would have been impacts to the remainder of fire-maintained habitats on Weehaw. Use of prescribed fire near (and certainly immediately adjacent to) a medical facility would have greatly reduced the likelihood of continued use of fire on Weehaw proper. Impacts to medically impaired persons, especially those with respiratory issues, is something practitioners of prescribed fire would consider too great a public health risk and liability. Were the medical campus built on the Hospital Parcel, Folk Land Management would not conduct the prescribed fires.

There are several examples that bear out this issue. Folk Land Management has conducted prescribed fire on Spring Island in Beaufort County. This is a low-density development immediate south of the Port Royal Sound. For several years, a resident of Spring Island would leave the property for several days while burns were being conducted. His respiratory conditions were such that he could not be near areas with prescribed fire, not during the day of the fire nor the day or two afterwards when remnant smoke might be in the air.

A second, public example was the attempt to place a hospital near Lewis Ocean Bay Heritage Preserve. This property is owned and managed by the South Carolina Department of Natural Resources. Habitats within the Heritage Preserve require frequent prescribed fire to maintain habitat quality, especially for the endangered Venus fly trap. Habitats there are similar to those at Weehaw in that fire maintains the understory in an herbaceous and shrubby condition, valuable for a variety of flora and fauna. See Benson (2024) for a recent summary of this topic. Placement of a medical campus on the Hospital Parcel would have eliminated the use of prescribed fire as a management tool and thus lead to reductions in habitat quality on Weehaw proper. This would represent a loss of conservation value on Weehaw proper as a result of use of the Hospital Parcel for a medical campus.

The 56.75 acres of the Hospital Parcel has approximately 200 linear feet of frontage to US Highway 701 and approximately 2,000 linear feet of frontage to Wedgefield Road. The view from these two roads is a forested stand and composed of pines, wax myrtle, and other small trees and shrubs. South of the Hospital Parcel on US Highway 701, the view shed is increasingly developed as you approach the more urbanized area of Georgetown. Wedgefield Road has a golf course and large development east of the Hospital Parcel. The parcel directly across US Highway 701 is currently being clearcut and prepared for development. Developments have recently been completed just north of Weehaw on US Highway 701. US Highway 701 connects the cities of Georgetown and Conway. While the Hospital Parcel is at the edge of the town of Georgetown, this forested viewshed is becoming increasingly surrounded by developed acres.

This section of US Highway 701 is one of the busiest roads in Georgetown County. (Georgetown County 2023). The Georgetown County Comprehensive Plan, Transportation Element identifies this highway for possible widening due to the heavy daily traffic (Georgetown County 2023). Page 10 of this report indicates the intersection of US Highway 701 and Wedgefield Road has an annual average daily traffic (AADT) of over 10,000 and has increased in recent years. (AADT is the total annual traffic of a road divided by 365.) The viewshed of the Hospital Parcel is valuable and will become increasingly rare in this section of US Highway 701.

The removal of Hospital Parcel from coverage by the NALT conservation easement has removed the forested perimeter from the public's viewshed along one of the busiest roads in Georgetown County. The lack of ecologically motivated land management within the 56.75 acres of the Hospital Parcel has led to the loss of fire-maintained pine savanna habitat which is important for numerous plant and animal species, many of which have experienced population declines. Were this habitat still managed and covered by the conservation easement, the 56.75 acres could contributed to rare habitats across Georgetown County and the Lowcountry.

5. **Evaluation of 5 relinquished house parcels and recreation area within Weehaw and changes in ecological and viewshed values**

One premise to justify the 2008 amendment of the conservation easement was the relinquishment of building rights on 5 Restricted Building Envelopes and the Recreation Area (hereafter I will refer to them as the 6 relinquished building areas). The 2008 amendment says the following:

"*Whereas, upon study and inspection, Grantee has determined that the extinguishment of the five Restricted Building Envelopes and the right to five Dwellings will have a greater ecological benefit and further advance and protect the Conservation Purposes of the Conservation Easement that any loss of such from the removal of the Hospital Parcel from the Conservation Easement, particularly due to the superior location of the five dwellings in terms of scenic view from the Pee Dee River, Black River and the Intracoastal Waterway and proximity to significant environmental features of the Property including, without limitation, the critical marsh habitat, the archeologically significant sites, and the wetlands area of the Property….*" (taken from the 8th preamble clause on page 2 of 2008 Amendment to Weehaw Conservation Easement).

December 4, 2024

And: "*Whereas, the loss of scenic view from Highway 701 and S-22-325 as a result of the development of the Hospital Parcel is insignificant in comparison to the substantial ecological and scenic benefits of the extinguishment of the five dwelling rights, in addition to the public and social benefits related to meeting the needs of the Hospital....*" (taken from the 9th preamble clause on page 2 of 2008 Amendment to Weehaw Conservation Easement).

Both of these preamble statements indicate that NALT, in 2008, considered the preservation of the viewshed (from the 6 relinquished building areas) from rivers to the east of Weehaw to be of greater value than the viewshed to the Hospital Parcel and the ecological value contained within those acres on the Hospital Parcel. They also considered potential construction impacts on these 6 relinquished building areas to water quality, archeological sites and critical wetland areas. Therefore, I evaluated the pertinent attributes of the 6 relinquished building areas. For clarity, Map 2 identifies the location and naming reference for the 6 relinquished building areas. This naming convention is taken from references in the 1995 Conservation Easement, the 2008 Amendment and Alton Brown's expert report dated August 2024.

