# EXHIBIT C

Travis Hayes Folk, Ph.D.
MST, LLC v. North American Land Trust, et al.
February 12, 2025

```
                                                        Page 1

 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  CHARLESTON DIVISION
 3    MST, LLC,
 4              Plaintiff,
 5         vs.   CASE NO. 2:22-cv-00874-DCN
 6    NORTH AMERICAN LAND TRUST AND GEORGETOWN
      MEMORIAL HOSPITAL,
 7
                Defendants.
 8
      GEORGETOWN MEMORIAL HOSPITAL,
 9
                Third-Party Plaintiff,
10
           vs.
11
      KYLE YOUNG AND JACQUELINE YOUNG,
12
                Third-Party Defendants.
13
14    VIDEOTAPED
      DEPOSITION OF:   TRAVIS HAYES FOLK, PHD
15
      DATE:            February 12, 2025
16
      TIME:            10:07 AM
17
      LOCATION:        NELSON MULLINS RILEY &
18                     SCARBOROUGH
                       151 Meeting Street
19                     Suite 600
                       Charleston, SC
20
      TAKEN BY:        Counsel for the Defendant and
21                     Third-Party Plaintiff,
                       GEORGETOWN MEMORIAL HOSPITAL
22
      REPORTED BY:     MICHAEL DAVID ROBERTS,
23                     Court Reporter
      _____
24
25
```

Travis Hayes Folk, Ph.D.    February 12, 2025
MST, LLC v. North American Land Trust, et al.

Page 126

1  hypothesis, you placed a flag approximately 25 to
2  30 feet high and --
3      A.  As high as I could reach.  I couldn't
4  get that high.  That's why I used the Marsh House
5  as a stand in, which was right on the edge and in
6  my mind presumably if I -- if I was going to see
7  something, I should be able to see that.
8      Q.  How high did you place the -- the --
9  the flag?
10     A.  I think I stood on the back of my truck
11 and got it 15 -- 12, maybe 15 feet.  But, again,
12 the Marsh House was also -- I also used that to
13 look at that.
14     Q.  Now, in certain pictures in your report
15 you can see the Marsh House fairly clearly.
16     A.  I wouldn't call it clearly.  Minimally.
17     Q.  Well, that's from a camera; is that
18 right?  Is that on your phone?
19     A.  Uh-huh.
20     Q.  Did that apply any magnification?
21     A.  Uh-huh.
22     Q.  How much?
23     A.  I don't remember.  I zoomed in.
24     Q.  And -- and if we're looking on page 31
25 of your report, that's an example of a photo where

Page 127

1  you can see the Marsh House; is that right?
2      A.  Uh-huh.
3      Q.  Now, if there had been some clearing,
4  thinning of the understory, if dwellings had been
5  built within those building envelopes, it's
6  possible those could be seen from this same
7  position where you took the image of the Marsh
8  House; is that right?
9          MR. WALKER:  Object to the form of the
10 question.
11         THE WITNESS:  I guess anything is
12 possible, if they were a bright color or lava
13 lights; but the distance there was -- they were
14 treating all of those building envelopes as equally
15 visible from the river, and they were not.  They
16 were variable distances back off the marsh.
17 BY MR. MORAN:
18     Q.  Is that your interpretation that they
19 were all being treated equally, or is that what it
20 says?
21     A.  Particularly due -- and I'm reciting --
22     Q.  Please.
23     A.  -- page 32, statement B, my citation of
24 the amendment.  Particularly due to the superior
25 location of five dwelling units -- five dwellings

Page 128

1  in terms of scenic view from the Pee Dee River,
2  Black River and Intracoastal.
3          In my mind that's that -- that equates
4  the footprint of all five of those having the same
5  scenic value to the rivers.  They didn't say, with
6  diminished scenic value one through five.  They
7  lumped them all into five dwellings in terms of
8  scenic values from the rivers.
9      Q.  As compared to the hospital parcel with
10 Highway 701, right?
11     A.  This statement just says the five --
12 addresses the scenic -- what they viewed as the
13 value of the scenic view to the five dwellings from
14 the river, and that's what I considered in that
15 statement B.
16     Q.  And they don't say there that they --
17 they view them all as equally visible from -- from
18 the river and that they have equal distance or
19 anything like that; is that right?
20     A.  If they weren't equal I would have
21 assumed that they would have been more precise in
22 their language versus just saying the five
23 dwellings in terms of scenic view.
24     Q.  Again, that's based off your
25 assumption, correct?  We don't know what NALT

Page 129

1  itself --
2      A.  Again, NALT's thought process leading
3  to the amendment, I have never been privy to that,
4  but that would be illuminating to say the least.
5      Q.  I want to go back to something you
6  testified to previously, and please correct me if I
7  misstate this, okay.
8          But you testified that you -- it's your
9  opinion, one of your opinions, that the ecological
10 benefits of the amendment do not outweigh the
11 ecological detriments as a result from that
12 amendment; is that correct?
13     A.  Yes.
14     Q.  And then separately you provide a -- a
15 critique of Alton Brown in your report; is that
16 correct?
17     A.  Correct.
18     Q.  Okay.  Which portions of your report
19 specifically relate to your critique of Mr. Brown
20 as opposed to your analysis of the ecological
21 values of the amendment?
22     A.  Towards the end critique -- starting on
23 page 34, critique of expert opinions offered by
24 Alton Brown.
25     Q.  Okay.  Have you ever met Mr. Brown?

33 (Pages 126 - 129)