# Exhibit E

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                   CHARLESTON DIVISION
 3    MST, LLC,
 4              Plaintiff,
 5         vs.                    CASE NO. 2:22-cv-874-DCN
 6    NORTH AMERICAN LAND TRUST AND GEORGETOWN
      MEMORIAL HOSPITAL,
 7
                Defendants.
 8
      GEORGETOWN MEMORIAL HOSPITAL,
 9
                   Third-Party Plaintiff,
10
           vs.
11
      KYLE YOUNG AND JACQUELINE YOUNG,
12
                   Third-Party Defendants.
13
14    VIDEOTAPED VTC
      DEPOSITION OF:    DANIEL WAYNE STACY, JR., ESQUIRE
15
      DATE:             February 13, 2025
16
      TIME:             10:09 AM
17
      LOCATION:         NELSON MULLINS RILEY &
18                      SCARBOROUGH
                        151 Meeting Street
19                      Suite 600
                        Charleston, SC
20
      TAKEN BY:         Counsel for the Defendant and
21                      Third-Party Plaintiff,
                        GEORGETOWN MEMORIAL HOSPITAL
22
      REPORTED BY:      MICHAEL DAVID ROBERTS,
23                      Court Reporter
      _____
24
25
```

Daniel Wayne Stacy , Jr., Esquire               February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 8

1          A.     Thank you.

2          Q.     Hopefully we can avoid those today.

3                 Mr. Stacy, am I correct that you

4     represented Georgetown Hospital system in its

5     acquisition of approximately 65 acres of Weehaw

6     Plantation from Jacqueline and Kyle Young, and that

7     transaction closed on December 30th, 2008?

8          A.    I did.

9          Q.    Okay.  Now, related to the acquisition

10    of that property, am I also correct that you

11    assisted and advised Georgetown Hospital System on

12    a permitting process?

13         A.    I did.

14         Q.    As well as an application for rezoning

15    that property, which I'll refer to as the hospital

16    parcel, for a planned unit development for a

17    hospital campus and medical offices?

18         A.    I did.  I was the attorney of record

19    for that -- that piece of work.

20         Q.    And you were also as part of that

21    acquisition asked to assist and advise the

22    Georgetown Memorial Hospital on an amendment to a

23    conservation easement that was previously -- or

24    previously encumbered the hospital parcel; is that

25    right?

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 9

1          A.    I did.

2          Q.    Now, putting aside the -- the

3    Georgetown Memorial Hospital System's purchase of

4    the hospital parcel, am I correct that you also

5    represented MST, LLC in its purchase of Weehaw

6    Plantation from Jacqueline and Kyle Young in

7    June of 2010?

8          A.    Yes, sir, I did.

9          Q.    And then subsequently in the 2013 time

10   frame, did you represent MST, LLC in its purchase

11   of what is called the Weehaw Cheves tract?

12         A.    Just a moment, please.  Our office did

13   represent them in the purchase of the adjacent

14   property.

15         Q.    I would like to start asking you some

16   questions about Georgetown Memorial -- or

17   Georgetown Hospital System's purchase of the

18   hospital parcel.

19         A.    Okay.

20         Q.    When were you first retained,

21   approximately, by Georgetown Hospital System to

22   represent it in that transaction?

23         A.    Several months before that actual

24   closing I was retained to assist with site

25   selection input for a potential new hospital, so it

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 10

1    would have been several, several months before the

2    actual closing of the portion -- of the hospital

3    parcel as you called it.

4          Q.   And with your reference to site

5    selection, am -- am I correct that in that time

6    frame leading up to -- to 2008, Georgetown Hospital

7    System was inquiring as to potential properties for

8    it to build a new hospital campus in Georgetown?

9          A.   Yes, and they asked me to assist with

10   site criteria.  I mean, just like this area that

11   we're in today, we have a lot of areas that you run

12   in wetland areas or sewer or water capacity issues,

13   and so it was more of a look at that part of our

14   county and what sites might be available that might

15   be large enough that might have adequate

16   infrastructure in place, that might have adequate

17   utilities and road frontage, and that was part of

18   that process.

19         Q.   I'm going to hand you -- I put the

20   sticker on my copy.  I apologize.

21              I'm going to hand you what I am marking

22   as Exhibit 2 to the deposition.

23              (DFT. EXHIBIT 2, Three-page letter to

24   Rick Kaylor from Daniel W. Stacy, Jr. Dated 5/2/06,

25   was marked for identification.)

Daniel Wayne Stacy , Jr., Esquire    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 13

1    within and around Georgetown County?

2          A.   Yes, sir, inasmuch as needed.  We did

3    some real estate acquisitions, some lease

