# Exhibit N

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 1

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION
 3    MST, LLC,
 4            Plaintiff,
 5        vs.    CASE NO. 2:22-cv-00874-DCN
 6    NORTH AMERICAN LAND TRUST AND GEORGETOWN
      MEMORIAL HOSPITAL,
 7
              Defendants.
 8
      GEORGETOWN MEMORIAL HOSPITAL,
 9
              Third-Party Plaintiff,
10
          vs.
11
      KYLE YOUNG AND JACQUELINE YOUNG,
12
              Third-Party Defendants.
13
14    30(B)(6) VTC     NORTH AMERICAN LAND TRUST
      DEPOSITION OF:   BY:  STEVEN WILLIAM CARTER
15
      DATE:            January 14, 2025
16
      TIME:            9:58 AM
17
      LOCATION:        WALKER GRESSETTE LINTON, LLC
18                     66 Hasell Street
                       Charleston, SC
19
      TAKEN BY:        Counsel for the Plaintiff
20
      REPORTED BY:     MICHAEL DAVID ROBERTS,
21                     Court Reporter
      _____
22
23
24
25
```

Page 33

1    that we have been aware of, and we've been

2    successful in just about all of those with the

3    exception of one.

4              Q.    And which one was that?

5              A.    That was Atkinson versus Commissioner,

6    St. James conservation easement.  The tax court

7    judge did not find that the conservation purposes

8    were sufficient to qualify for tax deductibility.

9              Q.    You mentioned 11 cases.  Do you have a

10   record of those 11 cases?

11             A.    I do.

12             Q.    All right.  Have any of those cases

13   involved an instance where the service questioned

14   an amendment to the easement?

15             A.    No.

16             Q.    They have all involved the original

17   easement?

18             A.    Yes, sir.  Correct.

19             Q.    There have been instances where the

20   service has -- the IRS has audited NALT, correct?

21             A.    Yes, sir.

22             Q.    How many times has the IRS audited

23   NALT?

24             A.    Three times:  2004, 2014 and 2018 just,

25   recently.

Page 34

1          Q.    And we'll get to those later.

2          A.    I hope so.  Proud of that work, too.

3    Or those outcomes I should say.

4          Q.    Has NALT been a direct party to any

5    litigation?

6          A.    It has not.

7          Q.    It has never been a defendant in a suit

8    brought by the government or an individual?

9          A.    No.  I'm aware of -- in 2015 there's a

10   project Beaver Pond.  Apparently NALT was named as

11   a -- in this lawsuit, but we were never served and

12   it never went anywhere, and I'm not sure it still

13   exists.

14         Q.    Has NALT ever initiated any litigation

15   to enforce the terms of an easement that it

16   believed to have been breached?

17         A.    We have.

18         Q.    What -- how many times has NALT done

19   that?

20         A.    We were only compelled to do that once.

21   We've been able to usually resolve most of our

22   compliance issues without litigation, which is our

23   strong preference of course.  But in one

24   circumstance three years ago we were forced to hire

25   an attorney and litigate.

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

                                                    Page 103

1         Q.   And that doesn't include the pavement,

2    correct, that goes along with the parking?

3         A.   I don't know.  I didn't get down to

4    that level.

5         Q.   It doesn't include the pole lighting of

6    the -- of the parking lots, does it?

7         A.   I didn't get down to that level.  I'm

8    sorry.

9         Q.   Was there a helicopter pad that was

10   contemplated for this hospital; do you know?

11        A.   I understand there was, or at least I

12   saw a narrative talking about helicopters, so I

13   assume, unfortunately, that there was.

14        Q.   To your knowledge, was anybody at North

15   American Land Trust charged with evaluating the

16   plan for the -- the hospital's plan to determine

17   the impact on that 56 acres as well as the

18   collateral impact on the remaining land of Weehaw?

19        A.   Andy Johnson.

20        Q.   That was his job?

21        A.   Correct.

22        Q.   Where's Andy Johnson now?

23        A.   Six feet under.

24        Q.   I'm sorry.

25        A.   Andy passed away.  Yeah.

Page 104

1          Q.    When did he die?
2          A.    2021.  Did you not know that?  I'm
3     sorry, I didn't mean to be --
4          Q.    No, I didn't know --
5          A.    -- flippant there.
6          Q.    -- because I -- I didn't know -- that's
7     the first I've heard of it.
8          A.    Yes.  Andy passed away unfortunately in
9     2001 -- 2021.  Excuse me.
10          Q.    Okay.  So he would have been the person
11     that you think would have evaluated those
12     consequences that I just mentioned?
13          A.    Absolutely.
14          Q.    At some point this was presented to the
15     NALT board for final decision, was it not?
16          A.    It was.
17          Q.    And if you would please go to the
18     letter dated May 9, 2008 at NALT 5003.
19          A.    5003?
20               MR. MORAN:  Jim, is that 503?
21     BY MR. WALKER:
22          Q.    It's 503.  I'm getting 5,000 ahead of
23     me.  It's 503.
24          A.    503.  You scared me.  I thought we were
25     going to be here a while.

30(b)(6) Steven William Carter    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 105