The specific features I evaluated are listed below:

- What is the habitat type in 2024
- Interpretation of aerial photography near time of 2008 amendment
- What is the distance from the eastern most section of the building parcel to the Pee Dee and Black Rivers
- Can you see the river from the building envelope
- What is the viewshed from the Black River to an existing dwelling on Weehaw
- Is there any evidence to suggest archeological features exist within the building envelope
- Proximity of wetlands or wetland critical area to the building area
- Ecological value

I undertook an in-person evaluation of the viewshed and ecological condition of each of the 6 relinquished building areas. Specifically, I visited each building envelope on October 1, 2024 and observed its current condition and the view from the building envelope towards the rivers. I also conducted a river-based trip on the Black River to view the uplands of Weehaw on November 15, 2024. At the conclusion of the narrative describing the conditions of the 6 relinquished buildings envelopes, I provide details and opinion about visibility of uplands of Weehaw from rivers to the east of the property.

The following is a narrative and photographic summary of my findings.

15

*Dwelling Unit 1*

- 2024 habitat – The habitat at this location has a sparse overstory of loblolly and longleaf pine.  The midstory is predominantly shrubby and small trees and some herbaceous understory has developed as a result from a recent prescribed fire.



*Eastern view from Dwelling Unit 1 on November 15, 2024*

- A March 2024 aerial photo shows this area as forested, as well as areas to the east of the Dwelling Unit footprint (i.e., between a hypothetical house and the rivers).



16

▪ 2008 habitat – A 2007 aerial photo shows a more open forest structure.  It appears as if a timber harvesting operation recently took place; however, the footprint of this tree harvesting was restricted to an 8-acre block.  Area to the east of the dwelling unit footprint remained forested.



- Distance to Rivers – From the eastern most edge of the dwelling unit footprint, the Pee Dee and Black Rivers are 1.31 and 1.33 miles, respectively.  The maximum distance to a river section is 1.68 miles, which is at the confluence of the two previously named rivers.  The Intracoastal Waterway is 2.4 miles to the east of this dwelling unit footprint.

- Visibility of building envelope from rivers – Any building at this site would not be visible from the Pee Dee or Black Rivers, the two closest rivers to the property.  Visibility from the Intracoastal Waterway is not possible.  The lack of visibility is due to the forested sections between the footprint and the marsh and the distance across the marsh to the above-mentioned rivers.

- Evidence of archeological features – I consulted ARCH Site, the public repository of the South Carolina Institute of Archeology and Anthropology (SCIAA) and South Carolina Department of Archives and History (SCDAH) and no historic resource was noted for this location.  I also reviewed elevational LiDAR data and no anthropogenic anomaly was apparent.  No above ground historic resource is present.  I find no evidence of significant archeological value at this location.  See Map 7.

- Proximity of wetlands to building envelope – The National Wetlands Inventory indicates there are not wetlands within this footprint, nor was any significantly large wetland visible during my site visit.  Critical area wetlands are 0.53 miles to the east.

- Just prior to the 2007-era timber harvest, 2006 aerial photography show this area as a densely stocked forest, likely with pine.  Without regular fire, this area would not have been as valuable

December 4, 2024

habitat as the acres in fire-maintained pine savanna at and near the 56.75 acres at the Hospital Parcel.

*Dwelling Unit 2*

- 2024 habitat – The habitat at this location has a pine and hardwood overstory and a shrubby midstory. Little herbaceous understory exists.



*Eastern view from Dwelling Unit 2 on November 15, 2024*

- A March 2024 aerial photo shows this area as forested, as well as areas to the east of the Dwelling Unit footprint (i.e., between a hypothetical house and the rivers).



18

▪ 2008 habitat – A 2007 aerial photo shows a similar habitat coverage.  Additionally, the area to the east of the dwelling unit footprint is also forested.



- Distance to Rivers – From the eastern most edge of the dwelling unit footprint, the Pee Dee and Black Rivers are 1.10 and 0.98 miles, respectively.  The maximum distance to a river section is 1.40 miles, which is at the confluence of the two previously named rivers.  The Intracoastal Waterway is 2.3 miles to the east of this dwelling unit footprint.

- Visibility of building envelope from rivers – Any building at this site would not be visible from the Pee Dee or Black Rivers, the two closest rivers to the property.  Visibility from the Intracoastal Waterway is not possible.  The lack of visibility is due to the forested sections between the footprint and the marsh and the distance across the marsh to the above-mentioned rivers.

- Evidence of archeological features – I consulted ARCH Site, the public repository of the South Carolina Institute of Archeology and Anthropology (SCIAA) and South Carolina Department of Archives and History (SCDAH) and no historic resource was noted for this location.  I also reviewed elevational LiDAR data and no anthropogenic anomaly was apparent.  No above ground historic resource is present.  I find no evidence of significant archeological value at this location.

- Proximity of wetlands to building envelope – The National Wetlands Inventory indicates there are forested wetlands within this footprint.  NWI data has a larger acreage than field observation suggests.  This forested wetland connects to critical marsh 0.34 miles along this gravity-fed, forested wetland.  See Map 8.
- This area has moderate ecological value.  Its current condition is a common habitat type across the area.  Loss of this habitat would not be as significant as loss of other less common habitats, like fire-maintained pine savanna.

December 4, 2024

*Dwelling Unit 3*

- 2024 habitat – The habitat at this location is manicured grasses, likely mowed or bush hogged multiple times during the growing season. Trees at this location are tall loblolly pine and larger diameter live oaks.