4    transactions for them.  That was just -- this was

5    me asking, I think, for Charles to give me whatever

6    he had in his files regarding this parcel.

7          Q.   Okay.  And -- and that's what I want to

8    get into here.  Is the -- the May 2006 time frame,

9    is that approximately the time frame that the

10    hospital began looking into potential tracts for it

11    to build its new hospital campus?

12          A.   To the best of my recollection, yes,

13    sir.  That was quite a number of years ago, maybe

14    19 years ago now, but they would -- they asked me

15    to help them rank sites, including this was one of

16    the sites they had looked at before.

17          Q.   Okay.  What -- in that ranking process,

18    what criteria did you, along with Georgetown

19    Memorial Hospital, come up with as to what would be

20    a suitable site for a new Georgetown Hospital

21    campus?

22          A.   Well, again, most like the Charleston

23    market there are bridges in certain places and you

24    did not want to be on one side of the bridge or the

25    other.  You were looking to be closer to your core

Page 14

1    population center, and thankfully in Georgetown

2    County when do you run out of adequate water and

3    sewer capacity to accommodate a facility like a

4    hospital system, because a lot of the western part

5    of the county is not developed.  And so we had some

6    limitations on where we had enough of that

7    infrastructure that was in place.

8         Q.   And am I correct you also needed an

9    adequate number of acreage to build a hospital

10   campus?

11        A.   Oh, that is correct, Mr. Moran.  And of

12   course you would have to have a big enough site

13   with contiguous upland acres versus trying to work

14   through wetland areas whether you could potentially

15   fill them or not, but you would try to have as many

16   contiguous upland acres as you could because a

17   hospital campus has a critical mass of size that it

18   would require.

19        Q.   And when Mr. Bailey gave his deposition

20   in the last week or two, I believe he also

21   testified that railroad crossings were a concern

22   for where the property could feasibly be located

23   for the hospital campus.  Is that also right?

24        A.   Yes, sir, my recollection -- again,

25   this is sometime ago -- there were some sites that

Daniel Wayne Stacy , Jr., Esquire          February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 15

1     were located on Highway 521, but there are two or

2     three significant railroads crossings there, and

3     there was concern that should there be emergency

4     traffic that it would be unable to reach the

5     facility.

6          Again, trying to weigh out the bulk of

7     the population base.  Yes, there are people that

8     live on the other side of the track, so to speak,

9     that would need medical services; but the critical

10    mass, how many lives were in the least difficult to

11    access cone?

12          Q.   Now, in this letter to -- to Mr. Nation

13    you start by saying:  Per our conversation this

14    week, I need to get a significant amount of

15    information from you regarding your status on the

16    purchase on the tract.

17          And I know this was a long time ago,

18    but just to the best of your memory, who did

19    Mr. Nation represent with regard to the tract which

20    I believe you're referring to as the Weehaw tract

21    in the subject line?

22          A.   I believe he was working for Georgetown

23    Hospital System at the time and had begun some due

24    diligence efforts on the site, but they were,

25    again, transitioning representation.

Daniel Wayne Stacy , Jr., Esquire        February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 16

1        Q.    And so am I correct that either

2 Mr. Nation or personnel at -- at the hospital had

3 identified a portion of Weehaw Plantation as

4 potentially being a tract that's suitable for the

5 relocation of its -- of its hospital campus?

6        A.    Yes, sir, it was one of the sites that

7 met their criteria.

8        Q.    And -- and really this letter is -- is

9 really just the transition of services from

10 Mr. Nation to you and you getting the information

11 that he had available to him at that time; is that

12 right?

13        A.    It appears to be that, yes, sir.

14        Q.    How did you go about initially

15 approaching the owners of Weehaw Plantation about

16 Georgetown Memorial Hospital or Georgetown Hospital

17 System potentially purchasing a portion of the

18 property for its new hospital campus?

19        A.    So my recollection is they had been in

20 some conversations with the ownership group already

21 between Mr. Bailey and a principal of the Young

22 family. And when I came into this representation,

23 it was beginning to transition to trying to

24 negotiate a purchase and sales agreement with the,

25 you know, appropriate contingencies and due

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 17