```
 1          Q.   I wouldn't do that to you.
 2               So we're at 503, and this is a letter
 3     May 9, 2008 --
 4          A.   Uh-huh.
 5          Q.   -- to Andy Johnson from Kyle Young --
 6          A.   Yes, sir.
 7          Q.   -- potential modification to
 8     conservation easement Weehaw Plantation.
 9               Did you review this letter before your
10     deposition?
11          A.   I did.
12          Q.   In this letter he talks about the
13     various considerations that he understands the
14     board would take into account based on some
15     standards published by the Land Trust Alliance,
16     correct?
17          A.   Yes, sir.
18          Q.   And he refers to that specifically in
19     paragraph three, does he not?
20          A.   He does.
21          Q.   At that point Mr. Young goes through
22     those considerations, and he has comments related
23     to each one of those, does he not?
24          A.   He does.
25          Q.   Did North American Land Trust do its
```

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 106

1    own evaluation of these considerations?

2            A.    Absolutely.

3            Q.    All right.  Well, let's go to

4    Mr. Young, and in particular let's talk about A

5    first.  It must benefit the public interest.

6                 That's one of the considerations, is it

7    not?

8            A.    That's -- yep.  Yes.

9            Q.    He says, the Georgetown Hospital System

10   is a not-for-profit hospital system, and I have

11   provided a supplemental exhibit to this letter that

12   addresses the clear and compelling public benefit

13   this modification would produce.

14                The public benefit he's talking about

15   is the benefit of having the hospital there,

16   correct?

17           A.    Yes, sir.

18           Q.    Now, is it NALT's understanding that

19   the public interest when referring to a

20   conservation easement is referring to the

21   ecological qualities of the property or anything

22   that's in the public interest?

23                MS. TILLMAN:  Object to the form.

24                THE WITNESS:  Ecological qualities is

25   what we would be most interested in.

Page 107

1    BY MR. WALKER:

2         Q.    He was --

3         A.    Excuse me.

4         Q.    When we refer back to the treasury

5    regulation, they're talking about the public

6    interest in those qualities, too, correct --

7         A.    Correct.

8         Q.    -- through open space scenic and the

9    preservation of habitat, correct?

10         A.    Yes, sir.

11         Q.    Mr. Young doesn't address that public

12    interest, does he?

13         A.    Does not seem to do that, no.

14         Q.    And C says that the modification will

15    not jeopardize the tax status of North American

16    Land Trust.  Mr. Young qualifies that consideration

17    by saying, I'm not fully equipped to address this

18    point and trust that you have your own tax advisors

19    who can clarify this situation for you.  However,

20    Georgetown Hospital is a 501(c)(3) not-for-profit

21    organization.

22              Did North American Land Trust consult

23    its tax advisors to make sure that its tax status

24    would not be jeopardized by entering the amendment?

25         A.    That would be a customary process.  I

30(b)(6) Steven William Carter                     January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 108

1    would expect that that did happen.

2         Q.   I am asked -- I'm not asking you what

3    you expect.  There are a lot of times when people

4    expect things of other people.  I can tell you

5    around this firm I expect certain things.  Others

6    expect things of me that don't always get done.

7             Do you know for a fact whether or not

8    North American Land Trust consulted its tax

9    advisors for a determination of whether this

10   amendment removing 56.75 acres could potentially

11   jeopardize the tax status of NALT?

12             MS. TILLMAN:  Object to the form.

13             THE WITNESS:  I do not know that for a

14   fact.

15   BY MR. WALKER:

16        Q.   In the file that I was provided, I have

17   no documentation of that.  Would you agree there's

18   no documentation in the file of that?

19        A.   I would.  I would just make the comment

20   that that might be attorney-client privilege,

21   though, as well.  Again, I'm not -- I'm not an

22   attorney, so I don't know, but perhaps that's why

23   it was not included.  I don't know.

24        Q.   Well, I am not asking what the

25   substance of those opinions may have been.  All I'm

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

                                                        Page 109

1     asking is whether the exercise was done.

2            A.   I can't tell you for a fact.  I can

3     just explain what's customary.

4            Q.   Again, we don't know if customs were

5     followed here, right?

6            A.   I'm sorry?

7            Q.   We don't know if custom was followed

8     here, do we?

9            A.   Not for a fact.

10           Q.   On F and G, the consideration he

11    addresses is that the amendment is -- would be

12    consistent with the conservation purpose, and there

13    is a net benefit to the conservation value.

14                He goes on to say, I am sure that you

15    would like to send your staff biologist to inspect

16    the site, but our position is that we are taking

17    the available development sites that are on the

18    interior of the tract which are ecologically

19    sensitive parcels and placing them under

20    restrictions that prohibit further development or

21    impact on these sites, and in return we are

22    releasing approximately 56 acres of the eased

23    property.

24                Mr. Carter, did NALT send a staff

25    biologist to the site to inspect it before the

Page 110

1    amendment was entered?  I did not see where that

2    was done --

3                    MS. TILLMAN:  Object to the form.

4    BY MR. WALKER:

5          Q.    -- but did they do that?

6          A.    I cannot confirm.

7          Q.    You have no knowledge that they sent a

8    staff biologist to the site before the amendment

9    was entered, do you?

10         A.    I do not.

11         Q.    He says that the -- the development

12   sites, referring to the restrictive homesites, are

13   ecologically sensitive parcels.

14                  North American Land Trust did not send

15   a biologist to the site to render a decision or

16   come to a conclusion as to whether those sites were

17   ecologically sensitive or not --

18                  MS. TILLMAN:  Object to the form.

19   BY MR. WALKER:

20         Q.    -- did it?

21         A.    I -- I don't know.

22         Q.    You have no knowledge that it sent --

23         A.    I have no knowledge, yeah.

24         Q.    You have no knowledge that it sent a

25   biologist --

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 111

1              A.    I have no knowledge.

2              Q.    -- to determine whether it was

3      ecologically sensitive or not, correct?

4              A.    Fair.

5              Q.    Then he goes on at the end of the

6      paragraph, we certainly welcome a visit from your

7      biologist to make a field report to investigate

8      this issue, but we plan on abandoning further

9      development activities or capabilities on the

10     significant number of acres that are ecologically

11     sensitive in exchange for property that surrounds

12     an existing nine-acre commercial tract.

13                   From that sentence we can conclude that

14     he had no problem at all with NALT sending a

15     biologist to inspect the property firsthand,

16     correct?

17             A.    Correct.

18             Q.    At that time did NALT have a staff

19     biologist that it could have dispatched to make

20     that inspection?

21             A.    It had two staff biologists.  Also,

22     Andy Johnson is a trained ecologist.  I can't

23     confirm or deny whether he was there.  But he

24     certainly would have been more qualified than those

25     two to make these kinds of determinations.

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 112

1          Q.   You have no knowledge that between

2     when -- the time between when this letter was

3     entered and the -- and when this letter was sent

4     and the amendment was entered that Mr. Johnson

5     visited the site to confirm or refute anything

6     that's stated by Mr. Young, do you?

7          A.   I have --

8               MS. TILLMAN:   Object to the form.

9               THE WITNESS:   -- no personal knowledge.

10    BY MR. WALKER:

11         Q.   Nor do you know of the other two staff

12    biologists doing the same, right?

13         A.   I do not.

14         Q.   Was there a staff biologist assigned to

15    this area at that time?

16         A.   No.  Our staff biologists were located

17    in the southeast, but it was not said -- you know,

18    said, here, these are your projects, these are your

19    projects.

20         Q.   Where were they located then?

21         A.   Peter Smith was domiciled in Boone,

22    North Carolina, and Lee Echols would have been out

23    of Atlanta, Georgia.

24         Q.   The next bit of correspondence is on

25    the next page, which is NALT 505.  It's a letter of

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 113

1    May 14, 2008, and it's from Mr. Stacy to

2    Mr. Johnson.  Dear Andy, per our numerous phone

3    conversations, please find enclosed a letter from

4    Kyle Young making an official request for the North

5    American Land Trust to consider modifications to

6    the conservation easement at Weehaw Plantation.

7              You understand that Mr. Stacy is

8    referring to the letter we just went over?

9              A.    Yes, sir.

10             Q.    He also says right after that, also

11   included for your reference and information is a

12   communication from the Georgetown Hospital System

13   regarding this process, copies of the real estate

14   contracts that we have executed with the Young

15   family which are contingent upon many things,

16   including the organization's approval and a copy of

17   the appraisal provided to me by the Young family

18   dealing with the inurement question.

19             Do you know whether or not any person

20   in particular reviewed those documents that were

21   enclosed in Mr. Stacy's letter of May 14, 2008?

22             A.    Andy Johnson would have reviewed those.

23             Q.    What is Mr. Stacy referring to when he

24   talks about the inurement question?

25             A.    I think he's --

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 114

1              MR. MORAN:  Object to the form.

2              MS. TILLMAN:  Objection.  Yeah, sorry.

3     Object to the form.

4     BY MR. WALKER:

5         Q.    All right.  What do you -- what do

6     you under -- under --

7         A.    Insider dealing is private inurement.

8     I think what the better phrase would have been,

9     impermissible private benefit to the landowner is

10    what they're trying to avoid here.

11        Q.    Is -- is that your understanding of one

12    of the precepts, that transactions should not inure

13    to the benefit to the property owner?

14        A.    Correct.

15        Q.    And that's also something that's

16    embodied in the IRS regulations, correct?

17        A.    Absolutely.

18        Q.    He goes on to say in the second

19    paragraph, all these items are delivered to you per

20    our conversations and your request in anticipation

21    of your board meeting on May 16, 2008.

22              And that would be two days later,

23    correct?

24        A.    Correct.

25        Q.    Did the board undertake to consider the

Page 115

1    proposed amendment at its May 16, 2008 board

2    meeting?

3            A.    It did.

4            Q.    At the time the board considered the

5    proposed amendment at its May 16, 2008 meeting,

6    what due diligence had it done as part of its

7    consideration of this request?

8            A.    What was the board's due diligence?

9            Q.    I would say what due diligence had NALT

10   done because I understand the board is not out

11   there doing it.

12           A.    Yeah.  Andy would have concluded at

13   that point that there was no impermissible private

14   benefit that would be conferred as a result of this

15   transaction and that the conservation purposes --

16   conservation purposes and values would have been

17   enhanced.  He would have needed to make those

18   representations at the board meeting in order for

19   his board colleagues to consider this proposal.

20               THE VIDEOGRAPHER:  Mr. Walker, your

21   microphone fell off.

22               THE WITNESS:  It's not me this time.

23   BY MR. WALKER:

24           Q.    Again, those are your assumptions based

25   on standard practice?

30(b)(6) Steven William Carter        January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 116

1      A.    Absolutely.

2      Q.    What we do know is that NALT had not

3  done any type of ecological assessment of flora and

4  fauna to determine the condition of that at the

5  time the amendment was requested?  It was relying

6  on its earlier information, correct?

7           MR. MORAN:  Object to the form.