*Eastern view from Dwelling Unit 3 on November 15, 2024*

- A March 2024 aerial photo shows this area with grassy openings between pines and live oaks. The area to the east of this footprint is treated in a similar fashion (i.e., between a hypothetical house and the rivers).



20

- 2008 habitat – A 2007 aerial photo shows less spacing between canopies of pines and live oaks. Pines have a greater abundance in 2007 versus in 2024. The area to the east of the dwelling unit footprint has a thicker canopy coverage as well.



- Distance to Rivers – From the eastern most edge of the dwelling unit footprint, the Pee Dee and Black Rivers are 1.0 and 0.84 miles, respectively. The maximum distance to a river section is 1.24 miles, which is at the confluence of the two previously named rivers. The Intracoastal Waterway is 2.1 miles to the east of this dwelling unit footprint.

- Visibility of building envelope from rivers – Any building at this site might be minimally visible from the rivers. Were the area to be manicured in 2008 as it is now, the possible view of this site is limited to small pockets. If, however, the site was not bush hogged in 2008, the visibility would be further restricted from the already small windows. Additionally, from the marsh edge to the rivers is at or near 1 mile.

- Evidence of archeological features – I consulted ARCH Site, the public repository of the South Carolina Institute of Archeology and Anthropology (SCIAA) and South Carolina Department of Archives and History (SCDAH) and no historic resource was noted for this location. I also reviewed elevational LiDAR data and no anthropogenic anomaly was apparent. No above ground historic resource is present. I find no evidence of significant archeological value at this location.

- Proximity of wetlands to building envelope – The National Wetlands Inventory indicates there are no wetlands within this footprint. There is a man-made, freshwater pond near the rear of the site. Critical area wetlands are 0.18 miles from this site.

December 4, 2024

- This area has moderate to low ecological value.  It is a common habitat type.  The species that occur within this footprint would likely still occur within this footprint were a residence built.  Examples of these wildlife species include eastern gray squirrel, northern cardinals, and raccoons.

*Dwelling Unit 4*

- 2024 habitat – The habitat at this location is composed of an overstory of oaks (live, water, laurel) and large diameter loblolly pine.  The midstory is thick with various shrubs and smaller forms of the above-mentioned tree species.



*Eastern view from Dwelling Unit 4 on November 15, 2024*

- A March 2024 aerial photo shows this area with a tightly spaced canopies of evergreen trees (live oaks and pines) and deciduous trees (likely water and laurel oaks).  This canopy coverage exists to the east, southeast and south of the building envelope (i.e., between a hypothetical house and the rivers).



22

- 2008 habitat – A 2007 aerial photo shows a similar spacing of trees in the building envelope.  Tree coverage extends further south towards the rice field than that currently present; therefore, there would be more wooded acres on the marsh-side of this building envelope.



- Distance to Rivers – From the eastern most edge of the dwelling unit footprint, the Pee Dee and Black Rivers are 1.02 and 0.71 miles, respectively.  The maximum distance to a river section is 1.21 miles, which is at the confluence of the two previously named rivers.  The Intracoastal Waterway is 2.04 miles to the east of this dwelling unit footprint.

- Visibility of building envelope from rivers – Any building at this site might be minimally visible from the rivers.  The heavy forest cover would allow at most small pockets of visibility towards the river.  Visibility would likely be restricted to portions of a building through these pockets of visibility, and at that only the upper portions.

- Evidence of archeological features – I consulted ARCH Site, the public repository of the South Carolina Institute of Archeology and Anthropology (SCIAA) and South Carolina Department of Archives and History (SCDAH) and no historic resource was noted for this location.  I also reviewed elevational LiDAR data and no anthropogenic anomaly was apparent.  No above ground historic resource is present.  I find no evidence of significant archeological value at this location.

- Proximity of wetlands to building envelope – The National Wetlands Inventory indicates there are no wetlands within this footprint nor did my site visit reveal any large, substantial wetlands.  Critical area wetlands are 0.12 miles from this site.

- This site has moderate ecological value because of its prevalence across the Lowcountry.  Were a residence constructed here, live oaks would remain and midstory would be removed.  Wildlife

December 4, 2024

species that depend on this type of midstory (e.g., northern cardinals, racoons, and gray squirrels) would still occur in this area.

*Dwelling Unit 5*

- 2024 habitat – The habitat at this location is composed of an overstory of oaks (live, water, laurel) and large diameter loblolly pine. The portion closer to the managed rice field is mowed periodically and views towards the river are possible.



*Eastern view from Dwelling Unit 5 on November 15, 2024*

- A March 2024 aerial photo shows this area with a tightly spaced canopies of evergreen trees (live oaks and pines) and deciduous trees (likely water and laurel oaks). Some openings exists and are areas where periodic mowing occurs.



December 4, 2024

▪ 2008 habitat – A 2007 aerial photo shows a similar spacing of trees in the building envelope.



- Distance to Rivers – From the eastern most edge of the dwelling unit footprint, the Pee Dee and Black Rivers are 1.02 and 0.71 miles, respectively. The maximum distance to a river section is 1.21 miles, which is at the confluence of the two previously named rivers. The Intracoastal Waterway is 2.04 miles to the east of this dwelling unit footprint.

- Visibility of building envelope from rivers – This is the one building envelope that could have visibility from the Black River; however, visibility would be restricted. See below for general description of visibility of residences from the Black River.