```
 1   diligence periods.
 2          Q.    I'll hand you what I'm marking as
 3   Exhibit 3.  And for the record Exhibit 3 has
 4   beginning Bates No. GMH002824.
 5                (DFT. EXHIBIT 3, Three-page
 6   confidential document Bates labeled GMH_002824
 7   through GMH_002826, was marked for identification.)
 8   BY MR. MORAN:
 9          Q.    Mr. Stacy, have you had to take -- had
10   a chance to take a look at the document that's been
11   marked as Exhibit 3?
12          A.    Yes, sir, I have.
13          Q.    And what does this document appear to
14   you to be?
15          A.    It looks like a letter of intent that
16   was drafted by me on behalf of the hospital system
17   to propose to the owners of the property about the
18   framework to be -- you know, during the transition
19   to a traditional purchase and sale agreement.
20          Q.    And this property or this letter of
21   intent here is addressed to Danny Young, Larry
22   Young and Kyle Young; is that right?
23          A.    Yes.
24          Q.    And Larry Young was -- was Danny Young
25   and Kyle Young's father?
```

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 18

1              A.    Correct.

2              Q.    Okay.  And in looking at this letter of

3      intent, I see there's -- there's no mention of a

4      conservation easement or any contingency in here

5      about amending the conservation easement on the

6      Weehaw property as a condition of the hospital's

7      purchase; is that right?

8              A.    It's not in the letter of intent.  We

9      would have customarily gone from that to a contract

10     with an appropriate due diligence period in it

11     where we would have begun to do things like title

12     exams and wetland delineations and the like.  This

13     was an attempt, I think, I guess, in 2006 to set

14     forth the business terms.

15             Q.    And in your process -- let me back up.

16     How long have you been practicing law?

17             A.    Since 2000 -- since 1995.

18             Q.    Okay.  And -- and what area of law is

19     your practice traditionally focused on?

20             A.    The huge majority is real estate and

21     transactional-related matters.  There is some

22     probate and estate work and there is, you know,

23     some business acquisition, business formation,

24     small business purchase and sales and a lot of land

25     use, zoning and entitlement.  But all transactions,

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 21

1    soon as she had provided me her abstract and all

2    the copies of the exemptions, then I would have

3    absolutely known.

4            Q.    In this initial letter of intent I see

5    the -- the purchase price, looks like it was

6    initially listed at $35,000 per upland acre and

7    then somebody struck through that and listed 30,000

8    per upland acre.  Do you know who struck through

9    that?

10           A.    I do not recall.

11           Q.    And in this -- in this transaction, how

12   was it that the initial offer of $30,000 per upland

13   acre was determined?

14           A.    The CEO of the hospital system and

15   representatives of the Young family were discussing

16   business terms.

17           Q.    And so that's not something that you

18   discussed was the -- the purchase price; you would

19   have -- you would have been focused on the legal

20   terms of the transaction?

21           A.    Yes, sir.

22           Q.    Would you have provided any input on

23   sort of market comps and -- and, you know, fair

24   market value, things like that?

25           A.    If asked my opinion I would probably

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 22

1    been in a position to say, based on the

2    transactions we've closed recently in the area,

3    that seems like a fair price, not a fair price; but

4    I just don't recall one way or the other about

5    being asked this.

6            Q.   But it's your recollection that the --

7    the purchase price was solely negotiated between

8    the owners of Weehaw and the -- the management at

9    Georgetown Hospital System?

10           A.   Yes.

11           Q.   Okay.  Upon learning that -- just to

12   set a baseline fact here.  Is it your understanding

13   that of the 65 acres that Georgetown Hospital

14   System ultimately purchased from Jacqueline Young

15   and Kyle Young, 56.7 of those acres were previously

16   subject to conservation easement placed on Weehaw

17   Plantation?

18           A.   Yes, sir, as I recall the -- what I'll

19   call a corner parcel, the corner 15 acres on the