8           MS. TILLMAN:  Object to the form.

9           THE WITNESS:  I don't know.

10  BY MR. WALKER:

11      Q.    Did you find any current assessment of

12  the ecological values of the property -- when I say

13  current -- that was done between the time the

14  amendment first got on the table in the summer of

15  2007 and this board meeting in May 16, 2008, done

16  by NALT's staff or anybody else?

17      A.    No, I don't recall any of that being

18  available in our files.

19      Q.    I did not see that there was a separate

20  memo prepared by NALT's staff doing a conservation

21  value assessment before it went to the board.  Are

22  you familiar with any writing like that?

23      A.    Not for this particular project, no.

24  That is a customary part of our process now.

25      Q.    Is it also true that NALT had not done

30(b)(6) Steven William Carter                           January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 117

1  a separate impact assessment by looking at the

2  potential impacts of the hospital project and

3  medical office buildings around it on that 56.75

4  acres or collaterally on the adjoining east

5  property?

6            MS. TILLMAN:  Object to the form.

7            THE WITNESS:  No, I don't know that to

8  be true.  I have no records of what Andy did to --

9  to move that process forward.

10 BY MR. WALKER:

11      Q.   And NALT also didn't do a comparison of

12 the conservation values of the property with the

13 56.75 acres under easement and with it -- with the

14 easement not on the 56.75 acres, correct?

15           MS. TILLMAN:  Object to the form.

16           THE WITNESS:  I expect those things did

17 happen or our board wouldn't have voted.

18 BY MR. WALKER:

19      Q.   I asked about a written comparison.

20      A.   Oh, written.  I don't have anything

21 written, no.  I have not seen it.

22      Q.   Are you aware of the provision in the

23 conservation easement for Weehaw that addresses

24 amendments?

25      A.   No.

Page 118

1          Q.    All right.

2          A.    I mean, I'm not surprised to hear that

3    there's one in there, but I don't -- I would have

4    to look at it to refresh my memory.

5          Q.    That would be standard, would it not?

6          A.    It would be.

7          Q.    If you would be so kind as to turn to

8    page 62 and 63.

9                And I'll represent to you that the

10   amendment provision starts at the bottom of 62.

11   It's subpart nine.  Take a second to look at it.

12         A.    My memory is refreshed.

13         Q.    Is the provision that's in the Weehaw

14   easement concerning amendments a standard amendment

15   provision?

16         A.    It looks and appears to be standard.

17         Q.    It says, grantor and grantee recognize

18   that circumstances could arise which -- and then

19   there's a blank -- this end, grantee and grantor

20   shall mutually have the right in their sole

21   discretion to agree to amendments to this

22   declaration which are not inconsistent with the

23   basic purpose of the declaration as stated in this

24   document, provided, however, that grantee shall

25   have no right or power to agree to any amendments

Page 119

1  hereto that would result in this declaration and

2  declaration failing to qualify as a valid

3  conservation easement under the act as the same may

4  hereafter amended -- be hereafter amended or

5  section 170(h) to the code as hereafter amended.

6           Is that correct?

7        A.   Yes, sir.

8        Q.   Are we then -- well, first of all, did

9  you understand that the amendment that the board

10  was considering in 2008 had to comply with this

11  subsection F9?

12        A.   Yes, sir.

13        Q.   If we take it a little -- apart a

14  little bit, the first requirement is that the

15  amendment not be inconsistent with the basic

16  purpose of the declaration as stated in this

17  document, correct?

18        A.   Correct.

19        Q.   The conservation easement does state

20  its basic purpose, doesn't it?

21        A.   It does.

22        Q.   If you would go to page 58, and that is

23  page 5 of the conservation easement.  You'll see a

24  paragraph titled nine.  It's the last part of B,

25  about a third of the way down.

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 120

1              Do you see that?

2         A.   Yes.

3         Q.   Subsection B9 of the conservation

4    easement says, the parties recognize that this

5    declaration cannot address every circumstance that

6    may arise in the future, and the parties agree that

7    the purpose of this declaration is to preserve the

8    property predominantly in its present condition and

9    to protect or enhance the property's environmental

10   systems.

11             Did I read that correctly?

12        A.   You did.

13        Q.   When we're referring to the property,

14   we are referring to the entirety of the acreage of

15   Weehaw that was encumbered by this conservation

16   easement in December 1995, are we not?

17        A.   Property is capitalized.  That's

18   correct.

19        Q.   That property would include this 56.75

20   acres that NALT was being asked to release from the

21   conservation easement, correct?

22        A.   Yes.

23        Q.   And we can gather from this explicit

24   statement that the purpose was to preserve that

25   property in its present condition and to protect or

2:22-cv-00874-DCN    Date Filed 04/01/25    Entry Number 115-15    Page 23 of 71

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 121

1    enhance its environmental systems, correct?

2          A.    According to the words on the page,

3    yes.

4          Q.    Do you consider those words to be

5    binding?

6          A.    Yes, I do.

7          Q.    Do you consider those to be laudatory

8    objectives?

9                MS. TILLMAN:   Object to the form.

10   BY MR. WALKER:

11         Q.    Well, let me ask -- I'll rephrase it.

12   That was a terrible question.

13               Do you consider that that purpose is

14   consistent with the entire purpose of the

15   conservation easement which is to preserve the

16   property in a natural state subject to reserved

17   rights?

18               MS. TILLMAN:   Object to the form.

19               THE WITNESS:   Yes.

20   BY MR. WALKER:

21         Q.    The second part of the amendment

22   provision states that the grantee shall have no

23   right or power to agree to any amendments hereto

24   that would result in this declaration failing to

25   qualify as a valid conservation easement under the

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 122

1    act -- that's the South Carolina Conservation
2    Easement Act -- or section 170(h) of the code as
3    hereafter amended.
4              We can conclude -- well, first of all,
5    that is a limitation on North American Land Trust's
6    ability to agree to an amendment, correct?
7              MS. TILLMAN:  Object to the form.
8              THE WITNESS:  Sounds that way.
9    BY MR. WALKER:
10        Q.   It's worded to restrict the authority
11   of the land trust, is it not, so that it does not
12   have the authority to agree to an amendment that
13   would result in the easement violating section 170
14   of the code?
15             MS. TILLMAN:  Object to the form.
16   BY MR. WALKER:
17        Q.   170(h), correct?
18        A.   Correct.
19             MS. TILLMAN:  Object to the form.
20   BY MR. WALKER:
21        Q.   That's the way you read it?
22        A.   Yes, sir.
23        Q.   You're here for North American Land
24   Trust.  That's the way North American Land Trust
25   reads it, too, does it not?

Page 123

1                     MS. TILLMAN:  Object to the form.

2                     THE WITNESS:  It does.

3    BY MR. WALKER:

4          Q.   Did the amendment in allowing the 56.75

5    acres to be converted into a hospital campus with

6    hospital and medical office buildings preserve that

7    56.75 acres predominantly in the condition it was

8    in in December 1995?

9                     MS. TILLMAN:  Object to the form.

10                    THE WITNESS:  On its surface, no, but

11   it was offset by the restrictions that are put on

12   the development areas inside of the parcels.  So it

13   wasn't offset.

14   BY MR. WALKER:

15         Q.   I understand that you maintain that

16   there was an offset.  That was not my question.

17                    My question was whether or not the

18   significant development that was allowed on the

19   56.75 acres to Georgetown Hospital, whether that

20   would keep the property in predominantly the same

21   condition it was in in December 1995?

22                    MS. TILLMAN:  Object to the form.

23                    THE WITNESS:  I think there's some

24   interpretation there, predominantly.  Those

25   interior areas weren't preserved, and now they are.

Page 124

1    BY MR. WALKER:

2         Q.   I'm not talking about the interior

3    areas.  I'm talking about --

4         A.   Predominantly.  So I think there's some

5    interpretation with that word.

6         Q.   So you were saying that it really

7    doesn't matter if the 56-point -- well, let me

8    rephrase that.

9         A.   I didn't say that.

10        Q.   Can we agree that if the development

11   occurred, that the 56.75 acres would not

12   predominantly be in the same condition they were in

13   in December 1995?

14             MS. TILLMAN:  Object to the form.

15             THE WITNESS:  That 56 acres, but that's

16   part of the larger property, much, much larger

17   property, that also included building areas.

18   BY MR. WALKER:

19        Q.   But we can agree that the 56.75 acres,

20   if that hospital and the other medical office

21   buildings and accessory uses were completed, that

22   it wouldn't be anything close to the condition it

23   was in in 1995, would it?

24             MS. TILLMAN:  Object to the form.

25             THE WITNESS:  If we can agree that the

Page 125

1    building areas also wouldn't be close to the

2    condition that they would have been permitted to be

3    used.

4    BY MR. WALKER:

5         Q.   I'm not asking about the other parts of

6    the property.  I'm -- I'll object to that --

7         A.   But they're -- they're related, though,

8    so I'm not -- I'm not going to just focus on the

9    56.  It happened because of that, so I don't know

10   how you can separate those.

11        Q.   All right.  You can say -- all right.

12   We can -- we can go the way you're looking at it.

13             So you're saying the obliteration of

14   the ecological values through the development on

15   the 56.75 acres was offset by benefits by

16   eliminating the five homesites and the recreational

17   areas?

18        A.   That was --

19             MS. TILLMAN:  Object to the form.

20             THE WITNESS:  That was the position

21   North American Land Trust board took when they

22   decided to approve the amendment.

23   BY MR. WALKER:

24        Q.   What standard was used in making that

25   determination?  How did that -- what -- what did

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 126

1    North American Land Trust use to balance these two

2    things?  You have the development of 600,000 square

3    feet, possibly, on the 56.75 acres.  You have the

4    elimination of five dwellings and a recreation area

5    of no more than three acres.

6              What -- what standard did it look to to

7    say, okay, the conservation values actually are

8    benefited by this deal?

9         A.   Andy Johnson in his capacity as a

10   professional ecologist was qualified to make that

11   determination and did so.

12        Q.   So you're saying you believe he made a

13   subjective determination?

14             MS. TILLMAN:  Object to the form.

15             THE WITNESS:  Sure.

16   BY MR. WALKER:

17        Q.   We don't know that he referred to any

18   standard on the outside that said -- that guided

19   his assessment -- his personal assessment of where

20   the conservation values came out, whether they were

21   impaired or enhanced, do we?

22             MS. TILLMAN:  Object to the form.

23             THE WITNESS:  I don't have that

24   information, no.

25   BY MR. WALKER:

Page 127

1            Q.   Do you know whether or not North

2    American Land Trust obtained a legal opinion as to

3    the steps that are necessary under the treasury

4    regulations to extinguish a permanent conservation

5    easement on a portion of the property?

6                 MR. MORAN:  Object to the form.

7                 MS. TILLMAN:  Object --

8                 THE WITNESS:  I do not know.

9    BY MR. WALKER:

10           Q.   You are aware that the treasury

11   regulations do, in fact, address extinguishment of

12   an easement, do you not?

13           A.   I'm familiar --

14                MR. MORAN:  Object to the form.

15                THE WITNESS:  -- that there's language

16   regarding that.

17   BY MR. WALKER:

18           Q.   If you would please turn to exhibit 6.

19           A.   On page?

20           Q.   Exhibit 6, and it would be page 14.

21   There's some page numbers in the lower right corner

22   that are shaded.  They're kind of difficult to see.

23   So you go to exhibit 6.

24           A.   Oh, pardon me.

25           Q.   There's a tab.

30(b)(6) Steven William Carter       January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 128