- Evidence of archeological features – I consulted ARCH Site, the public repository of the South Carolina Institute of Archeology and Anthropology (SCIAA) and South Carolina Department of Archives and History (SCDAH) and no historic resource was noted for this location. I also reviewed elevational LiDAR data and no anthropogenic anomaly was apparent. No above ground historic resource is present. I find no evidence of significant archeological value at this location.

- Proximity of wetlands to building envelope – The National Wetlands Inventory indicates there are no wetlands within this footprint nor did my site visit reveal any large, substantial wetlands. Critical area wetlands are 0.12 miles from this site.

- This site has moderate ecological value because of its prevalence across the Lowcountry. Were a residence constructed here, live oaks would remain and midstory would be removed. Wildlife species that depend on this type of midstory (e.g., northern cardinals, racoons, and gray squirrels) would still occur in this area.

December 4, 2024

*Recreation Area*

- 2024 habitat – The habitat at this location is composed of an overstory of oaks (mostly water and live) and some loblolly pine.  The midstory is not abundant but has small diameter tree species (i.e., pine, sweetgum, etc.)  Understory is minimal.  Prescribed fire appears to have been used infrequently.



*Eastern view from Recreation Area November 15, 2024*

- A March 2024 aerial photo shows this area with a tightly spaced canopies of evergreen trees (live oaks and pines) and deciduous trees (likely water oaks).  This canopy coverage exists to the east, southeast and south of the building envelope (i.e., between a hypothetical recreation building and the rivers).



26

▪ 2008 habitat – A 2007 aerial photo shows a similar spacing of trees in the building envelope.  Tree coverage extends further south towards the rice field than that currently present; therefore, there would be more wooded acres on the marsh-side of this building envelope.



- Distance to Rivers – From the eastern most edge of the dwelling unit footprint, the Pee Dee and Black Rivers are 0.95 and 0.95 miles, respectively.  The maximum distance to a river section is 1.24 miles, which is at the confluence of the two previously named rivers.  The Intracoastal Waterway is 1.9 miles to the east of this dwelling unit footprint.

- Visibility of building envelope from rivers – Any building at this site would not be visible from the rivers due to the forested nature in and around this building envelope.

- Evidence of archeological features – I consulted ARCH Site, the public repository of the South Carolina Institute of Archeology and Anthropology (SCIAA) and South Carolina Department of Archives and History (SCDAH) and no historic resource was noted for this location.  I also reviewed elevational LiDAR data and no anthropogenic anomaly was apparent.  No above ground historic resource is present.  I find no evidence of significant archeological value at this location.

- Proximity of wetlands to building envelope – The National Wetlands Inventory indicates a forested wetland extends from tidal marsh into the uplands.  I observed this during my site visit.  It is a forested ephemeral run.  Critical area wetlands are 0.1 miles from this site.

- This site has moderate ecological value because of its prevalence across the Lowcountry.  Wildlife species that depend on this type of midstory (e.g., northern cardinals, racoons, and gray squirrels) would still occur in this area.

December 4, 2024

*Visibility of Building Envelopes from the Black River*

On November 15, 2024, I observed the upland portion of Weehaw from the Pee Dee and Black Rivers. I used as my barometer of viewshed from the river towards Weehaw the existing Lodge (aka, Marsh House) as a visual benchmark. I also placed flagging at Dwelling Units 3, 4, and 5 to evaluate whether I could see it from the river. Based on tree coverage now and in 2008, Dwelling Units 1, 2 and Recreation Area could not be viewed from the rivers so I did not place flagging in these locations.

It should be noted that I conducted my river-based observations during one of the largest spring tide events of the year (i.e., 4.4' tide as predicted for the Windsor Plantation, Black River tide gauge). Normal tidal amplitude in this river can be 4 to 5 feet. This is important because had I conducted my river-based observations during a low tide I would have had a viewing position at least 4 feet lower than I what I experienced on Friday morning, November 15, 2024. My vertical viewing position in the river was during one of the highest tides during the year and thus maximizing the chance I could see any visual impact of the Lodge and possible observe my flagging at Dwelling Units 3, 4, and 5.

For visual reference, the photo below is the Lodge and the structure I attempted to view from the river. The top of the chimney is approximately 25 to 30 feet above grade.



The map below shows the locations of my photo stations. Note, for each of the three sections of river, I took photos from the western side of the river (where marsh vegetation would obscure visibility) and the eastern side of the river (where visibility of Weehaw uplands should be increased).



28

December 4, 2024



Photo 1A



Photo 1B



Photo 2A

December 4, 2024



Photo 2B



Photo 3A



Photo 3B

Based on these photos taken from the Black River, I can make the following statements:

- The Lodge was not visible from photo station 1A, 2A or 3A, the western side of the river closest to Weehaw.
- The Lodge was not visible from photo station 3B
- The upper portion of the roof and chimney of the Lodge was visible from photo station 1B. At photo station 2B the Lodge was more minimal. Below is a zoomed section of photo 1B to indicate the extent the Lodge could be seen (with binoculars or magnification).



I did not attempt to view the uplands of Weehaw from the Intracoastal Waterway based on the findings from the Pee Dee and Black Rivers. The Intracoastal Waterway is an additional 0.75 to 1.1 miles to the east southeast of the photo stations depicted above.