20   corner of Wedgefield Road and 701 was never subject

21   to that easement, and so it was the surrounding

22   parcel.  That would comprise the size of the tract

23   that they felt they needed to build the campus that

24   they would have been planning at that moment.

25           Q.   If you could, after you learned that a

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 25

1      5th, 2007 because, obviously, I -- not obviously.

2      I would have communicated, I think, with Mr. Kaylor

3      about the issues and then it made itself to a

4      meeting for a discussion at the board level

5      sometime after that.

6            Q.   Now, outside of just notifying

7      Georgetown Hospital System that a portion of the

8      hospital parcel was encumbered by the conservation

9      easement and it would need to be modified or

10     amended if they wanted to use it for a hospital

11     campus as their intended use, did you ever raise to

12     them any other concerns specific to the

13     conservation easement itself?

14           A.   Other than going through the terms and

15     conditions of the easement and what was permissible

16     and what was not, and then, obviously, discussion

17     that it may be possible to have a discussion with

18     North American Land Trust about an amendment to it

19     because having read it now that I've had to refresh

20     myself on this file after a few years, realizing

21     that there were significant portions of the

22     inholdings of Weehaw that were subject to being

23     developed we decided we would ask, could we modify.

24           Q.   And understanding that you weren't at

25     this meeting, do these meetings -- do these

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 30

1    study.

2          Q.    And in this case you have -- you,

3    number one, provided your file to Georgetown

4    Memorial Hospital and you were also subpoenaed; is

5    that right --

6          A.    That is --

7          Q.    -- by North American Land Trust?

8          A.    That is correct.

9          Q.    And putting aside privilege, did -- did

10   you produce everything responsive that was not

11   privileged as part of your file?

12         A.    Everything we could find.  Again, at

13   that time, Mr. Moran, it was 2008.  The document

14   retention policy of the Bar was seven years.  We

15   didn't scan a lot then, and so that file was

16   shredded after the required retention period.

17              I just don't have the space to keep.  I

18   mean, we do, I don't know, a thousand transactions

19   a year.  I just don't have the space.

20         Q.    Prior to -- prior to that retention

21   policy expiring in approximately 2015, let's say,

22   would you in the normal course have retained a copy

23   of that environmental report prepared by Red Bay

24   Environmental?

25         A.    I would have kept the paper --

Daniel Wayne Stacy , Jr., Esquire               February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 31

1           MR. WALKER:  Object to the form.

2           Go ahead.

3           THE WITNESS:  I would have a kept a

4  paperer for everything until the file was ready to

5  be not kept.

6  BY MR. MORAN:

7      Q.   Understanding we don't have a copy of

8  the report prepared by -- or study prepared by Red

9  Bay Environmental here today, what do you recall

10  the conclusion of that report being?

11           MR. WALKER:  Object to the form.

12           THE WITNESS:  So to the best of my

13  recollection, that consultant determined that it

14  was an enhancement to the easement as it -- in

15  total because it would further encumber, in his

16  opinion, I recall, more ecologically sensitive

17  properties on the riverfront versus Upland Pine

18  Plantation.

19  BY MR. MORAN:

20      Q.   All right.  I'm going to go ahead and

21  mark two more exhibits.  I'll hand you Exhibit 5

22  which is the 1995 conservation easement placed on

23  Weehaw -- Weehaw Plantation by Larry and Judy

24  Young.

25           (DFT. EXHIBIT 5, Multipage document

Daniel Wayne Stacy , Jr., Esquire          February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 34

1      certainly worse for its ecological value by that

2      action.

3              Q.    Now, prior to the execution of the

4      amendment, did you understand the amendment to be

5      valid and legally enforceable in releasing the

6      56.75 acres of --

7              A.    I believe --

8              Q.    -- the hospital parcel from the

9      conservation easement restrictions?

10             A.    I believe that it was, still believe