```
 1           A.    Exhibit 6.  Got you.
 2                 And you're asking me to look at?  I'm
 3     sorry.
 4           Q.    If you would go to page 14.  There's
 5     some highlighted language at the bottom of that
 6     page that's subsection six.
 7                 Do you see that?
 8           A.    I do.
 9           Q.    It says -- the treasury
10     regulations says, extinguishment, in general, if a
11     subsequent unexpected change in the conditions
12     surrounding the property that is the subject of a
13     donation under this paragraph can make it
14     impossible or impractical the continued use of the
15     property for conservation purposes, the
16     conservation purpose can nonetheless be treated as
17     protected in perpetuity if the restrictions are
18     extinguished by judicial proceeding and all the
19     donee's proceeds determined under paragraph
20     (g)(6)(ii) of this section from a subsequent sale
21     or exchange of property are used by the donee
22     organization in a manner consistent with the
23     conservation purpose -- purposes of the original
24     contribution.
25                 Did, to your knowledge, North American
```

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 129

1    Land Trust consider this specific section of the

2    treasury regulation addressing extinguishment of

3    permanent conservation easements?

4              A.    I'm not sure if they consulted this

5    actual provision or not.

6              Q.    There was no subsequent unexpected

7    change in the conditions surrounding the property

8    that made it impossible or impracticable for the

9    property to be -- continued to be preserved for

10   conservation purposes, was there?

11                   MR. MORAN:  Object to the form.

12                   MS. TILLMAN:  Object to the form.

13                   THE WITNESS:  Can't confirm or deny

14   that.

15   BY MR. WALKER:

16             Q.    Well, let's ask it differently.  Are

17   you aware of any unexpected change in the

18   conditions surrounding the property that made it

19   impossible or impracticable for the continued use

20   of the property to be preserved under the terms of

21   the easement?

22             A.    I'm not.

23             Q.    To your knowledge, was there any

24   discussion within NALT of the potential need to

25   have a judicial proceeding to eliminate the

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 130

1    easement on this 56.75 acres?

2                MS. TILLMAN:  Object to the form.

3                THE WITNESS:  I'm not familiar with any

4    of those conversations.

5    BY MR. WALKER:

6         Q.   You were present at the board meeting

7    on May 16, 2008, were you not?

8         A.   I was.

9         Q.   Were you present for the discussion

10   about the proposed amendment?

11        A.   I was.

12        Q.   Do you recall any discussion at all

13   before the board in open session, not executive

14   session but open session, about whether the

15   amendment complied with the treasury regulations

16   including the section on extinguishment?

17        A.   I don't recall any of those

18   conversations.

19        Q.   Could it have been overlooked?

20        A.   No.  I think this section, the way that

21   we would interpret it is if it was a condemnation

22   by a public entity where there was no offset.  In

23   this circumstance there was an offset.

24        Q.   Where's condemnation mentioned in six,

25   extinguishment?

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

                                                    Page 131

1          A.    Again, I'm giving you my interpretation
2     of this.  This is how we would read it, if there
3     was no offset, and I'm giving an example of how
4     that might work.  Occasionally there are public
5     entities that need to condemn or, i.e., extinguish
6     portions of a conservation easement.
7          Q.    And condemnation is through judicial
8     proceedings, correct?
9          A.    Correct.  And that's where that comes
10    into there, and then there would be an offset in
11    terms of a monetary compensation.  That does happen
12    from time to time.
13         Q.    Well, this -- this doesn't talk about
14    that.  It talks about an unexpected change in
15    condition surrounding the property, does it not?
16         A.    That's what it says.
17         Q.    That's what it's addressing?
18         A.    Yeah.
19         Q.    Can we agree that you cannot -- North
20    American Land Trust cannot identify any change in
21    those conditions, correct?
22              MS. TILLMAN:  Object to the form.
23              THE WITNESS:  I cannot confirm that.
24    I -- I don't know what they were able to document
25    at the time of this transaction.

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

                                                        Page 132

 1    BY MR. WALKER:

 2          Q.    Well, you're here as the designated

 3    person to testify --

 4          A.    Yes, sir.

 5          Q.    -- to these things, and you have no

 6    knowledge of any change in the surrounding property

 7    that made it impractical or impossible to continue?

 8          A.    I do not have that knowledge.

 9          Q.    The easement itself has a similar

10    provision, does it not?

11                And I'll direct you to NALT page 62,

12    paragraph F6.  It's near the top of the page.

13                Do you see that?

14          A.    I do.

15          Q.    It says, when a change in conditions

16    gives rise to the extinguishment of this

17    declaration or a material term or provision hereof

18    by judicial proceeding, the grantee on any

19    subsequent sale, exchange or involuntary conversion

20    of the property shall be entitled to a portion of

21    the proceeds of sale equal to the greater of, and

22    then it goes on to discuss various formulas or

23    proportions.

24                There was a sale of the property -- the

25    56.75 acres, was there not?

Page 133