In summary, 5 of the 6 relinquished building envelopes could not be seen from the rivers. I base this on the forest cover of the building envelope at the time of the amendment and today as well as the forest cover between the building envelope and the marsh to the east of Weehaw. Only Dwelling Unit 5 is possible to view from the rivers. I make this assessment based on the visibility of the Lodge which is similarly situated at the edge of the marsh, much the way Dwelling Unit 5 was placed.

Additionally, we found little to no evidence that archeological concerns would be heightened within the 6 building envelopes versus any other portion of the property. In fact, one building envelop that remains (referred to as Dwelling Unit 6) is known to occur at or near where the older plantation home once stood, yet this was retained in the amended conservation easement. Were concern for archeological features of paramount importance, Dwelling Unit 6 would have been a logical one to restrict construction.

**6.    Analysis of ecological values and viewshed benefits before and after the 2008 amendment**

Given the previous documentation in this report, I now provide an assessment of the substantiation of the 2008 amendment to the 1995 NALT held conservation easement on Weehaw Plantation. I use as a

guide for this analysis the statements given in the 2008 amendment.  I present the specific substantiation in the 2008 NALT amendment and then, using preceding evidence in this report, provide my opinion as to the accurateness of the statement.

**Statement A** – "*Whereas, upon study and inspection, Grantee has determined that the extinguishment of the five Restricted Building Envelopes and the right to five Dwellings will have a greater ecological benefit and further advance and protect the Conservation Purposes of the Conservation Easement that any loss of such from the removal of the Hospital Parcel….*" (taken from the 8th preamble clause on page 2 of 2008 Amendment to Weehaw Conservation Easement).

This statement suggests the loss of 56.75 acres on the Hospital Parcel have less value than the preservation of the 6 relinquished building envelopes.  I come to the opposite conclusion.  The loss of the Hospital Parcel and its development as a hospital and medical office complex was significantly more detrimental to the conservation values than the limited construction on the six sites allowed by the Conservation Easement.  A majority portion of the Hospital Parcel had fire-maintained pine savanna habitat.  A range of wildlife and plant species that are threatened, endangered or have experienced significant population declines depend on this habitat.  This contrasts with the 6 relinquished building envelopes where, at the time of the 2008 amendment, the habitat value was not as high because of the common habitat type within those building envelopes.  The complete clearing of 56.75 acres on the Hospital Parcel would have had a greater ecological impact than the limited clearing for houses on 5 building envelopes and the 3 acres on the Recreation Area.  Benefit to the public would be better served through conservation of less common habitats which support populations of declining or rare floral and faunal species.

**Statement B** – "*…particularly due to the superior location of the five dwellings in terms of scenic view from the Pee Dee River, Black River and the Intracoastal Waterway…*" (continuation of Statement A, taken from the 8th preamble clause on page 2 of 2008 Amendment to Weehaw Conservation Easement)

This statement suggests that all 5 (actually 6, including the Recreation Area) site had the same scenic value from the Pee Dee River, Black River and Intracoastal Waterway.  This cannot be substantiated.  Significant variation in placement and adjacent forest cover exists across all 6 relinquished building envelopes.  In my analysis only one relinquished building envelope (i.e., Dwelling Unit 5) could have been viewed from the rivers by the public.  The other 5 had substantial forest cover between the building footprint and the river.  Were the entire building envelope cleared, this eastern, adjacent forest cover would still exist and prevent view of a dwelling in these areas on Weehaw from the rivers.  Furthermore, these 5 building envelopes were between 1.6 and 0.7 miles from the nearest river, a distance that cannot be considered as near for public viewing.  I demonstrated by trying to view the current Marsh House from the nearest river and only the upper portion of this was visible.  This distance certainly precludes viewing more so than the distance of the Hospital Parcel from U.S. Highway 701 and Wedgefield Road.  Georgetown County data demonstrate U.S. Highway 701 as one of the busiest roads in the county.

An additional factor that indicates the purported view shed value of these building envelopes is the distance from the rivers. My analysis from actually viewing the uplands of Weehaw from the Black and Pee Dee Rivers is that the distance is great and makes viewing structures minimal.

In my analysis Dwelling Units 1 through 4 and the Recreation Area could not be viewed by the public from the rivers. The remaining Dwelling Unit, number 5, could only be viewed minimally from the rivers given the near mile long view from the rivers to this Dwelling Unit 5 footprint.

**Statement C** – "*...and proximity to significant environmental features of the Property including, without limitation, the critical marsh habitat, the archeologically significant sites, and the wetlands area of the Property...*" (continuation of Statement B, taken from the 8th preamble clause on page 2 of 2008 Amendment to Weehaw Conservation Easement).

There are three components of this statement. I address each individually.

Critical marsh habitat is not near all of the 6 relinquished building envelopes. As presented in the preceding section, only Dwelling Unit 5 was directly adjacent to critical marsh. Therefore, this value of removing potential development from impacting critical marsh cannot be allied to all 6 relinquished building envelopes. This applies to only 1 of the 6.

I found no visible, morphological, nor recorded evidence that the 6 relinquished building envelopes has archeological value above and beyond any other area on Weehaw Plantation. In fact, one of the retained building envelopes is at or near the location of the older plantation structure. The Lowcountry has had European impacts for hundreds of years and Native American impact for much longer. Were preservation of these 6 footprints of significant value to the public, then the same would apply to all acres of the Lowcountry.