11     that it is.

12             Q.    And did you communicate that

13     understanding to the hospital prior to their

14     execution and purchase of the property?

15             A.    Yes, sir, I mean, we worked hand in

16     glove or I worked hand in glove with the title

17     insurance company that was insuring the transaction

18     on this and worked with their underwriting counsel,

19     and we talked about this whole process as we went

20     through it together with North American Land Trust,

21     as we went through with their advisors, who I

22     didn't particularly have direct contact with; but I

23     worked with Mr. Johnson who told me he would work

24     with his own team, and we all believed it was

25     appropriate and enforceable.

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 35

1          Q.    Did you understand North American Land
2    Trust to be represented by legal counsel as it was
3    going through this amendment process?
4          A.    Mr. Johnson would say, let me run it by
5    my counsel, and then we would send notes or
6    documents and he would say, tweak this and change
7    that; and so I hate to assume anything, but I
8    assumed he was seeking that counsel.
9          Q.    Am I correct that Jacqueline and Kyle
10   Young were also represented by counsel in this
11   transaction and -- and the amendment process?
12         A.    They had advisors and counsel.  I'm
13   pretty sure I did the deep prep for the actual
14   transfer, but my memory is, the Young family was
15   using an attorney in Conway named Richard Lovelace
16   for most of their counsel and advice because
17   Mr. Young, Senior was a pretty active real estate
18   golf course developer and Richard did most of their
19   work.
20         Q.    Now, I also see -- I've seen in
21   correspondence of a gentleman named Trevor Thomas
22   on a lot of the documents.  Do you -- are you
23   familiar with Trevor Thomas?
24         A.    I think he used to work with Nelson
25   Mullins.  Am I correct in that?

Daniel Wayne Stacy , Jr., Esquire          February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 36

1          Q.    You are correct in that.

2          A.    And I think they must have sought his

3    counsel as well in some of these things now that

4    you say that.  I didn't really remember that, but I

5    do remember speaking with him once or twice.

6          Q.    In terms of ultimately amending the

7    easement in the manner that it was amended, what

8    due diligence did -- let me strike that.

9               In terms of amending the easement in

10   the manner that it was ultimately amended, what

11   interactions did you have with NALT as it relates

12   to defining the specific process for amending the

13   conservation easement and agreeing to a language

14   that's included in the amendment to the

15   conservation easement?

16         A.    I think in a lot of our conversations

17   with Mr. Johnson he told me what he would need to

18   have to present to his board in order to present

19   this, you know, the ecological study and surveys

20   and proposed language.  And we did -- I guess, the

21   hospital system did with my assistance provide,

22   prepare or procure those pieces of information.

23              I recall submittals to Mr. Johnson and

24   him saying, maybe -- maybe another piece of

25   information he wanted.  You know, I think he was

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 53

1    purposes of the conservation as a result of this

2    amendment far outweigh any possible detriment.

3                    Is it also your recollection that that

4    was a conclusion of the study provided by Red Bay

5    Environmental?

6                    MR. WALKER:   Object to the form of the

7    question.

8                    THE WITNESS:   I would say conclusion of

9    the North American Land Trust in their review of

10   the request in total with all the information

11   available to them.

12   BY MR. MORAN:

13        Q.   At any point in time prior to the

14   execution of the amendment, did you have any

15   concern that it was invalid or otherwise legally

16   unenforceable?

17        A.   No, we were working, again, with the

18   North American Land Trust and its expertise and

19   what they do as easement sponsors, and we were

20   working on my local end with our title insurance

21   company underwriters at Fidelity about making sure

22   we were doing this the right way; and no one ever

23   raised a question or an issue about it not being

24   valid or appropriate.

25        Q.   Who was the underwriter you were

Page 54