```
 1          A.   There was.
 2          Q.   The parties had purported to agree to
 3     extinguish the easement on that 60 -- 56.75 acres,
 4     correct?
 5               MR. MORAN:  Object to the form.
 6               MS. TILLMAN:   Object to the form.
 7               THE WITNESS:  They agreed to an
 8     exchange that involved partial extinguishment of
 9     some of the easement area --
10     BY MR. WALKER:
11          Q.   Yeah.
12          A.   -- but what they agreed to was an
13     exchange.
14          Q.   They agreed to -- all right.  We'll get
15     to that in a minute.
16               But there was a sale.  Did North
17     American Land Trust consider that it was entitled
18     to a portion of the proceeds of the sale?
19          A.   I don't know what the board considered
20     at that time.  Again, I would relate this to a
21     condemnation.  That's why this language was put in
22     there, to deal with condemnations, which are pretty
23     conventional things.  So this is how that proceeds
24     clause would -- that's how the money would be split
25     up between the landowner and the land trust as
```

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 134

1   required by the treasury regs.

2            Q.    Well, that's an interesting aside

3   because the easement itself actually directly

4   addresses condemnation, doesn't it?

5            A.    I don't know.

6            Q.    Let's look at the next paragraph.

7                  Seven, do you see that?

8            A.    I do.

9            Q.    Whenever all or a part of the property

10  is taken by exercise of eminent domain, by public,

11  corporate or other authority, so as to aggregate

12  the restrictions imposed by this declaration, the

13  grantor and grantee shall join in appropriate

14  actions at the time of such taking to recover the

15  full value of the taking and all incidental or

16  direct damages.

17                 Can we conclude from the fact -- or

18  wouldn't you conclude from the fact that paragraph

19  seven addresses condemnation, that paragraph six is

20  addressing when there is a -- an extinguishment

21  based on a change in conditions as opposed to

22  condemnation?

23                 MS. TILLMAN:  Object to the form.

24                 THE WITNESS:  No, I think they're

25  connected, and I don't know if this is -- the

Page 135

```
 1    respective rights of the grantor and grantee set

 2    forth in paragraph eight above.

 3    BY MR. WALKER:

 4         Q.    That's on the splits of the proceeds,

 5    correct?   That's what that's addressing.

 6              MS. TILLMAN:  Object to the form.

 7              THE WITNESS:  Oh, ask it again, please.

 8    This is pretty heavy legalese.  I'm trying not to

 9    get out of my league here.