**Statement D** - "*Whereas, the loss of scenic view from Highway 701 and S-22-325 as a result of the development of the Hospital Parcel is insignificant in comparison to the substantial ecological and scenic benefits of the extinguishment of the five dwelling rights ....*" (taken from the 9th preamble clause on page 2 of 2008 Amendment to Weehaw Conservation Easement).

This statement suggests that the loss of the scenic view of the Hospital Parcel is less than the ecological and scenic benefits of the relinquished buildings units.

The ecological value of the fire-maintained pine savanna in the Hospital Parcel is significant. I detail those attributes previously in this report. That stands in contrast to the habitats on the 6 relinquished building envelopes. The 6 relinquished building envelopes, while more valuable than dense housing or a parking lot, were (at the time of the 2008 amendment) common habitats across the Lowcountry. Benefit to the public in conservation of habitat is greater in habitats that are more uncommon versus those that are common. Fire-maintained pine savanna is not common whereas mixed pine-hardwood habitat it common. Therefore, it is my opinion that the loss of habitat on the Hospital Parcel was of greater negative impact that the small positive impact of foregoing the building of 5 houses on common habitat.

I have previously summarized the scenic benefits of the relinquished building envelopes to the public. That is, only one of the six is actually possible to view from the river and that one is nearly a mile from the river. This is in contrast to the view of the Hospital parcel from US Highway 701 and Wedgefield Road. These two roads pass by 2,200 linear feet of forested areas (that were encumbered by the conservation easement) on the Hospital Parcel. The viewshed of the Hospital Parcel is seen by more members of the public due to a US Highway and a second road passing these acres than the acres seen from the river. Far fewer members of the public could view the Weehaw upland acres from the rivers than the numbers that travel US Highway 701 and Wedgefield Road.

It is my opinion that the conservation values of the 1995 conservation easement were not maintained nor improved upon by the 2008 amendment but in fact were significantly diminished. The view shed values of the 6 relinquished building envelopes are not equal and yet were treated as such in the 2008 amendment. In my opinion, the significant traffic and resulting diminishment of the viewshed from US Highway 710 and Wedgefield Road far outweighs the possible nominal improvement to the viewshed from the rivers from the elimination of the five dwelling sites and the recreational area.

### 7. Critique of expert opinions offered by A. Brown

Mr. Alton Brown provided an expert opinion (dated August 2024) where he considered the 1995 NALT-held conservation easement and 2008 amendment to this conservation easement. He evaluated four factors in his consideration and they are as follows: biodiversity and habitat quality, cultural/archeological and recreation, size and contiguity, and location and degree of threat. For each factor, he ranked them as contributing to the conservation value of the landscape for both the 1995 conservation easement and 2008 amendment to the conservation easement. He used this organization to render his opinion and I respond to each below.

*1995 conservation easement*

-    biodiversity and habitat quality

Mr. Brown places a high conservation value on this factor under the 1995 conservation easement. He indicates the combination of habitats (see list at bottom of page 4 of Brown report) on one parcel is not common and these habitats are subject to development and habitat degradation due to lack of management.

I agree with Mr. Brown that these habitats are valuable and to provide all of these habitats within Weehaw has high conservation value. I further agree that clearcutting of fire-maintained pine savanna or degradation due to lack of active habitat management are major factors reducing these acres across the Lowcountry; therefore, removal of the 56.75 acres would have reduced the conservation value of the property. Furthermore, placement of a hospital campus next to the remaining fire-maintained pine habitat on Weehaw would have led to habitat degradation on Weehaw proper. Use of prescribed fire would cease were a medical campus built on the Hospital Parcel.

- cultural/archeological and recreation

Mr. Brown posits that development of the house sites could have negatively impacted archeological sites and diminished the natural view shed. He suggests the value for this factor as moderate. I found no physical nor recorded evidence of significant archeological resources in these areas. I would disagree with this statement which is unfounded.

Mr. Brown also suggests the historic viewshed could have been disrupted by the 6 building envelopes originally allowed by the 1995 conservation easement. I disagree with this contention as well. I previously demonstrated in this report that not all of these building envelopes are visible from the Black or Pee Dee Rivers. In his analysis, he considers all building envelopes to have similar viewshed placement and impact. This is incorrect.

- size and contiguity

Mr. Brown suggests that the placement of 5 building envelopes in the original conservation easement could lead to habitat fragmentation and he further says the conservation value of the parcel overall was moderate because of the presence of these 5 building envelopes (plus the 2 building envelopes that were retained).

I disagree the conservation value of the easement (for this factor) was moderate based on the presence of these building envelopes. To invoke concerns of habitat fragmentation is not appropriate in this context. Habitat fragmentation is typically defined in ecological considerations as disruptions to a large, continuous habitat blocks such that remaining habitat blocks are disjunct or not connected. Franklin et. al (2002) suggests that habitat is only fragmented when the habitat disruption results in changes to occupancy by a species, changes in reproduction or survival of a species. The 5 building envelopes would not have created disjunct areas of habitat. Given that 5 of the 6 relinquished building envelopes are common habitats and the species that utilize them are common, impacts to occupancy, reproduction or survival are unlikely. I would suggest that the conservation value of the entire 788-acre footprint original 1995 conservation easement footprint as high and not moderate.

- location and degree of threat

Mr. Brown suggests that the threat of development in 1995 was significant therefore the conservation value of the original Weehaw conservation easement was high. I agree that the location of Weehaw at the edge of urban Georgetown make it an excellent candidate for conservation through a conservation easement. This further underscores why removal of 56.75 acres from the conservation easement footprint was of such negative impact to the overall conservation values.