```
1    working with at Fidelity?

2          A.    He's a gentleman who's now retired.

3    His name is Joby, J-O-B-Y, Castine, C-A-S-T-I-N-E.

4    He's been retired for six or seven years now, but

5    he was their state underwriting counsel for

6    Fidelity National Title at that time.

7          Q.    And you had conversations with

8    Mr. Castine letting him know the plan to amend the

9    conservation easement in this manner?

10         A.    Absolutely.

11         Q.    And neither the -- the Youngs nor their

12   counsel ever raised any concern about the amendment

13   essentially being invalid or legally unenforceable;

14   is that right?

15               MS. BAUM:  Objection.

16               THE WITNESS:  We never had anybody

17   object to the amendment being invalid or concern

18   about the amendment being invalid or enforceable of

19   all the parties involved.

20               MR. MORAN:  Sarah, I heard you barely.

21   Did you have an objection you wanted to lodge, just

22   to be fair.

23               MS. BAUM:  Yes.  Thank you.

24   BY MR. MORAN:

25         Q.    Bear with me just one second.
```

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 62

1    medical office building and another hospital use if

2    we couldn't get an amendment on the balance.  There

3    was still some level of interest in, perhaps,

4    acquiring that nine acres for a potential future

5    use.

6          Q.    And in fact, the -- the hospital's

7    obligation to go through with the purchase of -- to

8    go through with either of those contracts was

9    contingent upon North American Land Trust agreeing

10   to amend the conservation easement; is that right?

11         A.    Yeah, it was, but the buyer could have

12   always waived a contingency if they chose as to

13   enforcement of that contract or one of the

14   contracts.

15         Q.    I would like to transition now to

16   talking about your representation of the Murrens in

17   their acquisition of Weehaw Plantation from

18   Jacqueline and Kyle Young.

19         A.    Okay.

20         Q.    And what is this, 11?

21               (DFT. EXHIBIT 11, Five-page document

22   entitled Title to Real Estate, was marked for

23   identification.)

24   BY MR. MORAN:

25         Q.    I'll hand you what's been marked as

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 63

1    Exhibit 11.  Mr. Stacy, do you recognize this

2    document?

3              A.   I do.  It's the deed from Kyle Young

4    and Jackie -- Jacqueline Young, MST, LLC, for I

5    will call it the balance of the Weehaw tract.

6              Q.   And the balance being 687.2 acres; is

7    that right?

8              A.   Per the deed, yes, sir.

9              Q.   And the deed is transferring property

10   from Kyle Young and Jacqueline Young to MST, LLC;

11   is that right?

12             A.   It is.

13             Q.   If you look at the bottom of the first

14   page and on to the second page, there's a statement

15   that says:  This conveyance is made subject to all

16   matters as shown on plat of 687.2 acres, the

17   remaining of Weehaw Plantation on Black River

18   surveyed for MST, LLC and the Nevada Limited

19   Liability Company.  Then it goes on to say:  It's

20   also subject to the conservation easement and

21   declaration of restrictive covenants made

22   December 29th, 1995 between Larry Young and Judy

23   Young and North American Land Trust and subject to

24   the amendment to the conservation easement and

25   declaration of restrictive covenants between Kyle

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 64

1    Young and Jacqueline Young and the North American

2    Land Trust.  Is that right?

3              A.    That's what it says, yes, sir.

4              Q.    Okay.  And in this transaction you --

5    you were the attorney for MST, LLC; is that right?

6              A.    I was.

7              Q.    Now, did you go over this provision

8    with the members of MST and explain to them what it

9    meant from a legal standpoint?

10             A.    I would have gone over the entirety of

11   the title notes with this parcel especially with

12   the fact that the Murrens at the time had not

13   bought a piece of property subject to a

14   conservation easement.  I wouldn't have necessarily

15   discussed the Spectrum Cable Television Easement

16   and the road right-of-way, but I would have

17   absolutely discussed the terms and conditions of

18   the easement.

19             Q.    And understanding that you don't recall

20   word for word what you discussed with them, do you

21   recall having that conversation with them

22   specifically?

23             A.    My recollection is it was a telephone

24   call because Mr. Murren wanted Hampton Peace his

25   real estate broker on the call, and we had a

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 65

1    conversation -- a telephone call to go through the

2    title notes, especially the provisions of the

3    conservation easement.