10    BY MR. WALKER:

11         Q.    I'm not asking you to interpret.  I'm

12    asking you to attest whether or not paragraph six,

13    F6, addresses when there's a change in conditions

14    giving rise to the extinguishment of the

15    declaration?

16         A.    That's what the words on the page say.

17         Q.    Versus seven which addresses when any

18    part of the property is taken by the exercise of

19    eminent domain?

20         A.    Yeah --

21              MS. TILLMAN:  Object to the form.

22              THE WITNESS:  -- I just don't think

23    they're connected.  But, you know, that's me.  The

24    proportion share, you're going to need to figure

25    that out when there's an eminent domain, and
```

Page 136

 1    section six describes how that happens.  It's
 2    actually very, very important from the IRS'
 3    perspective because they've thrown out easements
 4    when proceeds clause are not drafted correctly.
 5    BY MR. WALKER:
 6           Q.   Understood.  That's a requirement of
 7    the IRS, is it not --
 8           A.   It is.
 9           Q.   -- that the easement itself have a
10    correct allocation of proceeds if the easement is
11    extinguished by condemnation or otherwise so that
12    the recipient organization gets its share in
13    proportion to the value -- that the value of the
14    easement had to the value of the property at the
15    time of the donation, correct?
16           A.   Yes --
17                MS. TILLMAN:  Object --
18                THE WITNESS:  -- sir.
19                MS. TILLMAN:  -- to the form.
20    BY MR. WALKER:
21           Q.   Is that correct?
22           A.   It is.
23           Q.   Next we're going to talk about the
24    board meeting where this was considered.  The full
25    board minutes, Mr. Carter, appear at NALT 981 to

Page 137

1    983.  And by the time we get this deep into the

2    documents because of the repetition, they're not --

3    I didn't include all the pages.

4              Do you have 981 in front of you?

5         A.   I do.

6         Q.   Do you recognize the document that is

7    on 981 and 982?

8         A.   I do.

9         Q.   What is this?

10        A.   This is an excerpt of the board minutes

11   prepared by the secretary of the board.

12        Q.   Who is the secretary of the board?

13        A.   At that time it was George Asimos.

14        Q.   Have you reviewed these minutes in

15   preparation for the deposition?

16        A.   I have.

17        Q.   Are the minutes accurate to the best of

18   your knowledge based on your review of the records

19   and your presence at the board meeting on May 16 --

20        A.   To the best of my knowledge, yes.

21        Q.   -- 2008?

22             Who presented the proposal to the

23   board?

24        A.   Andrew Johnson.

25        Q.   In the presentation he made to the

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 138

1    board reflected in these minutes, he does not
2    address the amendment provision in the conservation
3    easement, does he?
4              A.    Not in these minutes.
5              MS. TILLMAN:   Object to the form.
6    BY MR. WALKER:
7              Q.    Nor does he address the conservation
8    purpose as explicitly stated in the conservation
9    easement, does he?
10             A.    It's not --
11             MS. TILLMAN:   Object to the form.
12             THE WITNESS:   It's not documented in
13   these textual minutes that were prepared.
14   BY MR. WALKER:
15             Q.    He also -- the minutes also do not
16   reflect any reference by him to whether or not the
17   amendment would comply with the IRS regulations,
18   does he?
19             A.    It does not.
20             Q.    He goes on -- in these minutes it says
21   that Mr. Johnson reported -- and I'm going down
22   about two-thirds of the way down -- one of the --
23   one of the conservation benefits of the amendment
24   would be the consolidation or reduction and
25   fragmentation of the conservation area and the

Page 139

1    resulting benefits ecologically.

2                    I did not see anything in writing, any

3    study, any assessment, any evaluation, before the

4    board met that addresses consolidation or reduction

5    in fragmentation of the conservation area.  Are you

6    aware of any such study, analysis or evaluation --

7                    MS. TILLMAN:  Object to the form.

8                    THE WITNESS:  Not any --

9    BY MR. WALKER:

10           Q.    -- written?

11           A.    Not anything that's written, no.

12           Q.    Isn't it also true that he did not

13   address the intensity of the development of 600,000

14   square feet of hospital and office on the 56.75

15   acres?

16                    MR. MORAN:  Object to the form.

17                    MS. TILLMAN:  Object to the form.

18                    THE WITNESS:  I don't know that that's

19   not true.

20   BY MR. WALKER:

21           Q.    You don't know that that's not true?

22           A.    You asked if it was true, and I'm

23   saying I don't know if that's not true.

24           Q.    The minutes don't reflect that he ever

25   addressed the intensity of the --

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 140

1          A.    You're talking about the minutes?

2          Q.    I'm talking about the minutes.

3          A.    The minutes don't say that, no.

4          Q.    The accurate minutes do not reflect

5    that he addressed the intensity of the plan

6    development on the site?

7                MS. TILLMAN:  Object to the form.

8                THE WITNESS:  They're not noted in the

9    minutes, which is a snapshot of a much longer

10   discussion.

11   BY MR. WALKER:

12         Q.    The minutes are to capture the key

13   points, are they not?

14         A.    They are.

15         Q.    Are you going to testify that you have

16   a specific recollection of Mr. Johnson

17   aggressing -- addressing the -- the impacts of the

18   potential development of the 56.75 acres?

19         A.    No, I don't have a recollection of that

20   particular board meeting.  Way too long ago.  I

21   also can't confirm that it did not happen.

22         Q.    Now I'm going to have to ask this

23   question.

24         A.    Sure.

25         Q.    You don't have any recollection that it

Page 149

1          Q.    Are you aware of anything in the file?

2          A.    I did not do any of that analysis,

3     so...

4               MS. TILLMAN:   Object to the form.

5               THE WITNESS:   In fact, it's not in the

6     file --

7     BY MR. WALKER:

8          Q.    That just seems to be a conclusion

9     without a factual basis.  Would you agree with

10    that?

11              MS. TILLMAN:   Object to the form.

12              MR. MORAN:   Object to the form.

13              THE WITNESS:   I would not.

14    BY MR. WALKER:

15         Q.    Well, where are the facts in the NALT

16    record to substantiate that?

17         A.    I don't know that we're required to

18    keep those records.  It was a long time ago back

19    then, and Andy was -- had his own process and way

20    of describing and representing things.  So I don't

21    know that any of that is a requirement.  Andy would

22    have made those representations as a 50-year

23    professional ecologist.  I know the board had a lot

24    of confidence and trust in his determination, so

25    I -- I wouldn't think that just because those

Page 150

1    materials aren't available that that doesn't mean

2    it didn't happen or that there wasn't due

3    diligence.

4         Q.   Well, we have no record of that

5    happening, do we?

6         A.   You have no physical record.

7         Q.   Written record?

8         A.   Yeah, it's not available.  It would be

9    inconsistent with our --

10        Q.   Are --

11        A.   -- our organization --

12        Q.   -- do you know of any --

13        A.   -- of over 25 years.

14        Q.   Do you know of any records that were

15   thrown away related to this file?

16        A.   I don't, no.  No recollection, no.

17        Q.   We're relying on the file being

18   complete.  Do you have information that it's not

19   complete?

20        A.   No.  Andy passed away in 2021, so I'm

21   not available to ask him how he would have managed

22   his files before I came into the position of

23   president of North American Land Trust.

24        Q.   You did, though, become involved in the

25   files when you put together the baseline

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 224

1          A.    His office.  Well, he had an assistant,
2     Susan Levin, who just actually retired.  That was
3     his personal assistant.  So he would lean on Susan
4     a lot to help keep him organized.  But he was not
5     the best organizer.
6          Q.    Okay.  And to your knowledge, was there
7     any point in -- in time of when the North American
8     Land Trust start scanning paper records or -- or
9     anything like that?
10         A.    Yeah.  Certainly, you know, the digital
11    world started to evolve, as my career started in
12    2001.  And I think that the point that I can
13    definitely recall when things took a turn, when our
14    organization was ransomed or hacked by an outside
15    source.  That happened in 2016.  We were taken
16    offline for a couple of weeks and had to pay a
17    Bitcoin ransom to get our information back.  And at
18    that point it became very real and apparent to us
19    that we needed to implement a more robust records
20    retention system and begin to scan in, you know,
21    hard copy documents and -- and create a more
22    durable, reliable system.
23         Q.    And tell me a little bit about that
24    ransom -- ransom experience.  Did NALT -- does NALT
25    know whether it lost data?

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 225

1          A.    We don't know.  We'll never be able to
2     know.  We were able to get some data back, but we
3     were highly compromised.  There was definitely data
4     that we did lose for sure and were never able to
5     get back.
6          Q.    And that was in 2016?
7          A.    I believe so, right around that time.
8          Q.    Okay.  Did -- did Andy Johnson do a lot
9     of emailing?
10         A.    He was more of a phone guy, sporadic
11    emails.  And his vision was very, very poor.
12    Actually he was almost blind at the end.  But you
13    will see in the records Andy -- Andy's emails,
14    because they were often misspelled and misplaced,
15    and you could tell he was somebody that was having
16    eye challenges.
17         Q.    Uh-huh.
18         A.    But no, he did not email a lot.
19         Q.    Okay.  How -- how about, you know,
20    along the same lines because of his eye challenges,
21    would you describe him as -- as dwelling more in
22    documents or dwelling in firsthand relationships?