35

*2008 amendment*

- biodiversity and habitat quality

Mr. Brown makes several statements. He says the 56.75 acres was mixed pine hardwood upland and is a common habitat. He also says of this habitat that it is the "least unique when considering biodiversity and habitat quality" (7th line of last paragraph on page 6 of Brown report).

I disagree with this for two reasons. First, the majority acreage of the 56.75 acres was not a mixed pine hardwood forest. It was a fire-maintained pine savanna composed of loblolly and longleaf pine. I demonstrated this historical interpretation of aerial photography for this site earlier in this report. This habitat is not common across the Lowcountry or the Southeast. This is evident by the numerous species that depend on this habitat that have experienced significant populations declines like red-cockaded woodpecker, Bachman's sparrow, eastern diamondback rattlesnake, pitcher plant species, etc.

Next Mr. Brown indicates the 56.75 acres does not currently contain RCW habitat due to past management practices like lack of fire application. He says the 56.75 acres "does not offer the same species benefits due to the condition of the property and past management practices" (11th line of last paragraph on page 6 of Brown report). This is not correct. I demonstrated earlier that the 56.75 acres was fire-maintained habitat. I showed this through a sequence of aerial photographs. Additionally, the photos from the 2003 NALT baseline document show this area as fire-maintained pine savanna. This would then place a high value of these areas within the Hospital Parcel, similar to the value Mr. Brown places on this type of pyrogenic-maintained habitat elsewhere on Weehaw.

Mr. Brown also suggests the Hospital Parcel habitat value currently is poor. Indeed, because of lack of fire for 10+ years the RCW habitat value is low, but this current habitat condition is a result of the easement and can not be used to retrospectively justify the loss of the 56.75 acres in the 2008 amendment.

I agree with Mr. Brown the habitat quality on the 56.75 acres is not valuable in 2024, but this is a result of lack of active land management due to the 2008 amendment. I disagree with Mr. Brown on his assessment of the habitat quality at the time of the 2008 amendment. Previously in this report I have demonstrated that the habitat quality of most of the 56.75 acres was high and was being managed as a fire-maintained pine savanna, quality habitat for RCWs.


- cultural/archeological and recreation

Mr. Brown suggests that elimination of the five dwellings from the amended conservation easement would have "substantially reduced the potential for impact to archeological sites and the historic upland viewshed as well as the historic Pee Dee River and Black River viewsheds" (7th line of second paragraph of page 7 of Brown report).

I disagree with this statement for several reasons. First, there is no visible nor documented evidence of archeological sites on the relinquished building envelopes. I reviewed elevation data and archeological inventories and could find no compelling suggestion of this value on these sites. Furthermore, one of the two retained building envelopes was more closely located to the historic Camelia gardens. Second, I disagree with Mr. Brown's assessment of the historic viewshed. Most of these sites are surrounded with

forested acres that could not be clearcut which would then prevent a broad change in the historic viewshed. Third, I similarly disagree with his assessment of the viewshed from the rivers. I conducted an in-person site visit to the Black and Pee Dee Rivers for the sole purpose of attempting to view the uplands of Weehaw from this vantage point. The rivers are 0.75 to over a mile from the Weehaw uplands so visibility of existing buildings is minimal. Additionally, not all of the 6 relinquished building envelopes could be seen from the rivers. Mr. Brown treated all relinquished building envelopes as having identical placement and viewshed characteristics. There are not equal and on-site investigation would have revealed this.

- size and contiguity

Mr. Brown makes several statements here. First, he suggests that removal of the 5 building sites will result in less habitat fragmentation in the future were these houses permitted to have been built. Habitat fragmentation was an inappropriate ecological context to have invoked in this situation for several reasons. First, habitat fragmentation suggests that two areas of similar habitat become disconnected as a result of some activity, most commonly anthropogenic in cause. A commonly cited example is a road that bisects a contiguous block of habitat. That is not the case in this situation. The 5 building parcels and the recreation area would not have completely blocked one area of habitat from another. Second, habitat fragmentation is most commonly considered with rare or unique habitats. Of the 6 relinquished building envelopes, only one had a habitat that is not common across the landscape (i.e., Dwelling Unit 1 which has been managed with prescribed fire). The other 5 areas are habitats that are common across the landscape and the wildlife that utilize these habitats are concomitantly common as well.

Mr. Brown says the loss of scenic view of the Hospital Parcel from U.S. Highway 701 and Wedgefield Road is "insignificant in comparison to the substantial ecological and scenic benefits of the extinguishment of the grantor's reserved right to develop five dwellings" (third paragraph of page 7 in Brown report). I disagree with this for three reasons. First, there is a substantial viewshed of the public to the Hospital Parcel from U.S. Highway 701 and Wedgefield Road. Previously in this report I indicate U.S. Highway 701 is one of the busiest roads in Georgetown County and the road traffic has been increasing. Second, the viewshed of the 6 relinquished building envelopes from the Black and Pee Dee Rivers is minimal to 2 sites and not possible to the remaining 4. Photos presented above from my river site visit demonstrate this. Finally, the loss of the majority of 56.75 acres as fire-maintained pine savanna when compared to limited house placement on 5 building envelopes is not equal. Fire-maintained pine habitat is not common nor are the wildlife species that depend on that habitat type. Furthermore, placement of a hospital campus directly across the property line from that habitat type on Weehaw proper would have made management of this pyrogenic habitat nearly impossible, resulting in loss of habitat through lack of management (as Mr. Brown noted earlier in his report). Many of the relinquished building envelopes are common habitat types.