4         Q.    Okay.  And that would have been prior

5    to the closing of this transaction; is that right?

6         A.    Most likely talked about the hospital

7    acquisition, and Mr. and Ms. Murren had a period of

8    due diligence, and we would have done the same

9    title examinations.  They obviously wanted a

10   surveyed -- I didn't recall that until just now --

11   but they clearly hired Mr. Powers to survey the

12   property.  So we went through our due diligence

13   process.  They themselves bought title insurance,

14   and we would have discussed the title commitment

15   and the exceptions in it.

16        Q.    And did you discuss how the amendment,

17   if at all, impacted their use and enjoyment of

18   Weehaw Plantation?

19        A.    We talked quite a bit about what the

20   first -- the original agreement provided for the

21   developability of these waterfront sites and how

22   that was no longer possible, and the restrictions

23   of the easement were now fully encumbering those,

24   and that he would have a neighbor that would

25   potentially be a hospital adjacent to him.  Because

Daniel Wayne Stacy , Jr., Esquire                    February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 66

1    at that point in time he was my client.  He needed

2    to know that.

3              Q.   And at that point in time, did

4    Mr. Murren raise any concern to you of there

5    potentially being a -- a hospital on the site next

6    door?

7              A.   He proceeded to close, so I'm assuming

8    he got comfortable with it or they, not him.

9              Q.   Now, Mr. Murren testified -- strike

10   that.  I lost my train of thought.  I'll come back

11   to it.

12             Now, Mr. Murren testified that you

13   communicated to him it was unlikely that the

14   hospital would develop a hospital on the hospital

15   parcel, and that is a terrible question.  Let me

16   strike that because I used hospital too many times.

17             Mr. Murren testified that you

18   communicated to him that GMH was unlikely to

19   develop a hospital campus on the hospital parcel.

20   Do you recall having that conversation with

21   Mr. Murren?

22             A.   I do not recall having that

23   conversation and cannot think of why I would have

24   said that.  I mean, after the hospital's

25   acquisition, you had the great recession.  There

Daniel Wayne Stacy , Jr., Esquire          February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 67

1    was a reset.  There was the pending approval of, I

2    guess I'll call it the Obamacare Act was being

3    discussed, and I think they were putting their

4    plans on pause; but I never would have represented

5    that they were going to do nothing with it.

6          Q.   And did you make clear to Mr. Murren

7    that even if the hospital didn't develop a medical

8    campus on the hospital parcel that was sold or the

9    hospital chose to it could develop some other type

10   of property there?

11              MR. WALKER:  Object to the form of the

12   question.

13              THE WITNESS:  I don't recall us having

14   that specific conversation.  Later we did.  Not at

15   that moment.

16   BY MR. MORAN:

17         Q.   And when -- what later conversation are

18   you referring to?

19         A.   When the system asked me to get this

20   parcel and several others that they had decided to

21   deem as surplus appraised so they could begin to

22   market what they deemed to be surplus properties, I

23   recommended that we reach out to Mr. Murren and

24   tell him that the property was going to be for sale

25   and that it would be offered to him before it hit

Daniel Wayne Stacy , Jr., Esquire                February 13, 2025
MST, LLC v. North American Land Trust, et al.

Page 68

1    the market based on whatever appraised value was

2    produced at that time.

3            So I did, I reached out to him and said

4    it was going to be for sale and if he would like to

5    purchase it.  I believe I shared a copy of the

6    appraisal from Hucks & Associates with him.  I did

7    not know that they had -- this is irrelevant -- I

8    did not know that they had any domestic issues so I

9    communicated email to both, but I spoke to her

10   separately and I spoke to him separately about that

11   it was available for purchase and that would have

12   been 2021ish, somewhere in there.

13        Q.   So you spoke to both Jim and Heather

14   Murren about the -- the hospital parcel being for

15   sale?

16        A.   I did.

17        Q.   Did either of them express any interest

18   in purchasing the hospital parcel?

19        A.   No, they did not.

20        Q.   Did they provide a reason as to why?

21        A.   They did not to me.  They said they

22   were not interested at the moment.  I said, okay.

23   Just thought it was the neighborly thing to do.

24        Q.   Now, during your representation of --

25   of MST, LLC, did either Jim or Heather Murren