23         A.    Firsthand relationships.
24         Q.    To -- to your knowledge did -- did Andy
25    visit Weehaw Plantation?

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 229

1     for future conversations.

2          Q.   Did -- to your knowledge did Andy

3     Johnson keep any -- any files or documents in his

4     house?

5          A.   He may have.

6          Q.   Is his house still there?

7          A.   It is.  But I would think it would be

8     extremely limited.  It's just Andy was not

9     organized, so nothing would surprise me is what I'm

10    trying to tell you.  I don't think he made it a

11    regular habit of trying to bring working files

12    home, but it wouldn't surprise me.

13         Q.   So let's talk about the 2008 amendment

14    as well because that's another snapshot in time

15    that --

16         A.   Yes, ma'am.

17         Q.   -- that Trenholm was talking about,

18    well, there -- there are not these documents, I --

19    I think.

20              And, again, to your knowledge does NALT

21    still have every piece of paper surrounding the

22    2008 amendment at Weehaw Plantation?

23         A.   No.

24              MR. WALKER:  Object to the form of the

25    question.

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 230

BY MS. TILLMAN:

1    BY MS. TILLMAN:

2           Q.    And -- and why don't you think so?

3           A.    Based on my, you know, long tenure at

4    NALT, 23 years knowing Andy, knowing his

5    personalities, it would be consistent with what I

6    know about the history and the process.

7           Q.    And 2008 would have been 15 years ago.

8    If this lawsuit had been filed in 2010 or 2011,

9    would it -- would it have been likely that NALT

10   would have been able to lay its hands on -- on much

11   more documentation --

12                MR. WALKER:    Object to the --

13   BY MS. TILLMAN:

14          Q.    -- surrounding this amendment?

15                MR. WALKER:    Object to the form of the

16   question.

17                THE WITNESS:    That would be my

18   expectation, yes.

19   BY MS. TILLMAN:

20          Q.    And if this lawsuit had been filed in

21   2011 or 2012, shortly after MST bought its

22   property, would Andy Johnson be available to -- to

23   testify firsthand to -- to his considerations as to

24   the 2008 amendment that's the subject of this

25   lawsuit.

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 231

1          A.    He loved this stuff.  He wouldn't have

2     missed it for a moment.  Yes, he would have, to

3     answer your question.

4          Q.    How serious was Andy Johnson about the,

5     you know, conservation purposes of this easement on

6     Weehaw Plantation?

7          A.    Very serious, and I think the record

8     shows that overall.  There was a lot of due

9     diligence and -- and conversations and staff

10    participation and board participation.  Andy was

11    very transparent, and he wanted to make sure that

12    his board colleagues were aware and -- and, you

13    know, had the right information to be able to make

14    a -- a collective decision about moving forward.

15         Q.    Would Andy Johnson have -- have rubber

16    stamped an amendment to a conservation easement,

17    either at Weehaw or anywhere?

18         A.    No, Andy --

19               MR. WALKER:  Object to the form of the

20    question.

21               THE WITNESS:  No, Andy was also -- and

22    I believe at the time of Weehaw, he was the vice

23    president, so he wasn't authorized to sign

24    conservation easements.  John Halsey signed the

25    first one.  I don't -- maybe Andy did -- there was

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 235

1          A.    Yes, that's correct.

2          Q.    And I think Trenholm described LTA as

3    kind of the premier organization in -- in America

4    on -- on land trust practices and procedures?

5          A.    That's how he described it.

6          Q.    That's right.

7          And -- and in 2008, anyway, it looks

8    like from these minutes that -- that NALT was

9    looking to LTA for guidance?

10         A.    Sure.

11         Q.    And so tell me a little bit about these

12   amending conservation easements and seven guiding

13   amendment principles.

14         The first question I want to ask you

15   about them is, if amendments were per se taboo

16   under 170(h), why would the premier organization

17   for -- for land trust procedures and policies, the

18   LTA, why would it have seven guiding amendment

19   principles at all?

20         A.    Yeah.  I don't know that they were

21   taboo.  You hear that from time to time.  I think

22   that's kind of innuendo.  Land Trust Alliance going

23   back to -- all the way to that time, and also

24   We Conserve PA, both offer guidance to their land

25   trust membership on how to amend conservation

Page 236

1    easements.  So it's out there.  It's in the open.

2              And in fact the IRS released a guidance

3    in 2020 which also suggested that having an

4    amendment clause in your conservation easement

5    doesn't automatically defeat 170(h).  There's other

6    parts to that.

7              But I think both the trade groups and

8    the IRS recognize that amendments are a pretty

9    conventional part of the land trust process and

10   world.

11        Q.   All right.  And -- and how about with

12   NALT, does NALT -- is -- is this Weehaw amendment

13   the only amendment to a conservation easement

14   that -- that NALT has ever done?

15        A.   No.  We've done many amendments.

16        Q.   How many?

17        A.   Over a hundred.

18        Q.   Okay.  Over a hundred amendments to

19   conservation easements.  Have you reported all

20   those amendments to the IRS?

21        A.   We are required to do so and do that on

22   our Form 980.

23        Q.   And you testified earlier that you

24   certainly would have reported the Weehaw amendment

25   to the IRS --

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 237

1          A.    Absolutely.

2          Q.    -- is that correct?

3          A.    Yes, ma'am.

4          Q.    In any of the years that you were --

5    that North American Land Trust was audited, which I

6    think we said was 2004, 2014 and 2018 --

7          A.    Correct.

8          Q.    -- had -- had NALT done amendments

9    that -- that the IRS would have been aware of as

10   part of its audit?

11         A.    Absolutely.

12         Q.    Okay.  Did -- did -- has the IRS or did

13   the IRS ever question or raise concerns to NALT

14   about amendments --

15         A.    I do not recall that.

16         Q.    -- to the conservation easements?

17         A.    No.

18         Q.    So no?

19         A.    No.  I -- I hedge because the 2014 has

20   a lot of information in there.  Trenholm and I were

21   talking about that earlier.  I can't speak to

22   everything that they mention there, but I do not

23   believe that evidence came up.  I have no

24   recollection of that.

25         Q.    And this kind of goes without saying,

Page 238

1    but I'll get it on the record.  The IRS has -- has
2    never revoked the land trust 501(c)(3) status; is
3    that correct?
4            A.   No, ma'am.
5            Q.   Notwithstanding the fact that the land
6    trust has done a hundred amendments or so to
7    conservation easements in its -- in its time?
8            A.   (Witness moves head up and down.)
9            Q.   So let's talk about the seven guiding
10   amendment principles from LTA.  Do you know them
11   well enough to rattle them off?  I can tell you I
12   think they're on the very next page of NALT 849.
13           A.   Yeah.  I'm familiar.
14           Q.   Okay.  Kind of talk through what a land
15   trust typically does or -- and what the North
16   American Land Trust specifically does when they're
17   evaluating proposed amendments to conservation
18   easements.
19           A.   Right.  Well, in contemporary times we
20   use what's called a conservation benefit analysis,
21   and this is an internal process.  It works much
22   like a SWOT analysis if you're familiar with that,
23   strengths, opportunities, threats and weaknesses or
24   something like that.  But we will run through a
25   process to identify all of those boxes, and then

Page 239

1    hopefully that will begin to tell us whether the

2    risk profile of a particular amendment is such that

3    we would want to pursue it.

4            So it is a detailed internal process

5    that we take on now, and all of that information is

6    saved as part of our records retention, so we have

7    that available to document our process in -- in

8    evaluating the merits of a potential amendment

9    proposal.

10           Q.   And -- and at the time, though -- and

11   that's your practices now --

12           A.   Yes, ma'am.

13           Q.   -- as I understand it, but it looks

14   like would it be fair to say that in 2007, 2008,

15   based on -- well, that -- that NALT was -- was

16   really looking to the LTA's --

17           A.   Yes.

18           Q.   -- guidance?

19           A.   Yeah, this was kind of the foundation

20   for where our policy is today.  It's -- it has a

21   lot more information and context in our

22   board-approved policy which is updated every three

23   years.  But a lot of what you're seeing here, you

24   know, is part of that.

25           Q.   Has -- has NALT's thinking on

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 240

1    amendments to conservation easements evolved over
2    time?
3            A.    Oh, yeah for sure.  Yeah.
4            Q.    Tell me about that.  Just -- just give
5    me a broad overview of how it's evolved, and try
6    and anchor it to a time period while you're
7    talking.
8            A.    Well, high level, you know, when I
9    started, we were not familiar with any litigation
10   for conservation easements, whether it was
11   amendments or we just don't like the easement.
12   There was no case law or litigation out there to
13   help guide our process, procedures and policies.
14   That has changed a lot over the course over the
15   past 23 years.  There has been a lot of litigation.
16   There has been IRS guidance documents.  I mentioned
17   the one in 2020.  So now there is a lot of publicly
18   available information to give us more data on how
19   we should proceed with these.
20              There's also another example of the
21   Buck case which -- which was a major case that
22   everyone I'm sure is aware of that talked about the
23   exchanging of property.  That happened a few years
24   ago.  Obviously that information was not available
25   when the Weehaw conservation -- or conservation

Page 241

```
 1   easement amendment happened.  But -- but major

 2   events like that help guide our process and

 3   evolution of the organization going forward.