Mr. Brown says again that the 56.75 acres was a mixed pine hardwood stand and "unremarkable habitat" (third paragraph of page 7 in Brown report). I disagree with this statement as it is incorrect. The majority of the acreage on the 56.75 acres was fire-maintained habitat at the time of the 2008 amendment of the conservation easement.

- location and degree of threat

Mr. Brown suggests that the location of the footprint of the amended conservation easement is still highly valuable for conservation value. He indicates that development threat is still high. He placed a high conservation value. I agree that the placement of Weehaw at the edge of urban development coming from the City of Georgetown is significant. I disagree that the footprint of the amended conservation eased area is the same at that when the 1995 conservation easement was placed on the property. Placement of a hospital campus directly adjacent to fire-maintained pine savanna habitat threatens the ability to manage the remaining acres with fire. A recent example in Horry County demonstrates this. Benson (2024) summarizes an identical conflict between placement of an Horry County hospital directly adjacent to Lewis Ocean Bay Heritage Preserve. SCDNR objected to this placement of a hospital because of smoke concerns to patients at the hospital. SCDNR is now purchasing these acres originally designated for the Horry County hospital. Mr. Brown did not consider the detrimental effects to Weehaw proper of the 2008 amendment for a hospital campus.

In summary, I would disagree that the conservation value of Weehaw was greater as a result of the 2008 amendment. Valuable acres of fire-maintained pine savanna habitat were removed from active land management and as a result there has been a loss of valuable habitat for many species in decline, like red-cockaded woodpeckers. Additionally, placement of a hospital campus next to similar habitat of Weehaw proper would render those acres as unmanageable with fire. Improvements too the viewshed (as a result of the amended conservation easement) are also difficult to substantiate. Many of these sites are away from the marsh edge and all are at least 0.75 miles to 1+ miles away from the Pee Dee and Black Rivers. The public viewshed benefit of not having these sites not developed with a house is minimal because they couldn't be viewed by the public. This is in stark contrast to the loss of viewshed of the Hospital Parcel which fronts one of the busiest roads in Georgetown County.

8. **Summary of materials used in this evaluation**

A variety of materials were used in this evaluation. Some materials appear as images within the text and others are appended to this report. I list them below:

- Aerial photographs ranging from 1939 to March 2024
- Elevation data in form of LiDAR data (collected 2017)
- National Wetlands Inventory classification
- USDA soil classification
- 1995 NALT conservation easement
- 2008 NALT amendment to the conservation easement
- A. Brown expert report
- Various peer-reviewed articles in the scientific literature (See literature cited below)

- Newspaper reports pertaining to public comments about Lewis Ocean Bay in Horry County (See literature cited below)
- SCDNR Safe Harbor agreement with Weehaw Plantation and annual Safe Harbor reports written by SCDNR personnel
- Summary of federal threatened and endangered species (as derived from the US Fish and Wildlife Service's IPaC database)
- Summary of state threatened and endangered species (as derived from the SCDNR's Heritage Trust database)
- Observations and photographs collected by me during 2 site visits on October 1, 2024 and November 15, 2024.

### 9.   Literature Cited

Benson, A.  2024.  Conway Medical Center, DNR reach $9M land deal for site of scrapped Carolina Forest hospital project.  Available at https://www.counton2.com/news/south-carolina-news/conway-medical-center-dnr-reach-9m-land-deal-for-site-of-scrapped-carolina-forest-hospital-project/

Brewer, S.  2008.  Declines in plant species richness and endemic plant species in longleaf pine savannas invaded by Imperata cylindrica.  Biological Invasions 10: 1257–1264.

Conner, R. N., D. C. Rudolph, and J. R. Walters.  2001.  The red-cockaded woodpecker: surviving in a fire-maintained ecosystem.  University of Texas Press.  Austin, Texas.

Franklin, A. B., B. R. Noon, and T. L. George.  2002.  What is habitat fragmentation?  Studies in Avian Bioogy 25: 20-29.

Georgetown County.  2023.  Georgetown County Comprehensive Plan Transportation Element.  Available at https://gtcounty.org/DocumentCenter/View/1760/Transportation-Element-FINAL-PDF?bidId=.

Gibbons, W. and M. Dorcas.  2015.  Snakes of the Southeast.  University of Georgia Press.  Athens, Georgia.

Outcalt, K. W.  1994.  Seed Production of Wiregrass in Central Florida Following Growing-Season Prescribed Burns.  International Journal of Wildland Fire 4: 123-125.

Peet, R. K. and D. J. Allard.  1993.  Longleaf pine vegetation of the Southern Atlantic and Eastern Gulf Coastal Plain.  Proceedings of the Tall Timber Fire Ecology Conference 18: 45-81.

VerCauteren, K. C., J. C. Beasley, S. S. Ditchkoff, J. J. Mayer, G. J. Roloff and B. K. Strickland (editors).  2020.  Invasive wild pigs in North America: ecology, impacts, and management.  CRC Press, Boca Raton, Florida.

Walter, J. R., S. J. Daniels, J. H. Carter III, and P. D. Doerr.  2002.  Defining quality of red-cockaded woodpecker foraging habitat based on habitat use and fitness.  Journal of Wildlife Management 66: 1064-1082.