 4        Q.   And -- and specifically evolution of

 5   your practices and -- and kind of policies with

 6   regard to amendments; is that correct?

 7        A.   Correct.

 8        Q.   To your knowledge in 2008 had -- had

 9   the IRS issued any kind of guidance, or were

10   there -- were there cases out there about

11   amendments specifically?

12        A.   No, ma'am.

13        Q.   Okay.  So -- so it was reasonable for

14   NALT in -- in 2008 to rely on this LTA practices

15   and procedures and policies?

16        A.   Very conventional, yes.

17             MR. WALKER:  Object to the form of the

18   question.

19   BY MS. TILLMAN:

20        Q.   And it looks like NALT's board also

21   relied on those seven guiding principles of

22   amendment when it was evaluating the Weehaw

23   amendment; is that --

24        A.   It --

25        Q.   -- correct?
```

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 242

1          A.    It did.  And you note that they make

2     reference to that board in the board report which

3     is part of our official business records and was

4     provided to the board of directors at that time.

5          Q.    And, again, if there are not, you know,

6     paper documents, ecological documents, biology

7     reports in NALT's records now surrounding that

8     amendment that happened 15 years ago, does that

9     necessarily mean that they never existed?

10              MR. WALKER:  Object to the form.

11              THE WITNESS:  No.

12     BY MS. TILLMAN:

13          Q.    Are red-cockaded woodpeckers a part of

14     the 1995 conservation easement on Weehaw

15     Plantation?

16          A.    No, ma'am.

17          Q.    Would NALT have any obligation towards

18     red-cockaded woodpeckers or any enforceable

19     authority as far as red-cockaded woodpeckers go as

20     to the 1995 conservation easement on Weehaw

21     Plantation?

22          A.    I'm not sure how the -- the

23     conservation easement deed would necessarily guide

24     that, but certainly we would have an ethical

25     responsibility to take that into account and

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 245

1    perspective, you know, as the property is chopped

2    up and -- and certain habitats and -- you know, are

3    eliminated, the species will -- will stop using

4    that.  Obviously the more property that doesn't

5    have anthropogenic evidence, roads and houses and

6    trees running through, is going to be more suitable

7    for -- for wildlife that -- that like that kind of

8    habitat.  So fragmenting the property has -- can --

9    can have negative results for habitat and wildlife.

10        Q.   Okay.

11        A.   And then the other side of it is the

12   ownership perspective from a habitat -- or from a

13   fragmentation perspective.

14        Q.   Is -- is it costly for NALT to monitor

15   conservation easements?

16        A.   It is.

17        Q.   What percentage of your budget goes to

18   monitoring?

19        A.   We report it on our 990.  It's a --

20   it's a large number.  I believe that we are

21   averaging around $350,000 annually expended to run

22   our monitoring program.

23        Q.   And a representative from NALT as part

24   of the monitoring would've -- was -- would have

25   visited Weehaw Plantation at least annually --

Page 246

1          A.    Yes.

2          Q.    -- is that correct?

3          A.    Regularly.  I do see that there is some

4    voids early on with the monitoring which wouldn't

5    be unexpected.  We're at a place now where our

6    monitoring policy requires NALT to monitor

7    annually.  Back then we were looking at just the

8    treasury -- treasury regulations which only require

9    regular monitoring.

10         Q.    And -- and I noticed Lee Echols' name

11   come up a lot in those monitoring reports.  Who is

12   Lee Echols at NALT?  What is his position?

13         A.    He was a conservation biologist.  He

14   left the organization probably two or three years

15   ago, but he was a conservation biologist.

16         Q.    I hate to jump around, but I'm going

17   to.  Let's look at NALT page 758.  And -- and

18   really 758 is a snapshot in the middle of a lot of

19   drafts of the amendment to the conservation

20   easement.  Trenholm was -- was jumping around a

21   little.  I want to be clear that I'm -- I'm -- in

22   the question I'm asking, I'm encapsulating all the

23   drafts he was asking you questions about.

24              Is it NALT's understanding and your

25   understanding that -- that the drafting of -- of

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 247

1    this amendment to the conservation easement was a

2    collaborative process?

3              A.    Very much so.

4              Q.    Who -- who were the collaborators on

5    it?

6              A.    Primarily Andrew Johnson as the

7    president of North American Land Trust and Dan

8    Stacy as the representative for the landowner.

9              Q.    Did -- what about the Youngs, were --

10   were they involved?  Or a -- a represent --

11             MS. BAUM:  Objection.

12   BY MS. TILLMAN:

13             Q.    -- representative of the Youngs?

14             A.    I don't recall.

15             Q.    Okay.  And, you know, stepping back

16   from all the drafts, although keep your finger on

17   those pages, about -- for how -- how long did NALT

18   consider this amendment?  Do you -- do you have any

19   knowledge on that?

20             A.    Seems like it's almost two years to a

21   year and a half, somewhere in that area.  I

22   understand from the file that Andy was first

23   notified in the summer of 2007, and the amendment

24   wasn't recorded until December of 2008.

25             Q.    Okay.  So for about a year and a

Page 248

1    half --

2          A.    At least, yeah.

3          Q.    -- the -- the North American Land Trust

4    was collaborating and -- and working with all these

5    different people to arrive at an amendment that the

6    North American Land Trust was comfortable with; is

7    that correct?

8          A.    Yes, ma'am.

9          Q.    And -- and the ultimate 2008 amendment,

10   which was a product of all these drafts and

11   revisions and handwritten notes, did NALT -- did

12   the North American Land -- Land Trust ultimately

13   sign it?

14         A.    Yes.

15         Q.    And -- and why do you think it signed

16   the 2008 amendment?

17         A.    Because it was satisfied on all of the

18   elements of the -- the project that needed to be

19   satisfied.  Most importantly a conservation uplift

20   and no impermissible private benefit.

21         Q.    And -- and talking about no

22   impermissible private benefit, there was a lot of

23   innuendo surrounding the deed to the hospital

24   for three -- for $3 million or so.

25         A.    Yeah.

30(b)(6) Steven William Carter                           January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 268

BY MR. MORAN:

1
2          Q.    All right.  Mr. Carter, I won't -- I
3    will endeavor not to keep you here too much longer.
4    For the record, I'm Wes Moran.  I represent
5    Georgetown Memorial Hospital.
6                I would like to start, would you just
7    briefly paraphrase what NALT's mission is, please?
8          A.    The preservation of open space and
9    natural habitats and cultural resources.
10         Q.    Okay.  And in regard to that mission,
11   is it -- is one of NALT's key roles to enforce the
12   restrictions on conservation easements that it
13   holds?
14         A.    Absolutely.
15         Q.    Okay.  What incentive, if any, would
16   NALT have to execute an amendment to a conservation
17   easement that did not further the conservation
18   benefits or purposes of the underlying easement?
19         A.    There would be no incentive to do that.
20         Q.    Okay.  Now, in particular regard to the
21   2008 amendment at issue in this case, if NALT had
22   any concern that the amendment was improper or did
23   not further the conservation purposes and values of
24   the underlying easement, would it have executed
25   that amendment?

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 269

1           A.    No, sir.

2           Q.    Okay.  We looked at the seven guiding

3    principles for amending conservation easements that

4    was published by the Land Trust Alliance in

5    September of 2007; is that right?

6           A.    Yes, sir.

7           Q.    And those -- those are on page NALT 849

8    in the notebook in front of you; is that right?

9           A.    Correct.

10          Q.    Now, with respect to the seven

11   principles articulated here, is it your

12   understanding that before executing the 2008

13   amendment that is at issue in this lawsuit, did the

14   North American Land Trust conduct its own analysis

15   of each of those principles and determine that the

16   2008 amendment was in compliance with those?

17          A.    Yes, sir.

18          Q.    Okay.  And -- and if I heard your

19   testimony correctly, that would have been

20   Mr. Johnson primarily who conducted that analysis

21   and then presented that to the North American Land

22   Trust board; is that right?

23          A.    Yes, sir.

24               MR. WALKER:  Object to the form of the

25   question.

30(b)(6) Steven William Carter        January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 270

1    BY MR. MORAN:

2         Q.   And -- and did I hear you correctly

3    that -- that Mr. Johnson had a -- a master's degree

4    from Yale in ecology --

5         A.   Yes, sir.

6         Q.   -- is that right?

7         A.   (Witness moves head up and down.)

8         Q.   Okay.

9         A.   School of Forestry.  He was --

10        Q.   School of Forestry.  But a master's

11   degree from Yale?

12        A.   Yes.

13        Q.   And you don't happen to know what that

14   degree -- the specific delineation of that degree,

15   do you?

16        A.   I recall the Grinnell undergraduate

17   degree was ecology.  The Yale School of Forestry

18   degree, I'm sorry, I -- I don't recall.

19        Q.   No, no worries at all.

20           Let's look at the amendment itself

21   which is on NALT page 75 here.

22           If you would, please, just take a

23   second to familiarize yourself with that document.

24   Am I correct that this is the executed version of

25   the amendment that was recorded in the Georgetown

Page 271

1      County -- with the Georgetown County Registrar of

2      Deeds?

3                A.    Yes, sir.

4                Q.    Okay.  Now, there are -- there are a

5      couple of provisions that I would like to focus on

6      here.  If you look on the second page of that

7      document on -- which is Bates numbered NALT 76,

8      just a little past halfway down, there are three

9      whereas clauses.

10               And the first states, whereas, upon

11     study and inspection the grantee has concluded that

12     the release of the hospital parcel shall have no

13     material adverse effect upon the conservation

14     purposes and conservation values of the

15     conservation easement by virtue of its location and

16     its present condition due to the expansion of the

17     easement restrictions on the interior and marsh

18     riverfront components of the property which enhance

19     the biological and ecological value of the

20     property.

21               Did I read that correctly?

22               A.    You did.

23               Q.    And is it your understanding that it

24     was NALT's president Andy Johnson who executed this

25     document on its behalf?

30(b)(6) Steven William Carter                    January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 272

1         A.    Yes, sir.

2         Q.    Okay.  And based off of your history

3    working with Mr. Johnson, based off of your

4    experience with the North American Land Trust as an

5    organization, would either Mr. Johnson or any

6    officer of the North American Land Trust have

7    signed their name to this document if it did not

8    reach that determination that was articulated in

9    that whereas clause I just read?

10              MR. WALKER:  Object to the form of the

11    question.

12              THE WITNESS:  Absolutely not.

13    BY MR. MORAN:

14         Q.    And I believe Ms. Tillman touched on

15    this earlier.  Would Mr. Johnson or any officer of

16    North American Land Trust have represented here

17    that there was a study and inspection done by the

18    North American Land Trust if, in fact, there had

19    not been one done?

20         A.    No.

21              MR. WALKER:  Object to the form of the

22    question.

23    BY MR. MORAN:

24         Q.    All right.  I would like to look at the

25    next whereas clause, which again begins with,

30(b)(6) Steven William Carter     January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 273

1  whereas, upon study and inspection grantee -- and

2  grantee is NALT; is that right?

3        A.    Yes, sir.

4        Q.    -- grantee has determined that the

5  extinguishment of the five restricted building

6  envelopes and the right to the five dwellings will

7  have a greater ecological benefit and further

8  advance and protect the conservation purposes of

9  the conservation easement and any loss of such from

10  the removal of the hospital parcel from the

11  conservation easement, particularly due to the

12  superior location of the five dwellings in terms of

13  scenic view from the Pee Dee River, Black River and

14  Intracoastal Waterway in proximity to significant

15  environmental features of the property, including

16  without limitation the critical marsh habitat, the

17  archaeologically significant sites and the wetlands

18  area of the property.

19              Did I read all of that correctly?

20        A.    You did.

21        Q.    Okay.  Again, knowing what you know

22  about Mr. Johnson and being an officer of NALT

23  currently and being its representative of the

24  organization, would -- would any of those

25  categories of persons have represented here that

Page 274

1    there was a study and inspection done to support

2    that whereas clause if, in fact, there was no study

3    or inspection?

4              A.    Absolutely --

5                    MR. WALKER:  Object --

6                    THE WITNESS:  -- not.

7                    MR. WALKER:  -- to the form.

8    BY MR. MORAN:

9              Q.    Okay.  And would Mr. Johnson or any

10   officer of NALT have signed their name to this

11   document if they had not determined that the

12   contents of this whereas clause were accurate as

13   they -- in accordance with their analysis of those

14   issues?

15                   MR. WALKER:  Object to the form.

16                   THE WITNESS:  Absolutely not.

17   BY MR. MORAN:

18             Q.    Okay.  And the last whereas clause here

19   I want to focus on is, whereas, the loss of scenic

20   view from Highway 701 and S-22-325 as a result of

21   the development of the hospital parcel is

22   insignificant in comparison to the substantial

23   ecological and scenic benefits of the

24   extinguishment of the five dwelling rights in

25   addition to the public and social benefits related

30(b)(6) Steven William Carter                January 14, 2025
MST, LLC v. North American Land Trust, et al.

Page 275

1   to meeting the needs of the hospital.

2              Would anyone at NALT including

3   Mr. Johnson have signed their name to this document

4   had they not conducted an analysis and determined

5   that to be an accurate statement?

6              MR. WALKER:  Object to the form.

7              THE WITNESS:  Absolutely not.

8   BY MR. MORAN:

9        Q.   All of those whereas clauses that I

10  just read, those were -- were statements that

11  Mr. Johnson as the president of NALT attested to in

12  2008 when this was executed; is that right?

13       A.   Correct.

14       Q.   And does NALT stand by those whereas

15  clauses and the determinations reached therein to

16  this day?

17       A.   It does.

18       Q.   Early in your testimony Mr. Walker

19  showed you some -- some regulations that related to

20  the extinguishment of conservation easements.  Do

21  you recall that?

22       A.   I do.

23       Q.   In the case at hand NALT is still a

24  holder of the conservation easement on Weehaw

25  Plantation, is it not?

30(b)(6) Steven William Carter                          January 14, 2025
MST, LLC v. North American Land Trust, et al.

                                                        Page 278

 1    with the right to develop five of the building

 2    envelopes removed is $2,400,000; is that right?

 3              A.   Yes, sir.

 4              Q.   And so that would be a difference in

 5    value of 3,450,000 as determined by Pamela Ghents

 6    Ness of Cromartie Appraisal Service; is that right?

 7              A.   Correct.

 8              Q.   Okay.  And is this the document that

 9    the North American Land Trust relied on in

10    determining that there was no inurement in value to

11    the Youngs as a result of the amendment?

12              A.   That's my understanding.

13              Q.   Okay.  We looked at some drafts of the

14    amendment.  Do you recall that?

15              A.   I do.

16              Q.   And if you would, please, can you go to

17    page 758, NALT page 758.  I want to draw your

18    attention to one of the bracketed sentences that is

19    struck here, and it's just past about halfway down.

20              A.   Excuse me.

21              Q.   There is a note in here that says, must

22    discuss whether hospital parcel should remain

23    subject to the easement to the limited extent

24    necessary to assure that it remains restricted to

25    use for a hospital and related uses.

30(b)(6) Steven William Carter                      January 14, 2025
MST, LLC v. North American Land Trust, et al.

                                                    Page 279

1              Do you see that?

2         A.    I do.

3         Q.    And that note was struck from the draft

4    amendment, and ultimately the amendment nor any

5    other document that you're aware of restricts the

6    use of the hospital parcel for use as a hospital or

7    medical-related uses; is that right?

8         A.    Correct.

9         Q.    Is that something that was discussed

10   amongst North American Land Trust and Georgetown

11   Memorial Hospital as these negotiations were going?

12        A.    According to the records it seems that

13   way, yes.

14        Q.    Okay.  And I believe that Ms. Tillman

15   touched on this, but there are some other notes in

16   here in all caps as well where it -- in the next

17   paragraph down where it says, must be able to

18   substantiate this statement with biological and

19   other evidence, in -- in regard to one of the

20   whereas clauses, right?

21        A.    Yes, sir.

22        Q.    Do you have any reason to believe that

23   NALT did not conduct its own internal analysis to

24   be able to substantiate that statement with

25   biological and other evidence?